**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re:** | **Chapter 11 Case** |
| **INTERGALACTIC THERAPEUTICS, INC., f/k/a IGTX, LLC,** | **No. 23-41067** |
| **Debtor.** | |

**DEBTOR'S EMERGENCY MOTION FOR APPROVAL OF**
**DEBTOR-IN-POSSESSION FINANCING**

Intergalactic Therapeutics, Inc. (the "Debtor" or the "Company") respectfully moves the Court pursuant to Sections 105, 363, and 364 of the United States Bankruptcy Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Massachusetts Local Bankruptcy Rules ("MLBR") 4001-2 for the entry of an interim order on an emergency basis (the "Interim Order') substantially in the form attached hereto as Exhibit A, and following a Final Hearing to be set by the Court, entry of a final order (the "Final Order") authorizing secured debtor-in-possession financing from ATP Life Sciences or its nominee.  In further support of this motion, the Debtor relies upon and incorporates by reference the *Affidavit of Charles Allen, President, in Support of First Day Motion* (the "First Day Affidavit") and states as follows:

**Jurisdiction**

1.      This Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

1

2.      The bases for relief are Sections 105, 363 and 364 of the Bankruptcy Code,

Bankruptcy Rule 4001 and MLBR 4001-2.

**Background**

3.      On December 18, 2023 (the "Petition Date"), the Debtor filed a petition for relief

under chapter 11 of the title 11 of the Bankruptcy Code in the United States Bankruptcy Court

for the District of Massachusetts (the "Court").  The Debtor continues to operate as debtor-in-

possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code.

4.      A detailed description of the Debtor, including its business operations, its

corporate and capital structure, the events leading to the commencement of this chapter 11 case

and the facts and circumstances supporting this Motion, are set forth in greater detail in the First

Day Affidavit and incorporated by reference herein.

5.      As is more fully set forth in the First Day Affidavit, the Debtor intends to pursue a

sale of substantially all its assets pursuant to section 363 of the Bankruptcy Code to its majority

shareholder, ATP Life Sciences Ventures or its nominee.  Toward that end, the Debtor has

substantially drafted an asset purchase agreement and intends to file a motion to approve the sale

subject to higher offers, and to establish bidding procedures in connection with the sale.

6.      In connection with the proposed sale, ATP Life Sciences Ventures or its nominee

("DIP Lender") has agreed to provide a postpetition lending facility ("DIP Facility") to fund the

administration of the case and the implementation of the sale process including solicitation of

higher and better offers.

7.      The Debtor intends to retain an investment banker to assist the Debtor in

marketing its assets and soliciting counteroffers.  In this regard, the Debtor intends to file an

application to employ an investment banker.

8.      The Debtor's operations were largely funded prepetition by investments totaling approximately $96,000,000 by ATP Life Sciences.  ATP Life Sciences is an affiliate of Apple Tree Partners ("ATP"), a private equity fund that holds interests in a number of life science companies.

9.      In 2020, the Debtor incurred a net loss of $10,789,000 and used cash in operations of $10,031,000.

10.     In 2021, the Debtor incurred a net loss of $28,941,000 and used cash in operations of $24,869,000.

11.     In 2022, the Debtor incurred a net loss of $51,830,000 and used cash in operations of $39,535,000.

12.     In the six-month period January 1, 2023 through June 30, 2023, the Debtor incurred a net loss of $12,969,000 and used cash in operations of $14,482,000.

13.     As of the Petition Date, the Debtor had approximately $208,000 in cash.  The Debtor's other principal assets consist of:

   a.   Intellectual property, including a portfolio of patents and trademarks, research and clinical trial data, research materials, and software URLs, as well as any tangible personal property directly related to such intellectual property (the "Intellectual Property");

   b.   The Debtor's rights in the Collaboration Agreement with Galvanize Therapeutics, Inc. ("Galvanize"), an ATP affiliated entity, which is more fully described in the *First Day Affidavit*.

14.     The book value of the Debtor's remaining assets as of November 30, 2023 was approximately $400,000.  The fair value of its assets is undetermined.

15.     The claims of unsecured creditors against the Debtor are estimated to total approximately $20,000,000.

16.     As set forth above, the Debtor is currently negotiating an asset purchase agreement with ATP Life Sciences Ventures.  In order to enable implementation of the sale process, including marketing the Debtor's assets to potential counterofferors, the Debtor has entered into the DIP Facility with the DIP Lender.

17.     Attached as <u>Exhibit B</u> is a Term Sheet setting forth the terms and conditions of the proposed DIP Facility.  The material terms and conditions of the DIP Facility are summarized below.  The Debtor and the DIP Lender have agreed upon an initial budget, which is annexed to the Term Sheet.

| DIP Facility/ Use of Proceeds | **DIP Facility**: The DIP Facility shall be comprised of senior secured superpriority delayed multiple-draw term loans (the "<u>DIP Facilitys</u>" and the commitment of the DIP Lender to make the DIP Facilitys, the "<u>Commitment</u>") in an aggregate amount of up to $750,000.  Amounts paid or prepaid under the DIP Facilitys may not be reborrowed. |
|---|---|
| | **Use of DIP Facility Proceeds**: Subject to the terms and conditions herein, the proceeds of the DIP Facility (including the Interim Facility (as defined below)) shall be used in accordance with the terms of the Budget (as defined below) to provide working capital, and for other general corporate purposes of the Company (including, without limitation, to market and sell certain assets of the Debtor included in the 363 Sale (as defined below)), and to pay administration costs of the Chapter 11 Case and claims or amounts approved by the Bankruptcy Court. |
| | **Restrictions on Use of Funds**: No portion of the Company's cash collateral and other cash (collectively, the "<u>Cash Collateral</u>"), the DIP Facility, the Collateral (as defined below) or the "Carve-Out" (as defined below) may be used: |
| | (a) for any purpose that is prohibited under the Bankruptcy Code or the Chapter 11 Order; |
| | (b)  to finance in any way: (i) any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type adverse to the |

4

| | |
|---|---|
| | interests of the DIP Lender, and its respective rights and remedies under DIP Facility Documents, the Asset Purchase Agreement and other documents related to the 363 Sale, the Interim Order, and the Final Order, (ii) any other action which with the giving of notice or passing of time would result in a DIP Event of Default (as defined below) under the DIP Facility Documents;<br><br>(c) to make any distribution under a plan of reorganization in the Chapter 11 Case;(d) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender; and/or<br><br>(e) for any purpose or in any manner not approved in the Budget or by the DIP Lender. |
| **Availability** | **Interim Availability**: During the period commencing on the date (the "Interim Order Entry Date") of the Bankruptcy Court's entry of an interim order ("Interim Order") approving the DIP Facility or the terms hereof without modification, but prior to the entry of a final order ("Final Order" and the Interim Order as applicable, the "Chapter 11 Order") approving the DIP Facility or the terms hereof without modification  such earlier date upon the occurrence of a maturity event , the maximum amount available to be drawn under the DIP Facility shall be limited to $225,000 (the "Interim Facility"), subject to compliance with the terms, conditions and covenants herein and in accordance with the Budget. All DIP Facilitys made under the Interim Facility shall be due and payable on the date that is 30 calendar days after the entry of the Interim Order (unless such date is extended by DIP Lender) or such earlier date upon the occurrence of a maturity event (the "Interim Facility Maturity Date"), unless a Final Order approving the DIP Facility in form and substance satisfactory to the DIP Lender shall have been entered by the Bankruptcy Court on or before such date.<br><br>**Full Availability:**  Upon the Bankruptcy Court's entry of the Final Order (the "Final Order Entry Date"), the full remaining amount of the Commitment shall be available to the Debtor in incremental amounts in multiple draws in the discretion of the Debtor for the period between the Closing Date to the Maturity Date, subject to compliance with the terms, conditions and covenants described herein, including without limitation the Budget, and the delivery of a borrowing notice (the "Full Availability"). |
| **Budget** | **Budget.**  "Budget" means (i) the initial budget projecting operations for the ensuing thirteen (13) week period including cash flow forecast |

|  | of receipts and disbursements ("Initial Budget"); and (ii) each weekly cash flow forecast of receipts and disbursements update (in substantially the same format as the prior monthly cash flow forecast of receipts and disbursements) submitted by the Company no less frequently than once every four weeks commencing on the Wednesday of the fourth week following the Petition Date. The Initial Budget is attached hereto as Annex II. Each subsequent Budget must be satisfactory to the DIP Lender. |
| **Priority and Liens/Ranking/Security/ Collateral** | **Collateral**. To secure payment of the DIP Obligations, the Company hereby grants to the DIP Lender, a senior first priority security interest, junior only to Permitted Liens and subject to the Carve-Out, in and to the Collateral. <br><br> **Collateral** means the Personal Property, and all other assets of the Company, whether now owned or hereafter acquired, and all proceeds thereof. <br><br> **Personal Property**: All of the Company's personal property, accounts, equipment, goods, inventory, and fixtures on or hereafter located upon, attached to, and/or used or required to be used in connection with the operation of the business of the Company, including, without limitation, the following types of property, as defined in Article 9 of the Uniform Commercial Code: Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Electronic Chattel Paper, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter of Credit Rights, and Supporting Obligations. <br><br> **Priority**: All DIP Obligations of the Debtor to the DIP Lender under the DIP Facility Documents, including all loans made under the DIP Facility, shall, subject to the Carve-Out, at all times: <br><br> (a) pursuant to Bankruptcy Code section 364(c)(1), be entitled to superpriority administrative expense claim status in the Chapter 11 Case, which claim in respect of the DIP Facility shall be superior to all other claims; <br> (b) following the entry of the Final Order, pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on all unencumbered assets of the Debtor (now or hereafter acquired and all proceeds thereof); and <br><br> (c) subject to the succeeding paragraph, pursuant to Bankruptcy Code section 364(c)(3), have a junior lien on all assets of the Debtor (now or hereafter acquired and all proceeds thereof) that are encumbered by Permitted Liens. |

| | |
|---|---|
| | **Permitted Lien:** A valid, non-avoidable lien that was perfected as of the Petition Date, or following the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code.<br><br>The liens to be granted by the Bankruptcy Court shall cover all of the Collateral, except claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code and proceeds therefrom.<br><br>**Carve-Out**: All DIP Obligations (and the repayment thereof), and liens and security interests, and superpriority claims of the DIP Lender securing the DIP Facility and DIP Obligations shall be subject to and subordinate to a carve out (the "Carve-Out") for payment of (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court that are (i) incurred prior to the Maturity Date, and (ii) included in the Budget; plus (b) all allowed fees and expenses of professionals retained by the Debtor, other than ordinary course professionals ("Professionals"), in the Chapter 11 Case that are (i) incurred prior to the Maturity Date, and (ii) included in the Budget; (c) the Additional Fee of the investment banker, as such term is defined in the engagement agreement between the Debtor and the investment banker; plus (d) all allowed fees and expenses of Professionals after the occurrence of the Maturity Date, in an amount not to exceed $50,000; plus (d) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court after the Maturity Date.<br><br>All of the liens described herein with respect to the assets of the Debtor shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the DIP Lender may take whatever action, and the Debtor shall authorize and execute any documents related thereto, that it reasonably believes is advisable to perfect the liens granted herein (including, without limitation, the filing of UCC financing statements, the giving of notices, and the endorsement of notices on title documents). |
| **Maturity** | **Borrowings** shall be repaid in full (subject to the Carve-Out), and the Commitment shall terminate, on the earliest to occur of the Interim Facility Maturity Date, the closing of the 363 Sale, the occurrence of a DIP Event of Default, and March 22, 2024 (the "Maturity Date").<br><br>Any confirmation, conversion or dismissal order entered in the Chapter 11 Case shall not discharge or otherwise affect in any way any of the obligations of the Company to the DIP Lender under the DIP Facilities and the DIP Facility Documents, other than after the payment in full and in cash, to the DIP Lender of all DIP Obligations |

7

| | |
|---|---|
| | (subject to the Carve Out) under the DIP Facility and the DIP Facility Documents on or before the effective date of a plan of reorganization or any conversion or dismissal order and the termination of the Commitment. |
| **Interest and Fees** | The interest rate for the DIP Facility is SOFR plus 2%.<br><br>Interest shall accrue on the principal balance of the DIP Facility, from time to time, based on a 360 day year and charged for the actual number of days outstanding. The Debtor shall pay interest, default interest and any fees on the Maturity Date. |
| **363 Sale Milestones** | The following events shall constitute the 363 sale milestones (each, a "363 Sale Milestone"):<br><br>(a) As promptly as possible but in no event later than ten (10) calendar days after the Petition Date (the "Sale Motion Filing Date"), the Debtor shall file a motion ("Sale Motion") seeking the entry of an order approving the sale of all or substantially all of the Company's assets free and clear of all liens, claims and interests, junior only to Permitted Liens and subject to the Carve-Out, (the "363 Sale") to the DIP Lender or its designee pursuant to section 363 of the Bankruptcy Code (the "Stalking Horse Purchaser") and shall file a motion establishing and approving the Bidding Procedures (as defined below, the "Bid Procedures Motion");<br><br>(b) Within seven (7) calendar days after the Sale Motion Filing Date, the Bankruptcy Court shall enter an order (i) approving the Bid Procedures Motion consistent with this term sheet; and (ii) scheduling the date for an auction of all or substantially all of the Company's assets (the "Auction"), if necessary, and the hearing to consider approval of the 363 Sale. Such order (the "Bidding Procedures Order") will (x) specify that the DIP Lender, and any designee thereof, have the unconditional right to credit bid the outstanding amount of the DIP Obligations for any and all assets offered for sale by the Company, (y) require that any overbids at the Auction must provide sufficient cash purchase price to pay off the DIP Obligations in cash, and in full, (z) be otherwise reasonably acceptable to the DIP Lender, which Bidding Procedures Order shall further provide:<br><br>    (i) That overbids shall be due by at least three (3) business days before the hearing on the Sale Motion. Order (the "Overbid Deadline"); |

|  | (ii) | In the event of a successful overbid by a counterofferor, the Stalking Horse Purchaser shall be entitled to a breakup fee (the "Breakup Amount") in an amount equal to (x) $50,000 plus (y) the reasonable fees and expenses of the Stalking Horse Purchaser, not to exceed $50,000; |
|  | (iii) | That if any qualified overbid has been received by the Overbid Deadline in the business judgment of the Debtor, the Debtor shall conduct the Auction in accordance with the Bidding Procedures Order; |
|  | (iv) | That if the Debtor selects the bid of any entity other than the Stalking Horse Purchaser as the highest and best offer at the Auction, the Stalking Horse Purchaser shall be paid a fee equal to the Breakup Amount in cash at the closing of the 363 Sale; |
|  | (v) | That if no qualified overbid has been timely received by the Overbid Deadline in the business judgment of the Debtor, the Auction shall be canceled and the Debtor shall seek entry of the 363 Order (as defined below) for the 363 Sale to the Stalking Horse Purchaser in form and substance reasonably satisfactory to the Stalking Horse Purchaser; |
|  | (c) | Within [three (3)] business days after the conclusion of the Auction, or, if not Auction is conducted, the date set for the Auction pursuant to the Bidding Procedures Motion, the Court shall have entered an order approving the 363 Sale. |
|  | (d) | Within twenty (20) calendar days after entry of the 363 Order, the Debtor shall have consummated the 363 Sale. |

18.     Pursuant to Massachusetts Local Bankruptcy Rule 4001-2(d), the Debtor notes

that the following terms and conditions of the DIP Facility vary from the requirements of MLBR

4001-2(c):

a.   **Right to Relief from Stay**.  Following seven (7) days' notice of such DIP Event of Default to the Debtor, any official committee of unsecured creditors, and the U.S. Trustee, unless such DIP Event of Default is cured within such time or an order of

the Bankruptcy Court is entered to the contrary, the DIP Lender shall have relief from the automatic stay to exercise remedies under the DIP Facility Documents.

b. **Payment of secured creditor's expenses**: The Debtor shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the DIP Lender and its affiliates (including, in each case, the reasonable fees, charges and disbursements of counsel and advisors for such persons, including, without limitation, local counsel to such persons in any relevant jurisdiction), in connection with the preparation, negotiation, execution, delivery and administration of the DIP Facility and the DIP Facility Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), or related to the Chapter 11 Case and (ii) all documented out-of-pocket expenses incurred by the DIP Lender (including, in each case, the fees, charges and disbursements of counsel (including, without limitation, local counsel to such persons in any relevant jurisdiction) and advisors for the DIP Lender) in connection with the enforcement or protection of its rights (A) relating to or arising out of, in connection with or the result of the DIP Facility and the DIP Facility Documents, (B) relating to or arising out of, in connection with, or as a result of, the DIP Facilitys made hereunder, including all such documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such DIP Facilitys or (C) relating to or arising out of, in connection with or the result of the commencement, defense, conduct of, intervention in, or the taking of any other action (including, without limitation, preparation for and/or response to any subpoena or document request) related to the DIP Facility, the DIP Facility Documents or the DIP Facilitys in any action, litigation, investigation, or proceeding.

c. **Termination:** The occurrence of any of the following events shall constitute an event of default:
(i)Any Debtor Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the DIP Lender, claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest created by the Interim Order or the Final Order with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by a Debtor Party which contests the validity, perfection or enforceability of any of the liens and security interests of the DIP Lender created by the Interim Order or the Final Order.

d. **Release of Liability**: The Debtor shall indemnify the DIP Lender and each related party of any of the foregoing persons (each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, costs and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred

10

by any Indemnitee or asserted against any Indemnitee by any person (including
the Debtor) arising out of, in connection with, or as a result of (i) the execution or
delivery of the DIP Facility, any DIP Facility Document or any agreement or
instrument contemplated hereby or thereby, the performance by the parties hereto
of their respective obligations hereunder or thereunder, the consummation of the
transactions contemplated hereby or thereby, or the administration of the DIP
Facility and the DIP Facility Documents, (ii) any DIP Facility or the use or
proposed use of the proceeds therefrom, (iii) any breach or violation by the
Company of its obligations under, or any misrepresentation by the Company
contained in, this DIP Facility or the other DIP Facility Documents, or (iv) any
other action or inaction by, or matter which is the responsibility of, the Company,
or (v) any actual or prospective claim, litigation, investigation or proceeding
relating to any of the foregoing, whether based on contract, tort or any other
theory, whether brought by or on behalf of any person (including the Debtor), and
regardless of whether any Indemnitee is a party thereto; provided that such
indemnity shall not, as to any Indemnitee, be available to the extent that such
losses, claims, damages, liabilities, costs or related expenses are determined by a
court of competent jurisdiction by final and nonappealable judgment to have
resulted from the gross negligence or willful misconduct of such Indemnitee, if
the Debtor has obtained a final and nonappealable judgment in its favor on such
indemnification claim by such Indemnitee as determined by a court of competent
jurisdiction. This provision shall not apply with respect to taxes other than any
taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

19.     The Debtor has not started human trials of its drug therapy and there is no

certainty of whether that product will be commercialized.  The Debtor has no revenues.  Mr.

Madden has contacted several potential providers of debtor-in-possession financing and believes

that the Debtor is unable to obtain financing on terms equal to or better than that provided in the

proposed Term Sheet.

20.     In compliance with MLBR 4001-2, the proposed order specifically states that the

proposed terms and conditions vary from the requirements of section (c) of MLBR 4001-2 and

the proposed terms are conspicuously and specifically set forth in the proposed agreement.

**Basis for Relief**

21.      Section 364 of the Bankruptcy Code allows a debtor-in-possession to (a) obtain

unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the

ordinary course of business, (c) obtain credit with specialized priority and (d) obtain secured

credit by granting a secured lien on property of the estate.  *See* 11 U.S.C. § 364.  If a debtor-in-

possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize

credit that is secured by liens on the debtor's property.

22.      Sections 364(c) and (d) of the Bankruptcy Code provide that the estate

representative demonstrate that alternative sources of credit are not available under 364(a) or (b).

*See In re Ames Dept. Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)("debtor is not required to

seek credit from every possible source . . . [but only to] show that it has made a reasonable effort

to seek other sources of credit available.").  Against this backdrop, a Court will evaluate the facts

and circumstances of a debtor's case and will grant significant weight to an estate

representative's business judgment regarding the necessity for obtaining the requested financing.

*Id.* at 40.

23.      In order to effectuate the sale and to allow the Debtor an opportunity to market its

assets and solicit higher and better offers, the Debtor requires the funding being provided under

the DIP Facility. Absent the DIP Facility, the Debtor would be required to sell its assets under a

forced liquidation, which would substantially de-value those assets to the detriment of all

constituencies.

24.      Notice of this Motion will be served on: (a) the United States Trustee (the "U.S.

Trustee"); (b) each of the Debtor's twenty (20) largest non-priority unsecured creditors; (c)

counsel to the DIP Lender; (d) any party asserting a lien against any of the Debtor's assets; and

(d) all known taxing authorities which may assert claims against the Debtors (collectively, the "Notice Parties"). Such notice constitutes sufficient and adequate notice of the Motion and the relief granted in this order pursuant to the applicable Federal Rules of Bankruptcy Procedure and the Local Rules.

**WHEREFORE,** the Debtor requests (a) that the Court enter an interim order substantially in the form attached hereto as Exhibit A; (b) set a Final Hearing on this Motion; and (c) grant such other relief as the Court deems just and proper.

INTERGALACTIC
THERAPEUTICS, f/k/a
IGTX, LLC,
By its proposed counsel,

*/s/ Andrew G. Lizotte*
Harold B. Murphy (BBO #326610)
Andrew G. Lizotte (BBO #559609)
MURPHY & KING, P.C.
28 State Street, Suite 3101
Boston, MA 02109
(617) 423-0400
alizotte@murphyking.com

Dated: December 19, 2023

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>**INTERGALACTIC THERAPEUTICS,**<br>**INC., f/k/a IGTX, LLC**<br><br>Debtor. | **Chapter 11**<br><br>**Case No. 23-41067** |

**INTERIM ORDER (A) AUTHORIZING POSTPETITION FINANCING ON PRIORITY**
**SECURED BASIS, AND (B) GRANTING RELATED RELIEF**

This matter having come before the Court on the Debtor's *Emergency Motion for Approval of Debtor-in-Possession Financing and Related Relief* (the "Motion") filed by the above-captioned debtor and debtor-in-possession (the "Debtor"); and the Motion having sought the entry of an order: (a) authorizing the Debtors to obtain secured debtor-in-possession financing (the "DIP Facility") from ATP Life Sciences Ventures or its nominee (the "DIP Lender") pursuant to the terms and conditions of the Term Sheet[1] attached to the Motion as Exhibit A; (b) granting a senior first priority security interest, junior only to Permitted Liens and subject to the Carve-Out; and (c) granting related relief; and the Court having considered the Motion; and the initial hearing to consider the approval of the Motion, on an interim basis, having been held on [date] (the "Hearing"); and after due deliberation and consideration and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS:

A.      On December 19, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

---

[1]      Capitalized terms not otherwise defined in this order shall have the meanings ascribed to them in the Motion.

1

B.      <u>Jurisdiction</u>.  The Motion is a core-proceeding as defined in 28 U.S.C. §
157(b)(2)(D) and (M).  The Court has jurisdiction over this case and the property affected by this
order pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28
U.S.C. §§ 1408 and 1409.

C.      <u>Notice</u>.  Notice of the relief sought by the Motion and the Hearing were served
on: (a) the United States Trustee (the "<u>U.S. Trustee</u>"); (b) each of the Debtor's twenty (20)
largest non-priority unsecured creditors; (c) counsel to the DIP Lender; (d) any party asserting a
lien against any of the Debtor's assets; and (d) all known taxing authorities which may assert
claims against the Debtors (collectively, the "<u>Notice Parties</u>"). Such notice constitutes sufficient
and adequate notice of the Motion and the relief granted in this order pursuant to the applicable
Federal Rules of Bankruptcy Procedure and the Local Rules.

D.      The Debtor is in need of the DIP Facility to preserve the value of its assets.

E.      Based on the record before this Court: (I) it appears that the DIP Facility has been
negotiated in good faith between the Debtors and the DIP Lender; (ii) it appears that the terms of
the DIP Facility are fair and reasonable and reflect the exercise of the Debtor's prudent business
judgment; and (iii) the terms of the DIP Facility, as provided in this order, have been negotiated
at arms' length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The Motion is hereby granted on an interim basis.

2.      The DIP Facility is approved, on an interim basis, on terms and conditions set
forth in the Term Sheet except as modified by this order, in an amount up to $225,000 subject to
compliance with the terms, conditions and covenants in the Term Sheet and in accordance with
the Budget.

3.      To secure the amounts borrowed by the Debtor pursuant to this order, the DIP

Lender is hereby granted: (a) a senior first priority security interest, junior only to any valid, non-

avoidable lien that was perfected as of the Petition Date or following the Petition Date to the

extent permitted by section 546(b) of the Bankruptcy Code and subject to the Carve-Out.

4.      All of the liens described herein with respect to the assets of the Debtor shall be

effective and perfected of the date of this Order and without the necessity of the execution of

security agreements, pledge agreements, financing statement or other agreements.

Notwithstanding the foregoing, the DIP Lender my take whatever action, and the Debtor shall

authorize and execute any documents related thereto, that it reasonably believes is advisable to

perfect the liens granted herein.

5.      All amounts owing by the Debtor under the DIP Facility at all times will

constitute allowed super-priority administrative expense claims in this chapter 11 case (and any

successor case under chapter 7 of the United States Bankruptcy Code) under section 364(c)(1) of

the Bankruptcy, having priority over all pre-petition and post-petition liabilities, including any

and all administrative expenses of the kind specified in sections 326, 328, 330, 331,  503(b),

506(c), 507(a), 507(b),  364(c)(1) and/or 726 of the Bankruptcy Code; provided however, the

proceeds of the Debtor's claims and causes of action arising under chapter 5 of the Bankruptcy

Code shall not be subject to such super-priority administrative claim.

6.      Any amounts advanced by the DIP Lender pursuant to the DIP Facility and this

order are advanced in "good faith" as that term is defined by Section 364(e) of the Bankruptcy

Code.

7.      The Court has not been asked to find, and it does not find, that any asserted pre-

petition mortgage, lien or security interest is valid or perfected.  Nothing contained in this order

is intended, or shall be deemed, to be a ruling on the extent or validity of any creditor's asserted

pre-petition security interest, lien or claim, and all parties' rights, claims and defenses with

respect thereto are fully preserved.

8.      The provisions of this order shall be binding upon and inure to the benefit of the

DIP Lender and the Debtor, and their respective successors and assigns.

9.      The Court shall retain jurisdiction to enforce this order and to determine and

disputes arising from or related to this order.

10.      In the event of default under the DIP Facility, the DIP Lender may immediately

stop advancing under the DIP Facility without further notice. Following seven (7) days' notice of

an event of default to the Debtor, any official committee of unsecured creditors, and the U.S.

Trustee, unless such event of default is cured within such time or an order of the Bankruptcy

Court is entered to the contrary, the DIP Lender shall have relief from the automatic stay to

exercise remedies under the DIP Facility Documents.

11.      and  shall have the right to request from this Court an emergency hearing, on

three (3) business days' notice, to seek relief from the automatic stay including, without

limitation, for the purposes of exercising any or all rights and remedies available under the DIP

Liens and any other relief this Court determines to be just and proper; provided, however, that if

the automatic stay is no longer in effect as to the DIP Lender, the DIP Lender may, subject to the

terms of this order (including without limitation paragraph 5 of this order), exercise all such

rights and remedies without further order of the Bankruptcy Court.

12.      Subject to the terms of this order, the Debtor is authorized and directed to perform

all acts required under or in connection this order, including, without limitation, to pay to the

DIP Lender of amounts under the DIP Facility as and when due, and to execute and deliver to the

DIP Lender any other documents, instruments and agreements that the DIP Lender reasonably

determines to be necessary or appropriate in connection with the DIP Facility which shall be

prepared by the DIP Lender.

13.     The provisions of this order, including the grant of claims and Liens to or for the

benefit of the DIP Lender, and any actions taken pursuant hereto shall survive the entry of any

order converting this chapter 11 case to a case under chapter 7 of the Code or dismissing this

chapter 11 case.

**14.     The provisions of the Term Sheet depart from the provisions of**

**Massachusetts Local Bankruptcy Rule 4001-2(c) in the following respects:**

    **a.  Right to Relief from Stay.**  Following [seven (7) days' notice of such DIP Event
      of Default to the Debtor, any official committee of unsecured creditors, and the
      U.S. Trustee, unless such DIP Event of Default is cured within such time or an
      order of the Bankruptcy Court is entered to the contrary, the DIP Lender shall
      have relief from the automatic stay to exercise remedies under the DIP Facility
      Documents.

    **b.  Payment of secured creditor's expenses**: The Debtor shall pay (i) all reasonable
      and documented out-of-pocket expenses incurred by the DIP Lender and its
      affiliates (including, in each case, the reasonable fees, charges and disbursements
      of counsel and advisors for such persons, including, without limitation, local
      counsel to such persons in any relevant jurisdiction), in connection with the
      preparation, negotiation, execution, delivery and administration of the DIP
      Facility and the DIP Facility Documents or any amendments, modifications or
      waivers of the provisions hereof or thereof (whether or not the transactions
      contemplated hereby or thereby shall be consummated), or related to the Chapter
      11 Case and (ii) all documented out-of-pocket expenses incurred by the DIP
      Lender (including, in each case, the fees, charges and disbursements of counsel
      (including, without limitation, local counsel to such persons in any relevant
      jurisdiction) and advisors for the DIP Lender) in connection with the enforcement
      or protection of its rights (A) relating to or arising out of, in connection with or
      the result of the DIP Facility and the DIP Facility Documents, (B) relating to or
      arising out of, in connection with, or as a result of, the DIP Facilitys made
      hereunder, including all such documented out-of-pocket expenses incurred during
      any workout, restructuring or negotiations in respect of such DIP Facilitys or (C)
      relating to or arising out of, in connection with or the result of the
      commencement, defense, conduct of, intervention in, or the taking of any other
      action (including, without limitation, preparation for and/or response to any

subpoena or document request) related to the DIP Facility, the DIP Facility
Documents or the DIP Facilitys in any action, litigation, investigation, or
proceeding.

**c.  Termination:** The occurrence of any of the following events shall constitute an
event of default:

(i) Any Debtor Party shall attempt to invalidate, reduce or otherwise
impair the liens or security interests of the DIP Lender, claims or rights
against such person or to subject any Collateral to assessment pursuant to
Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest
created by the Interim Order or the Final Order with respect to Collateral
shall, for any reason, cease to be valid or (iii) any action is commenced by
a Debtor Party which contests the validity, perfection or enforceability of
any of the liens and security interests of the DIP Lender created by the
Interim Order or the Final Order.

**d.  Release of Liability**: The Debtor shall indemnify the DIP Lender and each related
party of any of the foregoing persons (each such person being called an
"Indemnitee") against, and hold each Indemnitee harmless from, any and all
losses, claims, damages, liabilities, costs and related expenses (including the fees,
charges and disbursements of any counsel for any Indemnitee), and shall
indemnify and hold harmless each Indemnitee from all fees and time charges and
disbursements for attorneys who may be employees of any Indemnitee, incurred
by any Indemnitee or asserted against any Indemnitee by any person (including
the Debtor) arising out of, in connection with, or as a result of (i) the execution or
delivery of the DIP Facility, any DIP Facility Document or any agreement or
instrument contemplated hereby or thereby, the performance by the parties hereto
of their respective obligations hereunder or thereunder, the consummation of the
transactions contemplated hereby or thereby, or the administration of the DIP
Facility and the DIP Facility Documents, (ii) any DIP Facility or the use or
proposed use of the proceeds therefrom, (iii) any breach or violation by the
Company of its obligations under, or any misrepresentation by the Company
contained in, this DIP Facility or the other DIP Facility Documents, or (iv) any
other action or inaction by, or matter which is the responsibility of, the Company,
or (v) any actual or prospective claim, litigation, investigation or proceeding
relating to any of the foregoing, whether based on contract, tort or any other
theory, whether brought by or on behalf of any person (including the Debtor), and
regardless of whether any Indemnitee is a party thereto; provided that such
indemnity shall not, as to any Indemnitee, be available to the extent that such
losses, claims, damages, liabilities, costs or related expenses are determined by a
court of competent jurisdiction by final and nonappealable judgment to have
resulted from the gross negligence or willful misconduct of such Indemnitee, if
the Debtor has obtained a final and nonappealable judgment in its favor on such
indemnification claim by such Indemnitee as determined by a court of competent
jurisdiction. This provision shall not apply with respect to taxes other than any
taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

15.     A final hearing (the "Final Hearing") on the motion will be held on January _,

2024, at _:_ a.m., prevailing Eastern Time.  The Debtors shall promptly mail copies of this

Interim order to Notice Parties, and to any other party that has filed a request for notice wit this

Court.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and

file written objections, which objections shall be served upon the Notice Parties and shall be filed

with the Clerk of the Court by January _, 2024 at 4:30 p.m., prevailing Eastern Time.


Dated: _____          _____

827334

**EXHIBIT B**

## INTERGALACTIC THERAPEUTICS, INC.

## TERMS FOR DEBTOR-IN-POSSESSION FINANCING

The parties hereby agree to the following terms of a debtor-in-possession financing ("DIP Facility") to be used to fund working capital during the pendency of the Chapter 11 Case ("Chapter 11 Case") of Intergalactic Therapeutics, Inc.

The terms and conditions with respect to the Commitment are mutually dependent on each other, and the DIP Lender shall not be obligated to extend credit unless agreement with the Debtor (as defined below) and approval by the Bankruptcy Court is obtained with respect to such terms and conditions as a whole and without modification.

| | |
|---|---|
| **Parties** | **Debtor**: Intergalactic Therapeutics, Inc. (the "Debtor" or the "Company"), as debtor-in-possession in the case pending under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"). The date the Chapter 11 Case is commenced, which is expected to occur on or about December 19, 2023 is referred to herein as the "Petition Date." The Debtor hereby agrees to the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise, including amounts that would become due but for the operation of the automatic stay) of all obligations and all fees, indemnification payments, premium and other amounts whatsoever, whether direct or indirect, absolute or contingent, now or hereafter from time to time owing or existing to the DIP Lender under this DIP Facility and the other documents executed in connection with the DIP Facility, if any (the "DIP Loan Documents"), including all interest, fees, premium and expenses accrued or incurred subsequent to the commencement of any bankruptcy or insolvency proceeding with respect to the Company (such obligations being herein collectively called the "DIP Obligations"). |
| | **Debtor Party**:  The Debtor as such term is defined in the Bankruptcy Code. |
| | **DIP Lender**: The lender under the DIP Facility (the "DIP Lender") shall be ATP Life Sciences Ventures or its nominee. |
| **DIP Facility/ Use of Proceeds** | **DIP Facility**: The DIP Facility shall be comprised of senior secured superpriority delayed multiple-draw term loans (the "DIP Loans" and the commitment of the DIP Lender to make the DIP Loans, the "Commitment") in an aggregate amount of up to $750,000.  Amounts paid or prepaid under the DIP Loans may not be reborrowed. |
| | **Use of DIP Loan Proceeds**: Subject to the terms and conditions herein, the proceeds of the DIP Facility (including the Interim Facility (as defined below)) shall be used in accordance with the terms of the Budget (as defined below) to provide working capital, and for other general corporate purposes of the Company (including, without limitation, to market and sell certain assets |

<table>
<tr><td></td><td>

of the Debtor included in the 363 Sale (as defined below)), and to pay administration costs of the Chapter 11 Case and claims or amounts approved by the Bankruptcy Court.

**Restrictions on Use of Funds**: No portion of the Company's cash collateral and other cash (collectively, the "Cash Collateral"), the DIP Facility, the Collateral (as defined below) or the "Carve-Out" (as defined below) may be used:

    (a)  for any purpose that is prohibited under the Bankruptcy Code or the Chapter 11 Order;

    (b)  to finance in any way: (i) any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type adverse to the interests of the DIP Lender, and its respective rights and remedies under DIP Loan Documents, the Asset Purchase Agreement and other documents related to the 363 Sale, the Interim Order, and the Final Order, (ii) any other action which with the giving of notice or passing of time would result in a DIP Event of Default (as defined below) under the DIP Loan Documents;

    (c)  to make any distribution under a plan of reorganization in the Chapter 11 Case;(d)  to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender; and/or

    (e)  for any purpose or in any manner not approved in the Budget or by the DIP Lender.

</td></tr>
<tr><td>

**Availability**

</td><td>

**Interim Availability**:   During the period commencing on the date (the "Interim Order Entry Date") of the Bankruptcy Court's entry of an interim order ("Interim Order") approving the DIP Facility or the terms hereof without modification, but prior to the entry of a final order ("Final Order" and the Interim Order as applicable, the "Chapter 11 Order") approving the DIP Facility or the terms hereof without modification or  such earlier date upon the occurrence of a maturity event , the maximum amount available to be drawn under the DIP Facility shall be limited to $225,000 (the "Interim Facility"), subject to compliance with the terms, conditions and covenants herein and in accordance with the Budget. All DIP Loans made under the Interim Facility shall be due and payable on the date that is 30 calendar days after the entry of the Interim Order (unless such date is extended by DIP Lender) or such earlier date upon the occurrence of a maturity event (the "Interim Facility Maturity Date"), unless a Final Order approving the DIP Facility in form and substance satisfactory to the DIP Lender shall have been entered by the Bankruptcy Court on or before such date.

**Full Availability**:  Upon the Bankruptcy Court's entry of the Final Order (the

</td></tr>
</table>

| | |
|---|---|
| | "<u>Final Order Entry Date</u>"), the full remaining amount of the Commitment shall be available to the Debtor in incremental amounts in multiple draws in the discretion of the Debtor for the period between the Closing Date to the Maturity Date, subject to compliance with the terms, conditions and covenants described herein, including without limitation the Budget, and the delivery of a borrowing notice (the "<u>Full Availability</u>"). |
| **Budget** | <u>**Budget**</u>.  "<u>Budget</u>" means (i) the initial budget projecting operations for the ensuing thirteen (13) week period including cash flow forecast of receipts and disbursements ("<u>Initial Budget</u>"); and (ii) each weekly cash flow forecast of receipts and disbursements update (in substantially the same format as the prior monthly cash flow forecast of receipts and disbursements) submitted by the Company no less frequently than once every four weeks commencing on the Wednesday of the fourth week following the Petition Date. The Initial Budget is attached hereto as <u>Annex II</u>. Each subsequent Budget must be satisfactory to the DIP Lender. |
| **Priority and Liens/Ranking/Security/Collateral** | <u>**Collateral.**</u>  To secure payment of the DIP Obligations, the Company hereby grants to the DIP Lender, a senior first priority security interest, junior only to Permitted Liens and subject to the Carve-Out, in and to the Collateral.<br><br><u>**Collateral**</u> means the Personal Property, and all other assets of the Company, whether now owned or hereafter acquired, and all proceeds thereof.<br><br><u>**Personal Property**</u>: All of the Company's personal property, accounts, equipment, goods, inventory, and fixtures on or hereafter located upon, attached to, and/or used or required to be used in connection with the operation of the business of the Company, including, without limitation, the following types of property, as defined in Article 9 of the Uniform Commercial Code: Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Electronic Chattel Paper, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter of Credit Rights, and Supporting Obligations.<br><br><u>**Priority**</u>: All DIP Obligations of the Debtor to the DIP Lender under the DIP Loan Documents, including all loans made under the DIP Facility, shall, subject to the Carve-Out, at all times:<br><br>(a)  pursuant to Bankruptcy Code section 364(c)(1), be entitled to superpriority administrative expense claim status in the Chapter 11 Case, which claim in respect of the DIP Facility shall be superior to all other claims;<br><br>(b)  following the entry of the Final Order, pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on all unencumbered assets of the Debtor (now or hereafter acquired and all proceeds thereof); and |

3

(c) subject to the succeeding paragraph, pursuant to Bankruptcy Code section 364(c)(3), have a junior lien on all assets of the Debtor (now or hereafter acquired and all proceeds thereof) that are encumbered by Permitted Liens.

**Permitted Lien:**  A valid, non-avoidable lien that was perfected as of the Petition Date, or following the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code.

The liens to be granted by the Bankruptcy Court shall cover all of the Collateral, except claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code and proceeds therefrom.

**Carve-Out:** All DIP Obligations (and the repayment thereof), and liens and security interests, and superpriority claims of the DIP Lender securing the DIP Facility and DIP Obligations shall be subject to and subordinate to a carve out (the "Carve-Out") for payment of (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court that are (i) incurred *prior* to the Maturity Date, and (ii) included in the Budget; plus (b) all allowed fees and expenses of professionals retained by the Debtor, other than ordinary course professionals ("Professionals"), in the Chapter 11 Case that are (i) incurred *prior* to the Maturity Date, and (ii) included in the Budget; (c) the Additional Fee of the investment banker, as such term is defined in the engagement agreement between the Debtor and the investment banker; plus (d) all allowed fees and expenses of Professionals *after* the occurrence of the Maturity Date, in an amount not to exceed $50,000; plus (d) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court *after* the Maturity Date.

All of the liens described herein with respect to the assets of the Debtor shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the DIP Lender may take whatever action, and the Debtor shall authorize and execute any documents related thereto, that it reasonably believes is advisable to perfect the liens granted herein (including, without limitation, the filing of UCC financing statements, the giving of notices, and the endorsement of notices on title documents).

| | |
|---|---|
| **Closing Date** | The date on or about the Interim Order Entry Date on which the specified portion of the Commitment is made available for borrowings under the DIP Facility (the "Closing Date"), which shall be no later than three (3) business days after the Interim Order Entry Date, subject to satisfaction (or waiver by the DIP Lender) of the applicable conditions precedent set forth herein. |
| **Maturity** | Borrowings shall be repaid in full (subject to the Carve-Out), and the Commitment shall terminate, on the earliest to occur of the Interim Facility |

\NY - 045803/000015 - 8533114 v5

| | |
|---|---|
| | Maturity Date, the closing of the 363 Sale, the occurrence of a DIP Event of Default, and March 22, 2024 (the "Maturity Date"). <br><br> Any confirmation, conversion or dismissal order entered in the Chapter 11 Case shall not discharge or otherwise affect in any way any of the obligations of the Company to the DIP Lender under the DIP Facilities and the DIP Loan Documents, other than after the payment in full and in cash, to the DIP Lender of all DIP Obligations (subject to the Carve Out) under the DIP Facility and the DIP Loan Documents on or before the effective date of a plan of reorganization or any conversion or dismissal order and the termination of the Commitment. |
| **Interest and Fees** | The interest rate, default rate and fees are appended as Annex I hereto. <br><br> Interest shall accrue on the principal balance of the DIP Loan, from time to time, based on a 360 day year and charged for the actual number of days outstanding. The Debtor shall pay interest, default interest and any fees on the Maturity Date. |
| **Conditions** | **Conditions to Interim Facility.** <br><br> 1.  Interim Order/Bankruptcy Matters. <br><br> (a) The Chapter 11 Case shall have been commenced in the Bankruptcy Court and all of the "First Day Orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Case or shortly thereafter shall have been reviewed in advance by the DIP Lender and shall be in form and substance acceptable to the DIP Lender in its sole discretion. <br><br> (b) The Bankruptcy Court shall have (i) entered an Interim Order as to the DIP Facility which Interim Order shall be in form and substance satisfactory to the sole discretion of the DIP Lender, and (ii) authorized, confirmed and approved all terms and provisions of this DIP Facility and related DIP Loan Documents. The Company shall be in compliance in all respects with the Interim Order. <br><br> (c) All First Day Orders entered by the Bankruptcy Court, including but not limited to, pertaining to cash management, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the DIP Lender in its sole discretion. <br><br> (d) The DIP Lender shall have been granted, pursuant to the Chapter 11 Order, a perfected, first priority lien, junior only to Permitted Liens and subject to the Carve-Out, on all Collateral. <br><br> (e) Delivery of UCC-1 financing statements for filing under the Uniform |

Commercial Code in the jurisdiction of organization of the Company.

2.  Initial Budget.

The DIP Lender shall have received the Initial Budget, which Initial Budget shall be in form and substance satisfactory to the DIP Lender in its sole discretion.

3.  Closing Documents.

(a) The DIP Lender shall be satisfied that the Debtor has complied with all other closing conditions, including, without limitation: (i) the delivery of corporate records and documents from public officials, and officer's certificates; (ii) evidence of authority; and (iii) obtaining of any material third party and governmental consents necessary in connection with the DIP Facility, the financing thereunder and related transactions. The Debtor and the transactions contemplated herein shall be in compliance with all applicable laws and regulations.

(b) Execution and delivery by the Debtor of the DIP Loan Documents evidencing the loans made and to be made under the DIP Facility.

**Conditions to Full Availability.**

Not later than thirty (30) calendar days following the Interim Order Entry Date (unless such date is extended by the DIP Lender), a Final Order as to the DIP Facility which Final Order shall be consistent in form and substance with this DIP Facility term sheet and with such changes or modifications to the Interim Order as are approved by the DIP Lender.

**Conditions to All Loans**:

(a) The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge.

(b) All "Conditions to the Interim Facility" remain true and correct and have been satisfied in a manner satisfactory to the DIP Lender.

(c) The Debtor shall be in compliance with each Chapter 11 Order, the Interim Order (prior to entry of the Final Order), the Final Order and the DIP Facility.

(d) The DIP Lender shall have received (i) all periodic updates required under the Budget, (ii) the Reconciliation Report (as defined below),

6

and (iii) all other deliverables pursuant to the DIP Loan Documents.

(e) All costs, fees, expenses of the DIP Lender, including, without limitation, the fees and disbursements of (i) Quinn, Emanuel, Urquhart & Sullivan, LLP as counsel to the DIP Lender, (ii) local counsel to the DIP Lender, if any, in connection with the administration of the DIP Facility and any other matter related to the DIP Facility or the Chapter 11 Case, other reasonable fees and disbursements, any other compensation contemplated herein and in the DIP Loan Documents, and the Debtor shall have complied in all respects with all of its other obligations to the DIP Lender.

(f) Except as disclosed in writing, since the Petition Date no event that constitutes a Material Adverse Effect (as defined below) (other than by virtue of the commencement of the Chapter 11 Case) shall have occurred.

(g) No trustee, examiner or receiver shall have been appointed or designated with respect to the Company, its properties or assets and no motion filed by any person other than a Debtor Party that is not contested in good faith by the Debtor, shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over Collateral.

(h) There shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality (i) which relates to the DIP Facility or the transactions contemplated thereby and (ii) which is not disclosed in a schedule to the DIP Loan Documents.

(i) No DIP Event of Default has occurred and is continuing.

(j) The representations and warranties of the Debtor contained herein or in any other DIP Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct on and as of the date hereof.

(k) No notice shall exist of any challenge by a Debtor Party or by any person other than a Debtor Party that is not contested in good faith by the Debtor, of any priority, superpriority, lien, claim, right or remedy of the DIP Lender with respect to the Collateral, property, or assets of the Debtor or with respect to this DIP Facility and any Chapter 11 Order.

(l) Satisfaction of any other condition requested by the DIP Lender that arises out of or related to the proposed use of DIP Loans.

**Material Adverse Effect** means that the matter in question could reasonably

7

| | |
|---|---|
| | be anticipated to materially and adversely affect (a) the Debtor's ability to perform its obligations under any of the DIP Loan Documents, (b) the Debtor's ability to operate in conformance with the then current Budget, (c) the value, cash flow or marketability of the Collateral, either presently or as contemplated to be operated, constructed, used, leased or configured pursuant to the then current business plan of the Debtor as approved by the DIP Lender, (d) enforceability of any DIP Loan Document or the perfection or priority of any lien created under any DIP Loan Document, or (e) the business operations, economic performance, assets or condition (financial or otherwise) of the Debtor. |
| **Covenants** | The Debtor covenants and agrees that, so long as the DIP Lender shall have any Commitment hereunder or any DIP Loan or other DIP Obligation remains outstanding:<br><br>(a) <u>Reconciliation Reports</u>.  The Debtor shall deliver a weekly report/reconciliation to the DIP Lender on the third (3rd) business day of the immediately following week (the "Budget Variance Test Date"), the actual and budgeted results for such week by line item in the Budget and the cash receipts, together with a reasonably detailed written explanation of all deviation in cash receipts and disbursements , which report shall be in form and substance satisfactory to the DIP Lender and the Debtor ("<u>Reconciliation Report</u>").<br><br>(b) <u>Disbursements Permitted Variation</u>.  The Debtor shall not permit (i) the sum of actual aggregate disbursements of the Debtor for the four weeks ending immediately prior to a Budget Variance Test Date (the "<u>Budget Test Period</u>") to be greater than 110% of the aggregate amount of disbursements set forth the most recent Budget approved by the DIP Lender (the "<u>Approved Budget</u>") for such period (the "<u>Disbursements Permitted Variation</u>").  In addition, the Debtor shall notify the DIP Lender as soon as reasonably practicable if the Debtor anticipates that it will exceed the Disbursements Permitted Deviation for any Budget Test Period.<br><br>(b) <u>Chapter 11 Cases Filings</u>. The Company shall deliver to the DIP Lender and its counsel promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtor with the Bankruptcy Court in the Chapter 11 Case, or distributed by or on behalf of the Debtor to any official committee appointed in the Chapter 11 Case.<br><br>(c) <u>Delivery of Information</u>. The Company shall deliver to the DIP Lender (i) written notification, no later than the following business day, if the cash balance of the Company as of the close of business on any business day is less than $50,000 and (ii) any and all |

information and developments in connection with any proposed transaction or change of control and any other event or condition which is reasonably likely to have a Material Adverse Effect.

**Negative Covenants**: The Debtor covenants and agrees that, so long as the DIP Lender shall have any Commitment hereunder or any DIP Loan or other DIP Obligation remains outstanding, it shall not:

(a) Create or permit to exist (i) any administrative expense, unsecured claim, or other claim or lien on the Collateral, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out or as may be incurred in the ordinary course of the Debtor's business or included in the Budget, or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection.

(b) Make any change, amendment or modification, or any application or motion for any change, amendment or modification, to any Chapter 11 Order, other than as agreed in writing by the DIP Lender

(c) Make any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than as provided for in a First Day Order and included in the Budget.

(d) Declare or make any dividend, payment or other distribution directly or indirectly of cash or a non-cash asset on account of equity or ownership interests.

(e)  File with the Court a motion to approve, or otherwise seek approval of or pay, any incentive or retention plan, other than as agreed in writing by DIP Lender.

**Financial Covenants**: The DIP Facility shall be subject to the following financial covenants:

(a) The proceeds of the DIP Loans and all proceeds of Collateral shall be used by the Debtor solely for the purposes of and up to the amounts set forth in the Budget (subject to the Disbursements Permitted Deviation).

(b) If at any time there is a Deficiency, the Debtor shall promptly, but in no event later than three (3) calendar days after it reasonably believes a Deficiency exists, notify the DIP Lender.

"Deficiency" means, with respect to the Budget, if at any time the projected disbursements of the Debtor through the Maturity Date exceed (i) the projected net receipts through the Maturity Date and (ii) the remaining availability of the Commitment.

9

| | |
|---|---|
| **363 Sale Milestones** | The following events shall constitute the 363 sale milestones (each, a "<u>363 Sale Milestone</u>"):<br><br>(a) As promptly as possible but in no event later than ten (10) calendar days after the Petition Date (the "<u>Sale Motion Filing Date</u>"), the Debtor shall file a motion ("Sale Motion") seeking the entry of an order approving the sale of all or substantially all of the Company's assets free and clear of all liens, claims and interests, junior only to Permitted Liens and subject to the Carve-Out, (the "<u>363 Sale</u>") to the DIP Lender or its designee pursuant to section 363 of the Bankruptcy Code (the "<u>Stalking Horse Purchaser</u>") and shall file a motion establishing and approving the Bidding Procedures (as defined below, the "<u>Bid Procedures Motion</u>");<br><br>(b) Within seven (7) calendar days after the Sale Motion Filing Date, the Bankruptcy Court shall enter an order (i) approving the Bid Procedures Motion consistent with this term sheet; and (ii) scheduling the date for an auction of all or substantially all of the Company's assets (the "<u>Auction</u>"), if necessary, and the hearing to consider approval of the 363 Sale. Such order (the "<u>Bidding Procedures Order</u>") will (x) specify that the DIP Lender, and any designee thereof, have the unconditional right to credit bid the outstanding amount of the DIP Obligations for any and all assets offered for sale by the Company, (y) require that any overbids at the Auction must provide sufficient cash purchase price to pay off the DIP Obligations in cash and in full, and (z) be otherwise reasonably acceptable to the DIP Lender, and which Bidding Procedures Order shall further provide:<br><br>(i) That overbids shall be due by at least three (3) business days before the hearing on the Sale Motion. Order (the "<u>Overbid Deadline</u>");<br><br>(ii) In the event of a successful overbid by a counterofferor, the Stalking Horse Purchaser shall be entitled to a breakup fee (the "<u>Breakup Amount</u>") in an amount equal to (x) $50,000 plus (y) the reasonable fees and expenses of the Stalking Horse Purchaser, not to exceed $50,000;<br><br>(iii) That if any qualified overbid has been received by the Overbid Deadline in the business judgment of the Debtor, the Debtor shall conduct the Auction in accordance with the Bidding Procedures Order;<br><br>(iv) That if the Debtor selects the bid of any entity other than the Stalking Horse Purchaser as the highest and best offer at the Auction, the Stalking Horse Purchaser shall be paid a fee equal to |

| | |
|---|---|
| | the Breakup Amount in cash at the closing of the 363 Sale;<br><br>(v) That if no qualified overbid has been timely received by the Overbid Deadline in the business judgment of the Debtor, the Auction shall be canceled and the Debtor shall seek entry of the 363 Order (as defined below) for the 363 Sale to the Stalking Horse Purchaser in form and substance reasonably satisfactory to the Stalking Horse Purchaser;<br><br>(c) Within three (3) business days after the conclusion of the Auction, or, if not Auction is conducted, the date set for the Auction pursuant to the Bidding Procedures Motion, the Court shall have entered an order approving the 363 Sale.<br><br>(d) Within twenty (20) calendar days after entry of the 363 Order, the Debtor shall have consummated the 363 Sale. |
| **Representations and Warranties** | The Company represents and warrants to the DIP Lender and the DIP Lender that subject to the entry and terms of the Chapter 11 Order, the execution of the DIP Loan Documents has been duly authorized and duly and validly executed and delivered by the Debtor and constitutes the Debtor's legal, valid and binding obligation, enforceable against it in accordance with its terms. |
| **Prepayments** | **Voluntary Prepayment**: The Debtor may, at any time, (i) repay the loans under the DIP Facility and/or (ii) reduce the Commitment, in each case in full but not in part.<br><br>**Mandatory Prepayment**:<br><br>(a) Asset Dispositions. Promptly upon receipt by the Company of net cash proceeds from any asset disposition of Collateral, the Company shall prepay the DIP Obligations (subject to the Carve-Out) in an amount equal to 100% of the net proceeds so received; provided that the Debtor shall not sell assets outside the ordinary course of business unless such sale is approved by the DIP Lender in its sole discretion and by order of the Bankruptcy Court.<br><br>(b) Casualty Events and Extraordinary Receipts. The Company promptly shall (i) prepay the DIP Obligations (subject to the Carve-Out) in an amount equal to 100% of such proceeds received by the Company from Casualty Events with respect to Collateral and (ii) prepay the DIP Obligations in an amount equal to 100% of all other Casualty Events or Extraordinary Receipts (subject to the Carve-Out).<br><br>(c) Incurrence of Indebtedness. Promptly upon the incurrence or issuance by the Company of any indebtedness (other than ordinary course |

| | |
|---|---|
| | trade debt and insurance premium financing consistent with prior practice), the Company shall prepay the DIP Obligations in an amount equal to 100% of such net cash proceeds so received; provided that the Debtor shall not incur or issue additional postpetition indebtedness or grant or request authority to grant any lien or security interest to secure postpetition indebtedness unless the amount of such debt shall be sufficient to pay (and shall be used to pay) the DIP Obligations in full in cash.. |
| | "Casualty Event" means, with respect to any property (including any interest in property) of the Company, any loss of, damage to, destruction of, or condemnation or other taking of, such property for which Company receives insurance proceeds, proceeds of a condemnation award or other compensation. |
| | "Extraordinary Receipt" means any cash in excess of $25,000 received by or paid to or for the account of the Company not in the ordinary course of business and not included in the Budget, including, without limitation, tax refunds, pension plan reversions, proceeds of insurance, condemnation awards (and payments in lieu thereof), indemnity payments (including, without limitation, in connection with any acquisition) and any purchase price adjustments (including, without limitation, in connection with any acquisition). |
| **Events of Default** | The occurrence of any of the following events shall constitute an event of default (each, a "DIP Event of Default"):

(a) The Debtor shall fail to pay (i) any principal of the DIP Loans when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment; or (ii) within three (3)  business days, any interest on the DIP Loans, the fees or other sums due hereunder, when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment.

(b) The Debtor shall fail to comply with the covenants or any of the other terms and conditions of the DIP Loan Documents, or the Chapter 11 Order.

(c) Any of the 363 Sale Milestones shall not have been timely satisfied.

(d) The Chapter 11 Case shall be dismissed or converted to a Chapter 7 case under the Bankruptcy Code.

(e)  A trustee, examiner or receiver with enlarged powers shall be appointed or designated in any of the Chapter 11 Case.

(f)  Except as expressly set forth in the Interim Order, the Final Order or |

12

this DIP Facility, the Company (1) incurs any additional postpetition indebtedness or (2) grants or requests authority to grant any lien or security interest to secure any obligation of the Debtor.

(g)   The Final Order Entry Date shall not have been occurred within thirty (30) calendar days after the Interim Order Entry Date (unless such date is extended by the DIP Lender).

(h)   A Debtor Party shall take any action, including the filing of an application, in support of any of (a) through (g) hereof, or any person other than the Debtor shall do so and such application is not contested in good faith by the Debtor.

(i)   A Debtor Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim other than (x) as provided for in a First Day Order and included in the Budget or (y) otherwise consented to by the DIP Lender in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets that are included in the assets to be purchased in the Asset Purchase Agreement or to permit other actions that would have a Material Adverse Effect, or (iii) approving any settlement or other stipulation not approved by the DIP Lender and not included in the Budget with any secured creditor of the Debtor providing for payments as adequate protection or otherwise to such secured creditor.

(k)   The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any asset of the Debtor to be included in the assets to be purchased in the Asset Purchase Agreement.

(1)   Any material contract of the Debtor is rejected or otherwise terminated or any material property of the Debtor is sold, in each instance, without the prior written consent of the DIP Lender and with respect to contracts scheduled to be assumed and assigned in the Asset Purchase Agreement or with respect to property to be included in the assets purchased in the Asset Purchase Agreement.

(m)   A Debtor Party files a motion without the express written consent of DIP Lender or any person other than a Debtor Party shall do so and such application is not contested in good faith by the Debtor and such motion is not granted, to obtain additional financing from a party other than DIP Lender under Section 364(d) of the Bankruptcy Code or to use Cash Collateral under Section 363(c) of the Bankruptcy Code.

(n)   Entry of an order by the Bankruptcy Court terminating or modifying

13

the exclusive right of the Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender.

(o) The Debtor shall support any other person's opposition of any motion made in the Bankruptcy Court by the DIP Lender seeking confirmation of the amount of the DIP Lender's claim or the validity and enforceability of the Liens in favor of the DIP Lender.

(p) (i) Any Debtor Party shall seek to, shall support, acquiesce in, or not challenge (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or on behalf of the Debtor) any other person's motion to, disallow in whole or in part the DIP Lender's claim in respect of the DIP Obligations or to challenge the validity and enforceability of the Liens in favor of the DIP Lender or contest any material provision of any DIP Loan Document, (ii) such Liens and/or superpriority claims shall otherwise cease to be valid, perfected and enforceable in all respects, or (iii) or any provision of any DIP Loan Document shall cease to be effective.

(q) Any judgments which are in the aggregate in excess of $50,000 (not covered by insurance), as to any postpetition obligation shall be rendered against the Debtor and the enforcement thereof shall not be stayed.

(r) (i) Any Debtor Party shall file any pleading or proceeding which could reasonably be expected to result in an impairment of the rights or interests of the DIP Lender or (ii) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other person which results in such impairment of the rights or interests of the DIP Lender.

(s) The Debtor shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the DIP Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lender.

(t) The Debtor shall fail to pay at maturity, or within any applicable period of grace, any obligation for indebtedness in excess of $50,000 or fail to observe or perform any material term, covenant or agreement (other than any such obligation with respect to which the Bankruptcy Code prohibits the Debtor from complying with such obligation or permits the Debtor not to comply with such obligation) contained in any agreement by which it is bound, evidencing or securing Indebtedness in excess of $50,000 for such period of time as would permit (assuming the lapse of time and/or giving of

14

|  | |
|---|---|
|  | appropriate notice if required and assuming such breach has not been cured within the applicable grace period thereunder) the holder or holders thereof or of any obligations issued thereunder to accelerate the maturity thereof. |
|  | (u) There shall occur, in any single event or in a series of events (related of unrelated) any damage to, or loss, theft or destruction of, any Collateral in an amount greater than $50,000 that is not covered by insurance. |
|  | (v) (i) Any Debtor Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the DIP Lender, claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest created by the Interim Order or the Final Order with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by a Debtor Party which contests the validity, perfection or enforceability of any of the liens and security interests of the DIP Lender created by the Interim Order or the Final Order. |
|  | (w) Any party, including, but not limited to, the Debtor, files a plan of reorganization or a motion to sell all or substantially all of the Debtor's assets, in either case, without the express prior written consent of the DIP Lender. |
|  | (x) The Debtor executes or enters into a definitive purchase or sale agreement with respect to the assets of the Debtor (including, but not limited to, any stalking horse purchase or sale agreement), or otherwise pursues any sale transaction, in either case, without the express prior consent of the DIP Lender, other than those in connection with the Bidding Procedures Order. |
| **Remedies** | Immediately upon the occurrence and during the continuation of a DIP Event of Default, DIP Lender may, in its sole discretion, without further notice or grace period, take any or all of the following actions: (a)(1) declare all obligations under this DIP Facility to be immediately due and payable, (2) declare the termination, reduction or restriction of any further Commitment, to the extent any such Commitment remains, and (3) terminate the DIP Facility as to any future liability or obligation of the DIP Lender, but without affecting any of the obligations under the DIP Facility, the liens under the DIP Facility, or postpetition administrative superpriority claim status; (b) declare a termination, reduction or restriction on the ability of the Debtor to use any Cash Collateral (any such declaration shall be made to the Company, the official committee of creditors of the Company (if applicable) and the United States Trustee (if applicable), and/or (c) exercise the rights of a secured party upon default under the UCC and other applicable law. |

\NY - 045803/000015 - 8533114 v5

|  | Following seven (7) days' notice of such DIP Event of Default to the Debtor, any official committee of unsecured creditors, and the U.S. Trustee, unless such DIP Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, the DIP Lender shall have relief from the automatic stay to exercise remedies under the DIP Loan Documents.

The DIP Lender shall be authorized to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Section 363 of the Bankruptcy Code of the United States or any similar laws in any other jurisdictions to which the Company is subject, or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by the DIP Lender (whether by judicial action or otherwise) in accordance with applicable law. |
|---|---|
| **Costs and Expenses; Indemnity** | **Costs and Expenses**. The Debtor shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the DIP Lender and its affiliates (including, in each case, the reasonable fees, charges and disbursements of counsel and advisors for such persons, including, without limitation, local counsel to such persons in any relevant jurisdiction), in connection with the preparation, negotiation, execution, delivery and administration of the DIP Facility and the DIP Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), or related to the Chapter 11 Case and (ii) all documented out-of-pocket expenses incurred by the DIP Lender (including, in each case, the fees, charges and disbursements of counsel (including, without limitation, local counsel to such persons in any relevant jurisdiction) and advisors for the DIP Lender) in connection with the enforcement or protection of its rights (A) relating to or arising out of, in connection with or the result of the DIP Facility and the DIP Loan Documents, (B) relating to or arising out of, in connection with, or as a result of, the DIP Loans made hereunder, including all such documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such DIP Loans or (C) relating to or arising out of, in connection with or the result of the commencement, defense, conduct of, intervention in, or the taking of any other action (including, without limitation, preparation for and/or response to any subpoena or document request) related to the DIP Facility, the DIP Loan Documents or the DIP Loans in any action, litigation, investigation, or proceeding.

**Indemnification by the Debtor**. The Debtor shall indemnify the DIP Lender and each related party of any of the foregoing persons (each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, costs and related expenses (including the fees, charges and disbursements of any counsel for any |

| | |
|---|---|
| | Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any person (including the Debtor) arising out of, in connection with, or as a result of (i) the execution or delivery of the DIP Facility, any DIP Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or the administration of the DIP Facility and the DIP Loan Documents, (ii) any DIP Loan or the use or proposed use of the proceeds therefrom, (iii) any breach or violation by the Company of its obligations under, or any misrepresentation by the Company contained in, this DIP Facility or the other DIP Loan Documents, or (iv) any other action or inaction by, or matter which is the responsibility of, the Company, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by or on behalf of any person (including the Debtor), and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, if the Debtor has obtained a final and nonappealable judgment in its favor on such indemnification claim by such Indemnitee as determined by a court of competent jurisdiction. This provision shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim. |
| **Waiver and Amendment** | This DIP Facility and the other DIP Loan Documents constitute the entire agreement between the parties hereto, and no modification, waiver, amendment, discharge or change of this DIP Facility or any other DIP Loan Document nor any provision hereof or thereof shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought |
| **Assignments and Participations** | The DIP Lender may at any time or times and without the Debtor's consent, grant any participation in its share of the DIP Loan to one or more persons not an affiliate of the Company (each a "<u>Participant</u>"). In the event of any such grant by the DIP Lender of a participation to a Participant, the DIP Lender shall remain responsible for the performance of its obligations hereunder. |

17

| Governing Law | The Debtor submits to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the Commonwealth of Massachusetts; and shall waive any right to trial by jury.<br><br>Massachusetts law shall govern this DIP Facility and the DIP Loan Documents except to the extent preempted by federal bankruptcy laws. |
|---|---|

18

## **Annex I**

Interest:                          SOFR plus 2%

Default Interest:                  During the continuance of a DIP Event of Default, the loans
                                   and all other outstanding obligations shall bear interest at an
                                   additional 2% per annum above the interest rate otherwise
                                   applicable and such interest shall be payable in cash.

Upfront Fee:                       50bps

Nature of Fees:                    Non-refundable under all circumstances.

\NY - 045803/000015 - 8533114 v5

**Annex II**

**Initial Budget**

\NY - 045803/000015 - 8533114 v5

**Intergalactic**

*Postpetition Budget*

*($ in 000's)*

| Week Ending | Post 12/23/23 | Post 12/30/23 | Post 1/6/24 | Post 1/13/24 | Post 1/20/24 | Post 1/27/24 | Post 2/3/24 | Post 2/10/24 | Post 2/17/24 | Post 2/24/24 | Post 3/2/24 | Post 3/9/24 | Post 3/16/24 | Post 3/23/24 | Post-filing Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $201.0 | $181.0 | $277.2 | $223.2 | $157.4 | $103.8 | $502.8 | $420.0 | $377.0 | $310.2 | $269.2 | $207.4 | $173.4 | $126.6 | $201.0 |
| **DIP Loan** | -- | $225.0 | -- | -- | -- | $525.0 | -- | -- | -- | -- | -- | -- | -- | -- | $750.0 |
| **Disbursements** | | | | | | | | | | | | | | | |
| Management Salary and Benefits | -- | $17.8 | -- | $17.8 | -- | -- | $17.8 | -- | $17.8 | -- | $17.8 | -- | $17.8 | $8.9 | **$115.7** |
| Independent Director | $10.0 | -- | -- | -- | $10.0 | -- | -- | -- | $10.0 | -- | -- | -- | -- | -- | **$30.0** |
| Debtor Counsel | -- | $25.0 | $25.0 | $25.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $15.0 | $15.0 | $15.0 | $15.0 | **$255.0** |
| Debtor Financial Advisor | $10.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | **$75.0** |
| Debtor Investment Banker | -- | $75.0 | -- | -- | -- | $75.0 | -- | -- | -- | -- | -- | -- | -- | -- | **$150.0** |
| UCC Fees (legal and FA) | -- | -- | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | **$60.0** |
| Tax | -- | -- | -- | -- | -- | -- | $12.0 | -- | -- | -- | -- | -- | -- | -- | **$12.0** |
| Patent Counsel | -- | -- | $15.0 | -- | -- | -- | $10.0 | -- | -- | -- | $10.0 | -- | -- | -- | **$35.0** |
| UST Fees | -- | -- | -- | -- | $0.6 | -- | -- | -- | -- | -- | -- | -- | -- | $2.9 | **$3.5** |
| Consulting (SME to support diligence) | -- | -- | -- | $5.0 | $5.0 | $10.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | $5.0 | -- | -- | **$50.0** |
| IT | -- | $2.0 | -- | -- | -- | $3.0 | -- | -- | -- | $2.0 | -- | -- | -- | $3.0 | **$10.0** |
| Other/Misc. | -- | $4.0 | $4.0 | $8.0 | $8.0 | $8.0 | $8.0 | $8.0 | $4.0 | $4.0 | $4.0 | $4.0 | $4.0 | -- | **$68.0** |
| **Total Disbursements** | **$20.0** | **$128.8** | **$54.0** | **$65.8** | **$53.6** | **$126.0** | **$82.8** | **$43.0** | **$66.8** | **$41.0** | **$61.8** | **$34.0** | **$46.8** | **$39.8** | **$864.2** |
| **Net Cash Flow** | **($20.0)** | **$96.2** | **($54.0)** | **($65.8)** | **($53.6)** | **$399.0** | **($82.8)** | **($43.0)** | **($66.8)** | **($41.0)** | **($61.8)** | **($34.0)** | **($46.8)** | **($39.8)** | **($114.2)** |
| **Ending Cash (Book Balance)** | **$181.0** | **$277.2** | **$223.2** | **$157.4** | **$103.8** | **$502.8** | **$420.0** | **$377.0** | **$310.2** | **$269.2** | **$207.4** | **$173.4** | **$126.6** | **$86.8** | **$86.8** |