**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **In re:** ) | | **Chapter 11** |
| ) | | |
| **INTERGALACTIC** ) | | **Case No. 23-41067-EDK** |
| **THERAPEUTICS, INC. f/k/a IGTX,** ) | | |
| **LLC** ) | | |
| ) | | |
| ) | | |
| **Debtor.** ) | | |
| ) | | |

**ALDEVRON, LLC'S COUNTEROFFER PURSUANT TO THE ORDER APPROVING**
**BID PROCEDURES IN CONNECTION WITH SALE BY DEBTOR-IN-POSSESSION**
**OF INTELLECTUAL PROPERTY AND RELATED ASSETS BY PRIVATE SALE,**
**FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES**

Pursuant to and in conformity with the Bid Procedures[1], Aldevron, LLC ("Aldevron")

hereby submits this Counteroffer to purchase certain assets of the Debtor, as specifically

identified in the Aldevron Asset Purchase Agreement (the "Aldevron Asset Purchase

Agreement") attached hereto as **Exhibit A-1** (along with a redline to the Asset Purchase

Agreement by and between Intergalactic Therapeutics, Inc. and IGTX Acquisition, Inc. dated as

of January 4, 2024 attached as Exhibit A to the Sale Motion (the "Stalking Horse Asset Purchase

Agreement"), attached hereto as **Exhibit A-2**), pursuant and subject to the terms contained in

such Asset Purchase Agreement.

---

[1]       Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Order
Approving Bid Procedures in Connection with Sale by Debtor-In-Possession of Intellectual Property and Related
Assets by Private Sale, Free and Clear of Liens, Claims, Interests and Encumbrances* [Docket No. 51] (the "Bid
Procedures Order") or the Bid Procedures Motion (as defined in the Bid Procedures Order), as applicable.

## <u>COUNTEROFFER DETAILS</u>

1.      As described in the Aldevron Asset Purchase Agreement, the Purchase Price, as defined therein, satisfies the minimum purchase price requirements set forth in the Bid Procedures.

2.      As described in the Aldevron Asset Purchase Agreement, the Counteroffer does not contemplate the assignment of any contracts, and therefore no cure amount payments or contract consents are required in connection with the Counteroffer.

3.      The Counteroffer does not contain any contingencies beyond those set forth in the Aldevron Asset Purchase Agreement's closing conditions, which are consistent with the closing conditions set forth in the Stalking Horse Asset Purchase Agreement.

4.      In addition, Aldevron has taken the following actions to qualify as a Counteroffer in accordance with the Bid Procedures:

      a)   Aldevron has executed and delivered the Debtor's form Non-Disclosure Agreement;

      b)   Aldevron has transferred the Deposit, in the amount of $100,000.00, by wire transfer to the account identified by the Debtors as of March 1, 2024; and

      c)   Aldevron has delivered to the Debtors satisfactory evidence, in the form of a letter from Aldevron' s parent, Danaher Corporation, (attached as **Exhibit B** hereto) of Aldevron's financial ability to consummate the transaction on the date and upon the terms contemplated by the Asset Purchase Agreement.

5.      For the avoidance of doubt, the Counteroffer is not contingent on any financing of the purchase price or the completion of due diligence or contain any expense reimbursement or break-up or termination fee. Additionally, the Counteroffer does not waive or modify any of Aldevron's rights or interests, as set forth more fully in *Aldevron, LLC's Reservation of Rights to*

*Motion by Debtor and Debtor-In-Possession to Sell Substantially All Assets by Private Sale,*

*Free and Clear of Liens, Claims, Interests, and Encumbrances*, filed concurrently herewith.


Dated: March 1, 2024                          Respectfully Submitted,

                                              */s/ George W. Shuster, Jr.*
                                              George W. Shuster, Jr. (BBO #647306)
                                              Benjamin W. Loveland (BBO #669445)
                                              WILMER CUTLER PICKERING HALE
                                              AND DORR LLP
                                              60 State Street
                                              Boston, MA 02109
                                              Telephone: (617) 526-6000
                                              Facsimile: (617) 526-5000
                                              E-mail:
                                              george.shuster@wilmerhale.com
                                              benjamin.loveland@wilmerhale.com

**Exhibit A-1**

**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

by and between

INTERGALACTIC THERAPEUTICS, INC.,

SELLER,

and

ALDEVRON, LLC,

PURCHASER

DATED AS OF MARCH 1, 2024

**EXECUTION VERSION**

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS AND CONSTRUCTION**..............................................................**1**
Section 1.1 Definitions.............................................................................................................1
Section 1.2 Construction........................................................................................................10

**ARTICLE 2 THE TRANSACTION** ......................................................................................**11**
Section 2.1 Sale and Purchase of Purchased Assets ............................................................11
Section 2.2 Excluded Assets .................................................................................................12
Section 2.3 Assumed Liabilities ...........................................................................................13
Section 2.4 Excluded Liabilities ...........................................................................................13
Section 2.5 Consideration .....................................................................................................15
Section 2.6 [Intentionally Omitted] ......................................................................................15
Section 2.7 Allocation of Purchase Price..............................................................................15
Section 2.8 Closing ...............................................................................................................16
Section 2.9 Closing Deliveries .............................................................................................16
Section 2.10 Payment of Cure Amounts ...............................................................................17
Section 2.11 Consents ...........................................................................................................17

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER**..................**17**
Section 3.1 Organization.......................................................................................................17
Section 3.2 Authority and Enforceability .............................................................................17
Section 3.3 No Conflict..........................................................................................................18
Section 3.4 Title to Assets; Liens .........................................................................................18
Section 3.5 Administration of Regulatory Proceedings........................................................18
Section 3.6 Contracts ............................................................................................................18
Section 3.7 Intellectual Property...........................................................................................18

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**..........**19**
Section 4.1 Organization and Good Standing.......................................................................19
Section 4.2 Authority and Enforceability .............................................................................20
Section 4.3 No Conflict..........................................................................................................20
Section 4.4 Legal Proceedings..............................................................................................20
Section 4.5 [Intentionally Omitted] ......................................................................................20
Section 4.6 Independent Investigation ..................................................................................20

**ARTICLE 5 COVENANTS** ....................................................................................................**21**
Section 5.1 Access and Investigation....................................................................................21
Section 5.2 Operation of the Business ..................................................................................21
Section 5.3 [Intentionally Omitted] ......................................................................................22
Section 5.4 Commercially Reasonable Efforts .....................................................................22
Section 5.5 Supplements to Disclosure Schedules ..............................................................23
Section 5.6 Confidentiality....................................................................................................23
Section 5.7 Public Announcements .......................................................................................24
Section 5.8 Further Actions ..................................................................................................24

Section 5.9 [Intentionally Omitted...........................................................................................24
Section 5.10 Bankruptcy Court Matters...................................................................................24
Section 5.11 Bankruptcy Court Approval.................................................................................25
Section 5.12 Assumption & Rejection of Executory Contracts...............................................26
Section 5.13 Back-Up Bidder ..................................................................................................26
Section 5.14 [Intentionally Omitted] .......................................................................................26
Section 5.15 Payments Received .............................................................................................26
Section 5.16 Cessation of Use of Acquired Intellectual Property ...........................................27
Section 5.17 Transfer of Permits and Governmental Authorizations ......................................27

**ARTICLE 6 CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE** .....................**27**
Section 6.1 Conditions to the Obligation of the Purchaser.......................................................27
Section 6.2 Conditions to the Obligations of the Seller...........................................................28

**ARTICLE 7 TERMINATION**...........................................................................................**29**
Section 7.1 Termination Events...............................................................................................29
Section 7.2 Effect of Termination ...........................................................................................30

**ARTICLE 8 NO SURVIVAL** ...........................................................................................**30**
Section 8.1 No Survival of Representations and Warranties and Certain Covenants ..................30

**ARTICLE 9 TAX MATTERS** ...........................................................................................**30**
Section 9.1 Transfer Taxes ......................................................................................................30
Section 9.2 Proration Items......................................................................................................31

**ARTICLE 10 GENERAL PROVISIONS**..........................................................................**31**
Section 10.1 Notices ................................................................................................................31
Section 10.2 Amendment.........................................................................................................32
Section 10.3 Waiver and Remedies .........................................................................................33
Section 10.4 Entire Agreement ................................................................................................33
Section 10.5 Assignment, Successors and No Third Party Rights ...........................................33
Section 10.6 Severability .........................................................................................................33
Section 10.7 Exhibits and Schedules .......................................................................................34
Section 10.8 Interpretation.......................................................................................................34
Section 10.9 Expenses..............................................................................................................34
Section 10.10 Limitation on Liability.......................................................................................34
Section 10.11 Specific Performance .........................................................................................34
Section 10.12 Governing Law; Jurisdiction; Waiver of Jury Trial............................................35
Section 10.13 No Joint Venture ................................................................................................35
Section 10.14 Counterparts; Signatures....................................................................................35
Section 10.15 Preservation of Records; Post-Closing Access and Cooperation ........................35

**Exhibits**
Exhibit A – Form of Bill of Sale
Exhibit B – Form of Assignment and Assumption Agreement
Exhibit C – Form of Intellectual Property Assignment

**Schedules**

Schedule 2.1(a) - Purchased Inventory
Schedule 2.1(b) - Personal Property
Schedule 2.1(d) - Acquired Intellectual Property
Schedule 2.1(f) - Governmental Authorizations
Schedule 2.2(k) - Specifically Excluded Assets
Schedule 2.3(f) - Other Assumed Liabilities
Schedule 5.12(a)(ii) - Contract & Cure Schedule

**Seller Disclosure Schedules**

Schedule 3.6 - Contracts
Schedule 3.9(a) - Company Owned Intellectual Property, Company Used Intellectual Property
and IP Agreements
Schedule 3.9(b) - Intellectual Property Claims Brought Against the Seller
Schedule 5.2 - Operation of the Business

**EXECUTION VERSION**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of March 1, 2024, by and between Intergalactic Therapeutics, Inc., a Delaware corporation (the "Seller"), and Aldevron, LLC, a North Dakota limited liability company (the "Purchaser").

## RECITALS

WHEREAS, the Seller is a biopharmaceutical company focused on the development and commercialization of pharmaceutical products and product candidates (the "Business");

WHEREAS, on December 19, 2023, the Seller filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") (Case No. 23-41067) and is operating and managing its businesses as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, subject to and upon the terms and conditions herein and applicable provisions of the Bankruptcy Code, the Seller desires to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, all of the Purchased Assets (as defined below);

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order (as defined below) approving such sale free and clear of all Liens and Claims, all as more specifically provided in this Agreement, and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bidding Procedures Order (as defined below); and

WHEREAS, the Seller and the Purchaser have negotiated in good faith and at arm's length for the purchase and sale of the Purchased Assets, the assumption of certain Liabilities associated therewith and for certain bid protections in connection therewith, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements, representations and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1

## DEFINITIONS AND CONSTRUCTION

Section 1.1    Definitions. For the purposes of this Agreement:

"Acquired Intellectual Property" has the meaning set forth in Section 2.1(d).

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, under no circumstance will the Purchaser and the Seller be deemed Affiliates of one another notwithstanding the possession by the Purchaser or its Affiliates (whether or not exercised) of any rights of control with respect to the Seller.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in Section 2.7(a).

"Allocation Statement" has the meaning set forth in Section 2.7(a).

"Alternative Transaction" means any transaction or series of related transactions (other than a transaction with Purchaser pursuant to this Agreement), whether effectuated pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed by the Seller, pursuant to which the Seller: (i) accepts a Qualified Bid, other than that of the Purchaser or its Affiliates, as the highest or otherwise best offer; or (ii) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an acquisition, asset sale, stock sale, purchase, merger, reorganization, recapitalization or other similar transaction with or involving any equity securities in the Seller or other interests in the Purchased Assets, including a stand-alone plan of reorganization, plan of liquidation, or refinancing, all or substantially all of the Purchased Assets (or agrees to any of the foregoing) in a transaction or series of transactions to a party or parties other than the Purchaser or its Affiliates.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" means the bankruptcy auction of the Seller's assets, as may be conducted by the Seller pursuant to the Bidding Procedures Order and the Bankruptcy Code.

"Back-Up Bidder" has the meaning set forth in Section 5.13.

"Back-Up Period" has the meaning set forth in Section 5.13.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures" means the procedure governing the solicitation of bids and the conduct of the Auction for the Purchased Assets under the supervision of the Bankruptcy Court to be approved pursuant to the Bidding Procedures Order.

2

"Bidding Procedures Order" means an order to be entered by the Bankruptcy Court approving the Bidding Procedures.

"Bill of Sale" has the meaning set forth in Section 2.9(a)(i).

"Budget" has the meaning set forth in the DIP Loan Agreement.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday or any day on which banking institutions in New York are closed either under applicable Law or action of any Governmental Authority.

"Business Payments" has the meaning set forth in Section 5.15.

"Cash Amount" has the meaning set forth in Section 2.5.

"Chapter 5 Actions and Claims" means, with respect to any Person, all avoidance actions, claims or causes of action that constitute property of such Person's bankruptcy estate under section 541 of the Bankruptcy Code, including claims and causes of action under chapter 5 of the Bankruptcy Code or any other applicable law, and all proceeds therefrom.

"Chapter 11 Case" means the case commenced by the Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.8.

"Closing Date" has the meaning set forth in Section 2.8.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, including the regulations promulgated thereunder.

"Company Owned Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller.

"Company Used Intellectual Property" means all right, title and interest of Seller in all Intellectual Property owned or controlled by a Third Party that is (i) licensed or sublicensed to Seller or for which Seller has obtained a covenant not to be sued or (ii) otherwise used or held for use in connection with the Business.

"Confidential Information" means any information that is not generally known to the public and that is or has been used, developed or obtained by the Seller and its Affiliates to the extent it relates to the Business, the Purchased Assets or the Assumed Liabilities, including: (i) products or services; (ii) fees, costs and pricing structures; (iii) designs and specifications; (iv) analyses; (v) drawings, photographs and reports; (vi) computer software, including electronic mail, operating systems, applications and program listings; (vii) flow charts, transaction

3

summaries and models, manuals and documentation; (viii) databases; (ix) financial reports, investment summaries, and accounting and business methods; (x) ideas, formulas, compositions, inventions, devices, new developments, methods and processes, whether patentable or unpatentable and whether or not reduced to practice; (xi) supplier, customers and clients and supplier, customer, contact or client lists and other marketing data or plans; (xii) know-how; (xiii) manufacturing and production processes and techniques; (xiv) research and development information; (xv) files and records; and (xvi) all similar and related information in whatever form, except that Confidential Information will not include any information that has been published in a form generally available to the public, other than as a result of a disclosure by the parties hereto or their respective representatives.

"Contract" means any contract, agreement, arrangement, lease, license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond or other instrument or consensual obligation.

"Copyrights" means all copyrights (whether or not registered), copyrightable works and all other corresponding rights, including copyrights in software and in the content contained on any Web site, and registrations and applications for any of the foregoing in any jurisdiction, and all derivative works, moral rights, renewals, extensions, reversions or restorations associated with any of the foregoing.

"Deposit" means the Purchaser's cash deposit in the amount equal to one hundred thousand U.S. dollars ($100,000) which was delivered to Seller by wire transfer on or before March 1, 2024.

"DIP Loan" means all amounts due and owing from time to time under the DIP Loan Agreement.

"DIP Loan Agreement" means the Debtor in Possession Term Sheet, dated as of December 19, 2023, as it may be amended from time to time, by and among the Seller and the Purchaser in its capacity as DIP Lender thereunder.

"DIP Loan Cap" means $800,000.00.

"Employee Plan" means any (i) "employee benefit plan" as defined in Section 3(3) of ERISA, (ii) compensation, employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, agreement, arrangement, program or policy or (iii) other plan, agreement, arrangement, program or policy providing for compensation, bonuses, profit-sharing, equity or equity-based compensation or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangement), medical, dental, vision, prescription or fringe benefits, life insurance, relocation or expatriate benefits, perquisites, disability or sick leave benefits, employee assistance program, workers' compensation, supplemental unemployment benefits or post-employment or retirement benefits (including compensation, pension, health, medical or insurance benefits), in each case whether or not written (x) that is sponsored, maintained, administered, contributed to or entered into by Seller for the current or future benefit of any current or former Service Provider or (y) for which Seller has any direct or indirect liability.

**EXECUTION VERSION**

"Environmental Law" means any Law concerning: (i) the treatment, disposal, emission, discharge, Release or threatened Release of, or exposure to, Hazardous Material; (ii) human health and safety, or (iii) the protection of the environment (including natural resources, air and surface or subsurface land or waters or wildlife).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any rules or regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.2(a).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Executory Contract" means a Contract that is an "executory contract" or "unexpired lease", as such terms are used in section 365 of the Bankruptcy Code.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of (i) the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed with Closing, and (ii) any other order that is required hereunder to be a Final Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed.

"Fundamental Representations" means each of the representations and warranties contained in Section 3.2 and Section 3.3.

"Governmental Authority" means any: (i) nation, region, state, county, city, town, village, district or other jurisdiction; (ii) federal, state, local, municipal, foreign or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal); (iv) multinational organization exercising judicial, legislative or regulatory power; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature of any federal, state, local, municipal, foreign or other government.

5

**EXECUTION VERSION**

"Governmental Authorization" means any approval, consent, ratification, waiver, license, Permit, registration or other authorization issued or granted by any Governmental Authority.

"Hazardous Material" means any waste or other substance that is listed, defined, designated or classified as hazardous, radioactive or toxic or a pollutant or a contaminant under, or is otherwise regulated by, any Environmental Law, including any admixture or solution thereof, and including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials in any form or condition and polychlorinated biphenyls.

"Intellectual Property" means all of the following anywhere in the world and all legal rights, title or interest in the following arising under Law: (i) all Patents; (ii) all Copyrights; (iii) all mask works, mask work registrations and mask work applications and all other corresponding rights; (iv) all Trademarks; (v) all inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind; (vi) all computer software (including source and object code), firmware, development tools, algorithms, files, records, technical drawings and related documentation, data and manuals; (vii) all databases and data collections; (viii) all licenses and permits to the extent transferable; (ix) all other intellectual property rights; and (x) all rights to assert, claim or sue and collect damages for the past, present or future infringement, misappropriation or other violation of any of the foregoing.

"Intellectual Property Assignment" has the meaning set forth in Section 2.9(a)(iv).

"IP Agreements" means all Contracts (including outstanding decrees, orders, judgments, settlement agreements, or stipulations) to which Seller is a party which contain provisions: (i) granting to any Person rights in Company Owned Intellectual Property or Company Used Intellectual Property; (ii) granting to Seller any rights in Company Used Intellectual Property; (iii) consenting to another Person's use of Company Owned Intellectual Property or Company Used Intellectual Property, or covenanting not to sue any Person for infringement, misappropriation or any other violation of any such Intellectual Property; or (iv) restricting Seller's use of Company Owned Intellectual Property or any Company Used Intellectual Property.

"IRS" means the Internal Revenue Service.

"Judgment" means any Order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Knowledge of the Seller" or "the Seller's Knowledge" means: (i) the actual knowledge of Charles Allen after due inquiry into the facts or circumstances supporting any representation, warranty or statement qualified by such terms; and (ii) all such knowledge as would reasonably

be obtained by the current Chief Financial Officer of Seller, for the time period of his tenure, in the discharge of such officer's duties.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance or code.

"Liability" means any liability or obligation, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due.

"Lien" means any possessory or non-possessory lien, license (other than with respect to any Company Used Intellectual Property), encumbrance or charge against or other interest in any property or assets, whether voluntary or involuntary and whether statutory or contractual, including any mortgage, deed of trust, deed to secure debt, pledge, assignment, hypothecation, security interest, attachment, judgment, levy, conditional sale agreement, right of first refusal, right of first offer or other arrangement, and including any agreement to give any of the foregoing.

"Material Adverse Effect" means any event, change, circumstance, effect or other matter that has, individually or in the aggregate, a material adverse effect on: (i) the financial condition or results of operations of the Business, taken as a whole; (ii) the condition or value of any material portion of the Purchased Assets or the Assumed Liabilities; or (iii) the ability of the Seller to consummate timely the transactions contemplated by this Agreement; provided, however, none of the following, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Effect, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Effect: any event, change, circumstance, effect or other matter to the extent resulting from or related to: (A) any outbreak or escalation of war or major hostilities or any act of terrorism; (B) changes in Laws, United States generally accepted accounting principles or enforcement or interpretation thereof; (C) changes that generally affect the industries and markets in which the Seller operates; (D) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs) or political conditions; (E) any failure, in and of itself, of the Seller to meet any published or internally prepared projections, budgets, plans or forecasts of revenues, earnings or other financial performance measures or operating statistics (provided that the underlying causes of such failure that are not otherwise excluded from the definition of a "Material Adverse Effect" may be taken into account in determining whether there has been a Material Adverse Effect); (F) any action required to be taken or not taken pursuant to or in accordance with this Agreement or at the express written request of, or expressly consented to in writing by, the Purchaser; (G) the filing or continuation of the Chapter 11 Case or any action approved by the Bankruptcy Court (or any other Governmental Authority in connection with any such Proceeding); or (H) the execution or delivery of this Agreement, the consummation of the transactions contemplated by this Agreement or the public announcement or other publicity with respect to any of the foregoing, in each of clauses (A), (B), (C) and (D) to the extent that such event, change, circumstance, effect or matter does not disproportionately affect the Seller compared to other companies that are principally engaged in the Business.

"Non-Proration Items" has the meaning set forth in Section 9.2.

"Order" means any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each case whether preliminary or final).

"Outside Date" means 5:00 p.m. Eastern Time on March 29, 2024.

"Patent" means all national and multinational statutory invention registrations, patents and patent applications of any type issued or applied for in any jurisdiction, including all industrial designs, provisionals, non-provisionals, continuations, divisionals, continuations-in-part, renewals, reissues, extensions, supplementary protection certificates, reexaminations and the equivalents of any of the foregoing in any jurisdiction, and all inventions disclosed in each such registration, patent or patent application.

"Permit" means all permits, licenses, consents, approvals, franchises, accreditations, certifications, easements, rights of way and authorizations related to the operation of the Business.

"Person" means an individual or an entity, including a corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity, or any Governmental Authority.

"Petition" has the meaning set forth in the Recitals.

"Petition Date" means the date the Petition is or was filed with the Bankruptcy Court.

"Post-Closing Access and Cooperation Period" has the meaning set forth in Section 10.15(a).

"Prepaid Expenses" means all prepaid charges and expenses of the Seller to the extent related to the Excluded Assets.

"Prepaid Expenses for Purchased Assets" has the meaning set forth in Section 2.1(c).

"Previously Omitted Contract" has the meaning set forth in Section 5.12(e).

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Proration Items" has the meaning set forth in Section 9.2.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Inventory" has the meaning set forth in Section 2.1(a).

"Purchaser" has the meaning set forth in the Preamble.

"Qualified Bid" means competing bids that are submitted in accordance with the Bidding Procedures and Bidding Procedures Order.

"Receivables" has the meaning set forth in Section 2.1(l).

"Release" means the release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating of any Hazardous Material into the environment.

"Sale Hearing" means the hearing to be conducted by the Bankruptcy Court to approve this Agreement and seeking entry of the Sale Order.

"Sale Order" means, collectively, one or more orders of the Bankruptcy Court in form and substance acceptable to the Purchaser and the Seller: (i) approving the sale of the Purchased Assets (and the assumption and assignment of the Assumed Contracts) to the Purchaser free and clear of all Claims and Liens pursuant to section 363(f) of the Bankruptcy Code, on the terms and conditions set forth in this Agreement; (ii) approving the Back-Up Bidder chosen at the Auction and the asset purchase agreement submitted by such Back-Up Bidder; (iii) authorizing consummation of the transactions contemplated hereby; (iv) containing a finding that the transactions contemplated by this Agreement are undertaken by the Seller and the Purchaser (solely in its capacity as such) at arm's length, without collusion and in good faith by the Purchaser within the meaning of section 363(m) of the Bankruptcy Code; (v) assuring that the Purchaser will not be subject to successor liability for any claims or causes of action of any kind or character against the Seller, whether known or unknown, unless expressly assumed as an Assumed Liability pursuant to this Agreement; (vi) authorizing the Purchaser to freely own and operate the Purchased Assets; (vii) providing that the Bankruptcy Court shall retain jurisdiction to hear any disputes arising in connection with the transactions contemplated by this Agreement, and (viii) permitting the Purchaser to waive, in its sole discretion, the 14-day stay period under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

"Schedule" means a schedule included in the Seller Disclosure Schedule and the other schedules attached hereto.

"Seller" has the meaning set forth in the Preamble.

"Seller Disclosure Schedule" has the meaning set forth in Article 3.

"Seller Names and Marks" means any and all (i) Trademarks of Seller, including all names, marks and logos set forth on Schedule 3.9(a) and the name and mark "Intergalactic Therapeutics" and all design marks and logos therefor and (ii) Trademarks derived from, confusingly similar to or including any of the foregoing.

"Service Provider" means any director, officer, employee or individual independent contractor of Seller.

"Successful Bidder" means the bidder who shall have submitted the highest or otherwise best bid at the conclusion of the Auction in accordance with the Bidding Procedures and Bidding

Procedures Order. "Straddle Period" means any taxable period beginning before the Closing Date and ending after the Closing Date.

"Tax" means: (i) any federal, state, local, foreign or other tax, charge, fee, duty (including customs duty), levy or assessment, including any income, gross receipts, net proceeds, alternative or add-on minimum, corporation, ad valorem, turnover, real property, personal property (tangible or intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, profits, occupational, premium, interest equalization, windfall profits, severance, license, registration, payroll, environmental (including Taxes under section 59A of the Code), capital stock, capital duty, disability, estimated, gains, wealth, welfare, employee's income withholding, other withholding, unemployment or social security or other tax of whatever kind (including any fee, assessment or other charges in the nature of or in lieu of any tax) that is imposed by any Governmental Authority; (ii) any interest, fines, penalties or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any related contest or dispute; and (iii) any Liability for the Taxes of another Person.

"Tax Return" means any report, return, declaration, claim for refund, or information return or statement related to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party" means any Person and/or group of Persons other than the Seller, the Purchaser or any of their respective Affiliates.

"Trademarks" means all trademarks, trade names, service marks, designs, logos, brand names, certification marks, corporate names, trade dress, emblems, signs or insignia, slogans, Internet addresses and domain names, other similar designations of source or origin and general intangibles of like nature, any derivations of any of the foregoing, and all registrations and applications for registrations pertaining to any of the foregoing (including any intent to use applications, supplemental registrations and any renewals or extensions of any of the foregoing), and all goodwill associated with any of the foregoing.

"Transfer Taxes" has the meaning set forth in Section 9.1.

Section 1.2    Construction. Any reference in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" refers to the corresponding Article, Section, Exhibit or Schedule of or to this Agreement, unless the context indicates otherwise. The table of contents and the headings of Articles and Sections are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement. All words used in this Agreement are to be construed to be of such gender or number as the circumstances require. The words "including," "includes" or "include" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance. Where this Agreement states that a party "shall", "will" or "must" perform in some manner or otherwise act or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement. Any reference to a statute is deemed also to refer to any amendments or successor legislation as in effect at the relevant time. Any reference to a Contract or other document as of a given date means the Contract or other document as amended,

supplemented and modified from time to time through such date, except with respect to any Contract or other document described in the Seller Disclosure Schedule.

## ARTICLE 2

## THE TRANSACTION

Section 2.1    Sale and Purchase of Purchased Assets. In accordance with the provisions of this Agreement and the Sale Order, and except as set forth in Section 2.2, at the Closing, the Seller will sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all of the Seller's right, title and interest in and to the following assets owned by Seller and used in the conduct of the Business (all of the assets to be sold, conveyed, assigned, transferred or delivered to the Purchaser are referred to as the "Purchased Assets"):

(a)    Inventory. All raw materials (including all active pharmaceutical ingredients), work in process, components, packaging and labeling materials, supplies, finished goods and other inventory listed on Schedule 2.1(a) (the "Purchased Inventory");

(b)    Personal Property. The personal property listed on Schedule 2.1(b) that is in the possession of Seller;

(c)    Prepaid Expenses for Purchased Assets. All prepaid expenses related to other Purchased Assets, including fees, costs, and expenses related to registration and maintenance of Intellectual Property comprising Purchased Assets ("Prepaid Expenses for Purchased Assets");

(d)    Intellectual Property. All Company Owned Intellectual Property, including (i) all Seller Names and Marks and (ii) Patents, Copyrights and Trademarks and other Intellectual Property set forth on Schedule 2.1(d) (collectively, the "Acquired Intellectual Property");

(e)    [Intentionally Omitted];

(f)    Authorizations. All Governmental Authorizations, including those Governmental Authorizations set forth on Schedule 2.1(f);

(g)    Correspondence. All correspondence with or to any Governmental Authority (including letters, minutes and official contact reports relating to any communications with any Governmental Authority), including (i) all regulatory submissions with respect to any product, and (ii) all original dossiers with respect to any Governmental Authorizations for any product;

(h)    Advertising Materials. All advertising, marketing, sale and promotional files and materials (including any television, radio and print content and materials), point of sale materials and Web site content (together with all source code, design notes and design documents associated therewith solely to the extent it is Company Owned Intellectual Property),

11

including all Company Owned Intellectual Property therein, in each case to the extent capable of electronic delivery;

(i)      Books and Records. All books, records, files and papers, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production reports, information and records, personnel and employment records, and financial and accounting records, that are within the Seller's control or readily accessible to the Seller and that relate to other Purchased Assets, in each case to the extent capable of electronic delivery;

(j)      Claims. All claims, rights, credits, causes of action, defenses and rights of set-off against Third Parties and against Purchaser and its Affiliates, including any commercial tort claims and unliquidated rights under manufacturers' and vendors' warranties and any Chapter 5 Action and/or Claim related to the Purchased Assets being purchased hereunder, but not including any claims against Purchaser in respect of this Agreement;

(k)      Receivables. All accounts receivable and other receivables (together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto), and all causes of action pertaining to the collection of the foregoing, including any intercompany receivables due to the Seller from any Subsidiary of the Seller (provided that at the Purchaser's sole election, any such intercompany receivable may be terminated or reinstated at the Closing pursuant to Section 5.18) ("Receivables").

Section 2.2    Excluded Assets. Notwithstanding the terms of Section 2.1, the Seller will retain and will not sell, convey, assign, transfer or deliver to the Purchaser, and the Purchaser will not purchase or acquire, and the Purchased Assets do not include, any assets of the Seller which are not Purchased Assets including the following assets described below (the "Excluded Assets"):

(a)      Contracts. All Contracts (each, an "Excluded Contract");

(b)      Books and Records. All minute books and records, stock ledgers, Tax records and all other materials that the Seller is required by Law to retain or primarily relating to an Excluded Asset or Excluded Liability; provided, however, that the Seller shall provide the Purchaser with reasonable access to and copies of any such materials;

(c)      Insurance. All insurance policies, claims and proceeds of insurance;

(d)      Claims. All rights, claims or causes of action of the Seller to the extent relating to any Excluded Assets or Excluded Liability (except to the extent constituting Purchased Assets pursuant to Section 2.1(j));

(e)      Chapter 5 Actions and Claims. All Chapter 5 Actions and Claims not constituting Purchased Assets pursuant to Section 2.1(j);

(f)      Estate Claims. All estate claims of the Seller (except to the extent constituting Purchased Assets pursuant to Section 2.1(j));

(g)      Accounts and Deposits. All: (i) cash, cash equivalents, bank deposits, investment accounts, lockboxes, certificates of deposit, marketable securities, bank accounts, corporate credit cards and other similar cash items, and (ii) deposits, pre-payments, refunds, rebates, credits and similar items, including rent and utility deposits, prepaid rent and all other prepaid charges and expenses, attributable to any period of time (or portion thereof) ending on or prior to the Closing Date, other than Prepaid Expenses for Purchased Assets;

(h)      Prepaid Expenses. All Prepaid Expenses;

(i)      Tax Refunds. All rights to refunds, rebates, credits or other benefits relating to Taxes and other governmental charges of whatever nature attributable to any period of time (or portion thereof) ending on or prior to the Closing Date;

(j)      This Agreement. All of the Seller's rights under this Agreement and all agreements ancillary to this Agreement (including payments comprising part of the Purchase Price); and

(k)      Specifically Excluded Assets. All assets specifically listed as Excluded Assets on Schedule 2.2(k).

Section 2.3      Assumed Liabilities. In accordance with the provisions of this Agreement and the Sale Order, at the Closing, the Purchaser will assume and pay or perform and discharge when due only the following Liabilities of the Seller and no other Liabilities (the "Assumed Liabilities"), and except for the Assumed Liabilities, the Purchaser shall not be deemed to have assumed any other Liabilities of the Seller or any of its predecessors:

(a)      [Intentionally Omitted];

(b)      [Intentionally Omitted];

(c)      [Intentionally Omitted];

(d)      Transfer Taxes. All Liabilities for Taxes borne by the Purchaser pursuant to Section 9.1;

(e)      [Intentionally Omitted.]; and

(f)      Other Assumed Liabilities. All Liabilities specifically identified on Schedule 2.3(f).

For the avoidance of doubt, all Liabilities arising out of, relating to or incurred in connection with the Business or the Purchased Assets arising after the Closing that are incurred from the conduct of the Business by the Purchaser after the Closing shall be Liabilities of the Purchaser.

Section 2.4      Excluded Liabilities. Notwithstanding any other provision of this Agreement or any other writing to the contrary, the Purchaser is assuming only the Assumed Liabilities and is not assuming any other Liability of the Seller or any of its predecessors of

whatever nature, whether presently in existence or arising hereafter, which shall be retained by and remain Liabilities of the Seller (the "Excluded Liabilities"). Such Excluded Liabilities include the following:

(a)     Operating Liabilities. All Liabilities which are not Assumed Liabilities to the extent relating to claims (including claims instituted after the Closing), events or conditions arising out of or relating in any way to the conduct or operation of the Business or the ownership of the Purchased Assets prior to the Closing, including as a result of the manufacture, design, use, operation, storage, acquisition, development or construction of, or warranties provided with respect to, a Purchased Asset during the period prior to the Closing;

(b)     Taxes. Any Liability for (i) Taxes of the Seller, (ii) Taxes attributable to the Business or the Purchased Assets for any period of time (or portion thereof) ending on or prior to the Closing Date (other than the Taxes expressly assumed by the Purchaser pursuant to Section 9.1 or Section 9.2), and (iii) Taxes borne by the Seller pursuant to Section 9.1 or Section 9.2;

(c)     Incidents and Events. All Liabilities and obligations arising out of, relating to or in connection with incidents or events occurring prior to the Closing by any Person employed by, or acting as an independent contractor on the property of or on behalf of, the Seller for payment, claims or benefits under workers' compensation Laws or any other Law;

(d)     Costs. All Liabilities of the Seller for fees, costs and expenses incurred in connection with the Chapter 11 Case or negotiating, preparing, closing and carrying out this Agreement and the transactions contemplated hereby, including (i) the fees and expenses of attorneys, investment bankers, finders, brokers, accountants and consultants and (ii) any fees, costs and expenses or payments related to any transaction bonus, discretionary bonus, change-of-control payment, retention or other compensatory payments made to any Employee (including the employer portion of any pre-Closing payroll, social security, unemployment or similar Taxes);

(e)     Litigation Claims. Any litigation claims and any other Liabilities arising from any Proceeding (i) arising prior to the Closing, including any tort claims, breach of contract claims, employment claims and discrimination claims, or (ii) to the extent relating to events or conditions arising out of or relating in any way to the conduct of the Business or the ownership of the Purchased Assets prior to the Closing even if instituted after the Closing;

(f)     Environmental. Any Liabilities arising in connection with or in any way relating to the Seller (or any predecessor or any prior owner of all or part of its business and assets), any property now or previously owned, leased or operated by the Seller or the Purchased Assets or any activities or operations occurring or conducted at any real property used or held for use by the Seller (including offsite disposal), which (i) arise under or relate to any Environmental Law and (ii) relate to actions occurring or conditions existing on or prior to the Closing Date;

(g)     Excluded Assets. Any Liability arising out of or related to any Excluded Asset or not arising out of or related to any of the Purchased Assets;

(h)     Indebtedness. Any Liability in respect of any indebtedness for borrowed money of the Seller or any of its predecessors, including any Liability in respect of the DIP Loan Agreement, provided that all Liabilities in respect of the DIP Loan Agreement are anticipated to be satisfied from the Purchase Price on the Closing Date;

(i)     Employee Benefits and Labor. Any Liabilities of the Seller relating to or arising out of an Employee Plan and any Liabilities relating to any current or former Service Providers;

(j)     Related Persons. Any Liabilities to any (i) owner or former owner of capital stock or other equity interests of the Seller, or (ii) current or former officer or director of the Seller in their capacity as such; and

(k)     Other. Any Liabilities that are not expressly included in the Assumed Liabilities.

Section 2.5     Consideration. The consideration for the Purchased Assets (the "Purchase Price") consists of: (a) cash in the amount of $500,000, (b) the outstanding balance of the DIP Loan at the time of Closing, provided that this component of the Purchase Price shall in no event exceed the DIP Loan Cap (collectively, the "Cash Amount"), and (c) the assumption of the Assumed Liabilities.

Section 2.6     [Intentionally Omitted].

Section 2.7     Allocation of Purchase Price.

(a)     Within sixty (60) days after the Closing Date, the Purchaser will deliver to the Seller, or any trustee appointed under the terms set forth in any bankruptcy plan confirmed by the Seller (as applicable), with a copy to the Official Committee of Unsecured Creditors in the Chapter 11 Case and DIP Lender, an allocation statement (the "Allocation Statement"), setting forth its calculation of the allocation of the sum of the Purchase Price and the Assumed Liabilities, as adjusted for payments made pursuant to Article 9, among the Purchased Assets, in accordance with section 1060 of the Code and any comparable provisions of state or local Law (the "Allocation"). The Seller will review the Allocation Statement and the Allocation, and, to the extent the Seller disagrees with the content of the Allocation Statement, the Seller will inform the Purchaser of such disagreement within thirty (30) days after receipt of the Allocation Statement. The Seller and the Purchaser will attempt in good faith to resolve any such disagreement. If the Seller and the Purchaser are unable to reach a good faith agreement on the content of the Allocation Statement within ninety (90) days of the Closing Date, the Seller and the Purchaser will each use its own allocation statement. For purposes of this Section 2.7, all actions of the Seller may be the obligations or rights of a liquidating trustee of the Seller's estate.

(b)     If the Purchaser and the Seller agree on the Allocation Statement, the Purchaser and the Seller will report the Allocation of the Purchase Price in a manner consistent with the Allocation Statement and will act in accordance with the Allocation Statement in the preparation and filing of all Tax Returns and for all other Tax, financial accounting or other purposes, in any litigation, or otherwise.

(c)       The Purchaser and the Seller will promptly inform one another of any challenge by any Governmental Authority to the Allocation made pursuant to this Section 2.6 and agree to consult with and keep each other informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

Section 2.8       Closing. The closing of the transactions contemplated by this Agreement (the "Closing") will take place electronically as soon as practicable, but in no event later than five (5) Business Days after the date on which all the conditions set forth in Article 6 have been satisfied or (if permissible) waived by the party hereto entitled to waive such condition (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions). The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.9       Closing Deliveries.

(a)       At the Closing, the **Seller** will deliver or cause to be delivered to the Purchaser:

(i)       a bill of sale in the form of Exhibit A (the "Bill of Sale") executed by the Seller;

(ii)       [Intentionally Omitted];

(iii)       a certificate, dated as of the Closing Date, executed by the Seller confirming the satisfaction of the conditions specified in Sections 6.1(a) and 6.1(b);

(iv)       an Intellectual Property assignment agreement in the form of Exhibit C (the "Intellectual Property Assignment") executed by the Seller;

(v)       [Intentionally Omitted];

(vi)       a certified copy of the Sale Order;

(vii)       a duly executed certification in accordance with Treasury Regulations Section 1.1445-2(b)(2) to the effect that the Seller is neither a disregarded entity as defined in Treasury Regulations Section 1.1445-2(b)(2)(iii) nor a "foreign person"; and

(viii)       such other instruments of sale, transfer, conveyance and assignment as the Purchaser reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

(b)       At the Closing the Deposit will be applied by Seller to the Cash Amount of the Purchase Price, and the **Purchaser** will deliver or cause to be delivered to the Seller or for the Seller's benefit:

(i)       the Cash Amount, less the Deposit, by delivery of cash to the Seller by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing in an amount equal to the Cash Amount;

16

(ii)    [Intentionally Omitted];

(iii)    [Intentionally Omitted];

(iv)    the Bill of Sale executed by the Purchaser;

(v)    a certificate, dated as of the Closing Date, executed by the Purchaser confirming the satisfaction of the conditions specified in Sections 6.2(a) and 6.2(b);

(vi)    the Intellectual Property Assignment executed by the Purchaser; and

(vii)    such other instruments of assumption as the Seller reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

Section 2.10    [Intentionally Omitted];

Section 2.11    [Intentionally Omitted];

# ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows, except as (subject to Section 10.7) set forth on the disclosure schedules delivered by the Seller to the Purchaser concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Seller Disclosure Schedule"):

Section 3.1    Organization. Seller is duly organized and validly existing and in good standing under the Laws of its jurisdiction of formation. Except as a result of the filing of the Petition, Seller has all requisite power and authority to conduct the Business as presently conducted. Seller is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not reasonably be expected to have a Material Adverse Effect. The Seller has heretofore delivered to the Purchaser true and complete copies of the certificate of incorporation and bylaws of Seller as currently in effect.

Section 3.2    Authority and Enforceability. Subject only to the entry of the Bidding Procedures Order and the Sale Order, the Seller has all requisite corporate power, authority and capacity to execute and deliver this Agreement and the other agreements contemplated hereunder and to perform its obligations under this Agreement and such other agreements. Subject only to the entry of the Bidding Procedures Order and the Sale Order, the execution, delivery and performance of this Agreement and the other agreements contemplated by this Agreement and the consummation of the transactions contemplated by this Agreement and such other agreements by the Seller have been duly authorized by all necessary action on the part of the Seller. The Seller has duly and validly executed and delivered this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Purchaser and subject to the entry of the Sale Order, this Agreement constitutes the valid and binding obligation of the Seller,

**EXECUTION VERSION**

enforceable against the Seller in accordance with its terms, subject to: (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (b) Laws governing specific performance, injunctive relief and other equitable remedies..

Section 3.3    No Conflict. Upon and subject only to the entry of the Bidding Procedures Order and the Sale Order, and except in the case of clauses (b), (c), (d) and (e) that has not had, and would not reasonably be expected to have, a Material Adverse Effect, neither the execution, delivery and performance of this Agreement by the Seller, nor the consummation by the Seller of the transactions contemplated by this Agreement, will: (a) conflict with or violate the Seller's organizational documents; (b) result in a breach or default under, or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any  Governmental Authorization; (c) violate any Law or Judgment applicable to Seller, the Business or the Purchased Assets; (d) require Seller to obtain any Governmental Authorization or make any filing with or provide any notice to, or, to the Knowledge of the Seller, require any action by, any Governmental Authority (provided that, subject to Section 5.4 and Section 5.17, the transfer of any Permits will be the obligation of the Purchaser, provided further that the Seller shall provide commercially reasonable assistance regarding the transfer of such Permits); or (e) result in the creation of any Lien or Claim on any Purchased Asset.

Section 3.4    Title to Assets; Liens. Subject to the entry of the Sale Order, at Closing, the Purchaser will be vested with good and marketable title to all of the Purchased Assets, which Purchased Assets shall be conveyed free and clear of any Liens or Claims by order of the Bankruptcy Court.

Section 3.5    Administration of Regulatory Proceedings. To the Knowledge of Seller there are currently no pending Proceedings, concerning or against Seller or to which the Business or any of the Purchased Assets is subject.

Section 3.6    [Intentionally Omitted].

Section 3.7    Intellectual Property.

(a)    Schedule 3.9(a) sets forth a true and complete list of all of the Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements known to Seller, including a true and complete list of all United States, foreign, international and state: (i) Patents, including serial numbers for each filed Patent application and Patent numbers for each issued Patent, included in the foregoing; (ii) Trademark registrations, applications and material unregistered Trademarks included in the foregoing; (iii) domain names, included in the foregoing; and (iv) Copyright registrations, applications and material unregistered Copyrights included in the foregoing. To the Knowledge of Seller, Seller has provided prior to the date hereof, subject to applicable confidentiality agreements, to the Purchaser true and complete copies of all IP Agreements known by Seller to be in Seller's possession, together with all written notices and amendments known to Seller relating thereto. The listing of IP Agreements set forth on Schedule 2.1(d) includes for each agreement the title, the parties and the date executed.

18

(b)     Except as disclosed on Schedule 3.9(b), Seller solely and exclusively owns all Company Owned Intellectual Property and is properly licensed under or has the valid and enforceable right to use all Company Used Intellectual Property, and, none of such rights will be materially adversely affected by the consummation of the transactions contemplated by this Agreement. Except as disclosed on Schedule 3.9(b), there are no pending inquiries, investigations or Claims, and, Seller has not received written notice from any Third Party: (i) alleging infringement, misappropriation or other violation by Seller or the Business of Intellectual Property of any Person; or (ii) challenging or threatening to challenge Seller's right, title, or interest with respect to its ownership or use of, or continued use or right to preclude others from using, any Company Owned Intellectual Property or Company Used Intellectual Property as currently used, or the inventorship, validity, enforceability or registrability of any such Intellectual Property. Seller has not infringed, misappropriated or otherwise violated any Intellectual Property of any Person and no Person has infringed, misappropriated or otherwise violated any Company Owned Intellectual Property or Seller's interest in any Company Used Intellectual Property.

(c)     Seller has not brought or threatened in writing a Claim against any Person: (i) alleging infringement, misappropriation or other violation of Company Owned Intellectual Property or Company Used Intellectual Property; or (ii) challenging any Person's ownership or use of, or the inventorship, validity, enforceability or registrability of any Intellectual Property.

(d)     Any existing Patents, Copyrights and Trademarks: (i) have been duly maintained; (ii) are subsisting, in full force and effect; (iii) have not been cancelled, expired or abandoned or adjudged invalid or unenforceable; and (iv) is valid and enforceable (except for pending Patent applications in various jurisdictions, which by their nature as applications are not yet enforceable).

(e)     To the Knowledge of Seller, Seller has taken reasonable steps in accordance with normal industry practice to maintain the confidentiality of all Company Owned Intellectual Property and Company Used Intellectual Property, the value of which to Seller is contingent upon maintaining the confidentiality thereof and, to the Knowledge of Seller, no such Intellectual Property has been disclosed other than to employees, representatives and agents of Seller, all of whom are bound by written confidentiality agreements, or to third parties who are subject to customary written non-disclosure agreements.

# ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller as of the date hereof and as of the Closing Date as follows:

Section 4.1     Organization and Good Standing. The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of North Dakota and has all requisite corporate power and authority to conduct its business as it is presently conducted.

Section 4.2     Authority and Enforceability. The Purchaser has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Purchaser. The Purchaser has duly and validly executed and delivered this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Seller this Agreement constitutes the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to: (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (b) Laws governing specific performance, injunctive relief and other equitable remedies.

Section 4.3     No Conflict. Neither the Purchaser's execution, delivery and performance of this Agreement, nor the consummation by the Purchaser of the transactions contemplated by this Agreement, will: (a) conflict with or violate the Purchaser's organizational documents; (b) result in a breach or default under or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any Contract to which the Purchaser is a party or by which the Purchaser is bound, in any case with or without due notice or lapse of time or both; (c) result in the imposition of any Lien or other encumbrance on any of the assets of the Purchaser; (d) violate any Law or Judgment applicable to the Purchaser; or (e) require the Purchaser to obtain any Governmental Authorization or make any filing with any Governmental Authority.

Section 4.4     Legal Proceedings. There is no Proceeding pending or, to the Purchaser's knowledge, threatened against the Purchaser that questions or challenges the validity of this Agreement or that may prevent, delay, make illegal or otherwise interfere with the ability of the Purchaser to consummate any of the transactions contemplated by this Agreement.

Section 4.5     [Intentionally Omitted].

Section 4.6     Independent Investigation. The Purchaser has conducted its own independent investigation, review and analysis of Seller, the Purchased Assets, the Assumed Liabilities and the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Business as it has deemed appropriate, which investigation, review and analysis was done by the Purchaser and its representatives. The Purchaser acknowledges that it and its representatives have been provided adequate access to the Purchased Assets, the Assumed Liabilities, personnel, properties, premises and records of the Business for such purpose. In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis by Purchaser and its representatives and not on any factual representations or opinions of the Seller or its representatives (except the representations and warranties set forth in Article 3). The Purchaser hereby acknowledges and agrees that: (a) the Purchaser is purchasing the Purchased Assets from the Seller "as is" and "where is" and, other than the representations and warranties set forth in Article 3, none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders make or have made any representation or warranty, express or implied, at law or in equity, as to any matter whatsoever relating to Seller, the Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to: (i) merchantability or fitness for

20

**EXECUTION VERSION**

any particular use or purpose; (ii) the operation of the Business by the Purchaser after the Closing in any manner; or (iii) the probable success or profitability of the Business after the Closing; and (b) none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders will have or will be subject to any Liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to Seller, the Purchased Assets, the Assumed Liabilities or the Business or any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Purchaser or in any other form in expectation of the transactions contemplated by this Agreement. Nothing in this Section 4.6 shall be deemed to constitute a waiver of fraud.

## ARTICLE 5

## COVENANTS

Section 5.1    Access and Investigation. Until the Closing, subject to existing confidentiality agreements and upon reasonable advance notice from the Purchaser, the Seller will allow the Purchaser and its representatives reasonable access during normal business hours and without unreasonable interference with the operation of the Business to: (a) such materials and information about the Business as the Purchaser may reasonably request; and (b) specified members of management of the Business as the Purchaser may reasonably request.

Section 5.2    Operation of the Business.

(a)    Until the Closing, except: (i) as required by Law, including in connection with the Chapter 11 Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code); (ii) as expressly set forth in this Agreement or Schedule 5.2 of the Seller Disclosure Schedule; or (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), the Seller will pay all administrative claims in accordance with the Budget, and maintain in effect all Governmental Authorizations.

(b)    Until the Closing, except: (i) as required by Law, including in connection with the Chapter 11 Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code); (ii) as expressly set forth in this Agreement or Schedule 5.2 of the Seller Disclosure Schedule; (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed); or (iv) pursuant to any orders approving debtor in possession financing and/or use of cash collateral entered by the Bankruptcy Court in the Chapter 11 Case, the Seller will not:

(i)      [Intentionally Omitted];

(ii)      waive or release any material right or claim of the Business (other than any right or claim to the extent relating to any Excluded Assets or Excluded Liabilities), other than in the ordinary course of business consistent with past practice;

(iii)      sell, lease, transfer, license or otherwise dispose of, abandon or permit to lapse, fail to take any action necessary to maintain, enforce or protect, or permit or create any Lien or Claim on, any assets or properties (other than Excluded Assets);

(iv)      incur or suffer to exist any indebtedness for borrowed money except for the DIP Loan, up to the DIP Loan Cap, and any such indebtedness that is an Excluded Liability;

(v)      acquire, by merger or consolidation with, or by purchase of all or a substantial portion of the assets or stock of, or by any other manner, any business or entity, make any investment in any Person or enter into any joint venture, partnership or other similar arrangement for the conduct of the Business;

(vi)      except as required by applicable Law or an Employee Plan, grant any severance, retention or termination pay to, or enter into or amend any severance, retention, termination, employment, consulting, bonus, change in control or severance agreement with, any Service Provider;

(vii)      fail to pay any material Tax on or before the date when it becomes due and payable; or

(viii)      agree in writing to take any of the foregoing actions.

Section 5.3      [Intentionally Omitted].

Section 5.4      Commercially Reasonable Efforts.

(a)      Subject to the terms and conditions of this Agreement, the Bankruptcy Code and the Bidding Procedures Order, each of the parties will use their respective commercially reasonable efforts: to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement.

(b)      The Seller, on the one hand, and the Purchaser, on the other hand, will promptly notify the other of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement, and will permit the other party to review in advance any proposed communication by such party to any Governmental Authority. Neither the Seller, on the one hand, nor the Purchaser, on the other hand, will agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry relating to the transactions contemplated by this Agreement unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority, gives the other party the opportunity to attend and participate at such

**EXECUTION VERSION**

meeting. The Seller, on the one hand, and the Purchaser, on the other hand, will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing. The Seller, on the one hand, and the Purchaser, on the other hand, will provide each other with copies of all correspondence, filings or communications from and after the date of this Agreement between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement.

(c)     The Seller will promptly notify the Purchaser of any written communication that, to Seller's Knowledge Seller receives from any Person (other than a Governmental Authority) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.

Section 5.5     Supplements to Disclosure Schedules. The Seller may, from time to time prior to ten (10) Business Days prior to the Closing by written notice to the Purchaser, supplement the Seller Disclosure Schedule or add a schedule to the Seller Disclosure Schedule (such added schedule to be deemed a supplement hereunder) in order to disclose any matter which, if occurring prior to the date of this Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule or to correct any inaccuracy or breach in the representations and warranties made by the Seller in this Agreement. Subject to this Section 5.5, none of such supplements to the Seller Disclosure Schedule will be deemed to cure the representations and warranties to which such matters relate with respect to the satisfaction of the conditions set forth in Section 6.1(a) or otherwise affect any other term or condition contained in this Agreement; provided, however, that, unless the Purchaser delivers a notice of termination with respect to such matter as contemplated by Section 7.1(a)(ii) (to the extent the Purchaser is entitled to deliver such notice pursuant to Section 7.1(a)(ii)) within ten (10) Business Days of the receipt by the Purchaser of any supplement to the Seller Disclosure Schedule pursuant to this Section 5.5, the Purchaser will be deemed to have waived any and all rights to terminate this Agreement pursuant to Section 7.1(a)(ii) or otherwise arising out of or relating to the contents of such supplement and the resulting breach or breaches of the representations and warranties and the Purchaser will be deemed to have accepted the contents of such supplement for all purposes of this Agreement; and provided, further, that from and after the Closing, the Seller will have no Liability for any inaccuracy or breach in the representations and warranties made by the Seller in this Agreement or for any matters disclosed on the Seller Disclosure Schedule, as supplemented or amended by the Seller prior to the Closing.

Section 5.6     Confidentiality.

(a)     Effective upon the Closing, any confidentiality agreement between the Seller and Purchaser or its predecessor shall terminate.

(b)     Following the Closing, the Seller will, and will instruct its directors, officers, employees and advisors to, hold in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all Confidential Information, except to the extent that such Confidential Information: (a) must be disclosed in connection with the obligations of the Seller pursuant to this Agreement; (b) can be shown to have been in the public

**EXECUTION VERSION**

domain through no fault of the Seller, any of its Affiliates or any of their respective representatives; (c) becomes a matter of public record as required by the Bankruptcy Code or the Chapter 11 Case and filings made with the Bankruptcy Court with respect thereto; or (d) was later lawfully acquired by the Seller from sources other than those related to its prior ownership of the Business. Notwithstanding the foregoing, in no event will this Section 5.6 limit or otherwise restrict the right of the Seller to disclose such Confidential Information: (i) to its and its Affiliates' respective directors, officers, employees, agents and advisors to the extent reasonably required to facilitate any delivery or performance of this Agreement; (ii) to any Governmental Authority or arbitrator to the extent reasonably required in connection with the Chapter 11 Case or any other Proceeding relating to the enforcement of this Agreement; or (iii) as otherwise required by applicable Law.

Section 5.7    Public Announcements. Prior to the Closing, neither the Purchaser, on the one hand, nor the Seller, on the other hand, will issue any press release or make any other public announcement relating to this Agreement or the transactions contemplated hereby without the prior written approval of the other party (which approval will not be unreasonably withheld, conditioned or delayed), unless required by the Bankruptcy Court (or made through Bankruptcy Court filings in the sale process), applicable Law or by any listing agreement with any national securities exchange. Prior to issuing any such press release or making any such other public announcement as required by the Bankruptcy Court, applicable Law or listing agreement with any national securities exchange and without the other party's prior written approval, the disclosing party will give the other party a copy of the proposed press release or other public announcement and reasonable opportunity to comment on the same, provided this sentence shall not apply to filings made with the Bankruptcy Court in the sale process.

Section 5.8    Further Actions. Subject to the other express provisions of this Agreement, upon the request of either the Purchaser, on the one hand, or the Seller, on the other hand, following the Closing, the other party will execute and deliver such other documents, instruments and agreements as the requesting party may reasonably require for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement.

Section 5.9    [Intentionally Omitted].

Section 5.10    Bankruptcy Court Matters.

(a)    The Purchaser and the Seller will use their respective good faith and commercially reasonable efforts to cause the Sale Order to become a Final Order as soon as practicable after its entry, subject in all cases to the requirements of the Bankruptcy Court and the Bankruptcy Code.

(b)    The Seller shall, subject in all cases to the requirements of the Bankruptcy Court and the Bankruptcy Code, to use commercially reasonable efforts to:

(i)    consummate the Closing as promptly as practicable after entry of the Sale Order, but in no event later than 11:59 p.m. prevailing Eastern Time on or before March 29, 2024.

(c)    The Seller will provide the Purchaser with a reasonable opportunity to review and comment upon all motions, applications, petitions, schedules and supporting papers relating to the transactions contemplated by this Agreement prepared by the Seller (including forms of Orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Case. All motions, applications, petitions, schedules and supporting papers prepared by the Seller and relating to the transactions contemplated by this Agreement to be filed on behalf of the Seller after the date hereof must be reasonably satisfactory in form and substance to the Purchaser. The Seller shall use commercially reasonable efforts to obtain entry of the Sale Order. From and after the date hereof, the Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order.

(d)    The Seller will promptly take such actions as are reasonably requested by the Purchaser to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Seller of its obligations under this Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered in connection with the transactions contemplated by this Agreement and demonstrating that the Purchaser is a good faith buyer under section 363(m) of the Bankruptcy Code.

(e)    If an appeal is taken, or petition for certiorari or motion for rehearing or re-argument filed, or a stay pending appeal is requested from either the Bidding Procedures Order or the Sale Order, the Seller will promptly notify the Purchaser of such appeal, petition, motion or stay request and the Seller, with input from the Purchaser, will take all reasonable steps to defend against such appeal, petition, motion or stay request. Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and the Purchaser, in its sole discretion, waives in writing the condition set forth in Section 6.1(d) that the Sale Order be a Final Order.

(f)    The Seller and the Purchaser shall comply with all of their respective obligations under the Bidding Procedures Order and Sale Order (after the entry of such order by the Bankruptcy Court).

(g)    The Seller shall comply (or obtain an order waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement. The Seller shall serve on all required Persons, including: (i) all Persons who are known to possess or assert a Claim or Lien against or interest in the Purchased Assets; (ii) all applicable Governmental Authorities; (iii) all other Persons required by any order of the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules; and (iv) using commercially reasonable efforts to serve any other Persons that the Purchaser reasonably may request, any notice of the motions, hearings, or orders necessary to comply with its obligations under this Section 5.10 and to consummate the transactions contemplated hereby.

Section 5.11    Bankruptcy Court Approval

25

(a)     The Purchaser and the Seller acknowledge that, under the Bankruptcy Code, the sale of Purchased Assets is subject to approval of the Bankruptcy Court.

Section 5.12    [Intentionally Omitted];

(a)     [Intentionally Omitted];

(b)     [Intentionally Omitted];

(c)     [Intentionally Omitted];

(d)     [Intentionally Omitted];

(e)     [Intentionally Omitted];

(f)     [Intentionally Omitted];

Section 5.13    Back-Up Bidder. If an Auction is conducted, and the Court does not select the Purchaser as the Successful Bidder, but instead selects the Purchaser as the bidder having submitted the next highest or otherwise best bid at the conclusion of such Auction (the "Back-Up Bidder"), the Purchaser shall be the Back-Up Bidder. If the Purchaser is selected as the Back-Up Bidder, the Purchaser shall be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Purchaser prior to or at the Auction) open and irrevocable until the earlier of: (i) the date of closing on the sale of the Purchased Assets to the Successful Bidder; and (ii) twenty-five (25) Business Days following the date the order approving the sale of the Purchased Assets to the Successful Bidder shall have become a Final Order (such date, the "Back-Up Period"); provided, however, that if the Successful Bidder shall fail to close on its purchase of the Purchased Assets within the period set forth above, the Back-Up Bidder shall be deemed to be the Successful Bidder and the Seller will be authorized, without further order of the Bankruptcy Court, to, and the Back-Up Bidder shall, consummate the transactions contemplated by this Agreement within ten (10) Business Days of becoming the Successful Bidder on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Purchaser prior to or at the Auction).

Section 5.14    [Intentionally Omitted].

Section 5.15    Payments Received. The Seller, on the one hand, and the Purchaser, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts. Without limiting the generality of the foregoing, the Seller (prior to the entry by the Bankruptcy Court of an order confirming a Chapter 11 plan or dismissing the Chapter 11 Case, and at the sole cost of the Purchaser) agrees to cooperate with the Purchaser, at the sole cost of the Purchaser, to inform parties owing payments to the Business after the Closing that constitute Purchased Assets (the "Business Payments") of the accounts of the Purchaser that should receive such Business Payments

**EXECUTION VERSION**

following the Closing and otherwise reasonably assist the Purchaser to ensure that such Business Payments are made to such accounts. The Seller, on the one hand, and the Purchaser, on the other hand, hereto hereby agrees that any payments mistakenly received by it or its respective Affiliates shall be promptly transferred and delivered back to the other party or its Affiliate, as applicable.

Section 5.16   Cessation of Use of Acquired Intellectual Property. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, (a) the Seller acknowledges and agrees that, from and after the Closing, the Seller shall not have any right, title or interest in or to any Acquired Intellectual Property (including any Seller Names and Marks) and (b) from and after the Closing, the Seller shall cease and discontinue any and all use or other exploitation of any and all Acquired Intellectual Property (including all Seller Names and Marks).

Section 5.17   Transfer of Permits and Governmental Authorizations. From and after the date hereof, the Seller, on the one hand (subject to the availability of funds for such purpose), and the Purchaser, on the other hand, shall reasonably cooperate with Purchaser in Purchaser's efforts to seek the transfer to Purchaser as of the Closing (or as soon as reasonably practicable thereafter) all Governmental Authorizations included in the Purchased Assets necessary for the import, manufacture, distribution, marketing and sale by the Purchaser of the products of the Business under applicable Law; provided that (a) any reasonable, documented out-of-pocket costs associated with such cooperation by the Seller after the Closing (including the *pro rata* portion of the costs of any employee directly providing such cooperation after the Closing, as determined by the amount of time dedicated by such employee to such cooperation as a proportion of all time dedicated by such employee to the Seller) shall be borne by the Purchaser and (b) nothing in this Section shall be deemed to require the Seller to remain a debtor in the Chapter 11 Case or maintain its corporate existence for any period of time beyond 30 days after the Closing Date; provided that the foregoing shall not be deemed to require the Seller to take

## ARTICLE 6

## CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE

Section 6.1     Conditions to the Obligation of the Purchaser. The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the Purchaser becoming the Successful Bidder (whether following the conclusion of the Auction or thereafter as a result of the Purchaser becoming the Back-Up Bidder) and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Purchaser, in whole or in part, in its sole and absolute discretion):

(a)     Accuracy of Representations and Warranties. (i) Each of the Fundamental Representations (disregarding all materiality and "Material Adverse Effect" or similar qualifiers contained therein for this purpose) must be true and correct in all material respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all material respects as of such date), and (ii) the representations and warranties of the Seller in Article 3 (other than the Fundamental Representations) must be true and correct in all material respects as of the Closing (other than

representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all respects as of such date), except in the case of this clause (ii) where the failure of such representations and warranties to be so true and correct (disregarding all materiality and "Material Adverse Effect" or similar qualifiers contained therein for this purpose) has not had, and would not reasonably be expected to have, a Material Adverse Effect;

(b)    Performance of Covenants. All of the covenants and obligations that the Seller is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)    No Action. There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement;

(d)    Sale Order. The Sale Order must be a Final Order and must be in form and content satisfactory to the Purchaser in its reasonable discretion;

(e)    No Material Adverse Effect. There shall not have occurred any event or occurrence (regardless of whether such event or occurrence constitutes a breach of any representation, warranty, or covenant of the Seller under this Agreement) after the date of this Agreement which has had, or would reasonably be expected to have, a Material Adverse Effect; and

(f)    Transaction Documents. The Seller must have delivered or caused to be delivered each document under Section 2.9(a).

Section 6.2    Conditions to the Obligations of the Seller. The obligation of the Seller to perform any obligations hereunder, including to consummate the transactions contemplated by this Agreement, is subject to the Purchaser becoming the Successful Bidder (whether following the conclusion of the Auction or thereafter as a result of the Purchaser becoming the Back-Up Bidder) and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Seller, in whole or in part):

(a)    Accuracy of Representations and Warranties. The representations and warranties of the Purchaser in Article 4 must be true and correct in all respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all respects as of such date), except where the failure of such representations and warranties to be so true and correct (disregarding all materiality qualifiers contained therein for this purpose) has not had, and would not reasonably be expected to have, a material adverse effect on the Purchaser's ability to timely complete the transactions contemplated by this Agreement;

(b)    Performance of Covenants. All of the covenants and obligations that the Purchaser is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)    No Action. There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement;

(d)     Sale Order. The Sale Order must be a Final Order and must be in form and content satisfactory to the Seller; and

(e)     Transaction Documents. The Purchaser must have taken the actions required to be taken under Section 2.9(b) and delivered or caused to be delivered to the Seller each document that Section 2.9(b) requires it to deliver.

## ARTICLE 7

## TERMINATION

Section 7.1    Termination Events.

(a)     This Agreement may, by written notice given before the Closing, be terminated:

(i)     by mutual consent of the Purchaser and the Seller;

(ii)     by the Purchaser (so long as the Purchaser is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if there has been a breach of any of the Seller's representations, warranties or covenants contained in this Agreement which would result in the failure of the condition set forth in Section 6.1(a) or Section 6.1(b), as applicable, to be satisfied, and which breach has not been cured within ten (10) days after written notice of such breach has been delivered to the Seller from the Purchaser or cannot be cured by the Outside Date;

(iii)     by the Seller (so long as the Seller is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if there has been a breach of any of the Purchaser's representations, warranties or covenants contained in this Agreement which would result in the failure of a condition set forth in Section 6.2(a) or Section 6.2(b), as applicable, to be satisfied, and which breach has not been cured within ten (10) days after written notice of such breach has been delivered to the Purchaser from the Seller or cannot be cured by the Outside Date;

(iv)     by either the Purchaser or the Seller, if there is in effect a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, however, that the right to terminate this Agreement under this Section 7.1(a)(iv) will not be available to any party whose failure to fulfill any covenant or obligation under this Agreement is the cause of or resulted in the action or event described in this Section 7.1(a)(iv) occurring; or

(v)     by the Purchaser if (a) the Chapter 11 Case is dismissed or converted into a case under chapter 7 of the Bankruptcy Code or (b) an examiner with expanded powers or trustee is appointed in the Chapter 11 Case.

(b)     This Agreement shall terminate automatically in the event that (i) an Alternative Transaction has been consummated following approval by the Bankruptcy Court, (ii) the Purchaser is not chosen at the Auction to be the Successful Bidder or the Back-Up Bidder or

(iii) the Purchaser is chosen at the Auction to be the Back-Up Bidder, upon the expiration of the Back-Up Period.

Section 7.2    Effect of Termination.

(a)    If this Agreement is terminated pursuant to Section 7.1, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any other party or its Affiliates, except that Section 4.6 (*Independent Investigation*), Section 5.7 (*Public Announcements*), Section 5.13 (*Back-Up Bidder*), Section 7.3 (*Termination Payment*), Article 10 (*General Provisions*) (except for Section 10.11 (*Specific Performance*)) and this Section 7.2 shall remain in full force and survive any termination of this Agreement. Notwithstanding the foregoing and subject to Section 7.3, in the event this Agreement is terminated by a party pursuant to Section 7.1 of this Agreement because of breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal rights and remedies hereunder and under applicable Law will survive such termination unimpaired.

(b)    If this Agreement is terminated pursuant to Section 7.1, other than pursuant to Section 7.1(iii), the Deposit shall be returned to Purchaser within three (3) business days following such termination. If this Agreement is terminated pursuant to Section 7.1(iii), Seller may retain any part of the Deposit required to compensate Seller for actual damages resulting from the cause of such termination and shall return any excess to Purchaser within three (3) business days following determination by Seller of such damages.

## ARTICLE 8

## NO SURVIVAL

Section 8.1    No Survival of Representations and Warranties and Certain Covenants. Each of the representations, warranties and covenants (other than covenants that, by their terms, survive the Closing or termination of this Agreement) in this Agreement or any agreement or certificate to be executed or delivered in connection with the transactions contemplated by this Agreement, and claims for breach or violation thereof, shall terminate at the Closing or upon termination of this Agreement pursuant to Section 7.1, subject to Section 7.2, and, following the Closing or the termination of this Agreement, as the case may be, no party shall make any claim whatsoever for any breach of any such representation, warranty or covenant hereunder, subject to Section 7.2.

## ARTICLE 9

## TAX MATTERS

Section 9.1    Transfer Taxes. Any sales, use, *ad valorem*, property, transfer, conveyance, documentary, recording, notarial, value added, excise, registration, stamp, gross receipts and similar Taxes and fees ("Transfer Taxes"), arising out of or in connection with or

**EXECUTION VERSION**

attributable to the transactions effected pursuant to this Agreement, including expenses and fees relating to registering Acquired Intellectual Property in the name of the Purchaser or its designee, regardless of whether such Transfer Taxes, expenses and fees are imposed by Law on the Purchaser, the Purchased Assets or the Seller , shall be borne by the Purchaser. Purchaser shall provide Seller evidence of timely payment of such Transfer Taxes, expenses or fees. Any Tax Returns that must be filed in connection with any Transfer Taxes will be prepared by the party that customarily has primary responsibility for filing such Tax Returns pursuant to the applicable Law under and according to which the respective Tax Returns are due to be filed; provided, however, that the preparing party will deliver such Tax Returns for the other party's review and approval (not to be unreasonably withheld, conditioned or delayed) at least ten (10) Business Days prior to the applicable due date. The parties will cooperate with each other in the provision of any information or preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any such Transfer Taxes.

Section 9.2    Proration Items. Personal property Taxes, other similar Taxes payable by Seller (the "Proration Items") with respect to the Purchased Assets for any Taxable period beginning before the Closing Date and ending after the Closing Date shall be prorated on a per diem basis between the Purchaser and the Seller as of the Closing Date. The amount of the Proration Items attributable to the Seller shall be equal to the amount of Tax for the period multiplied by a fraction, the numerator of which shall be the number of days from the beginning of the period through and including the Closing Date and the denominator of which shall be the entire number of days in the period. For purposes of allocating all other Taxes ("Non-Proration Items") with respect to the Purchased Assets for any Straddle Period, such Taxes shall be allocated between the pre-Closing portion of such Straddle Period and the post-Closing portion of such Straddle Period based on an interim closing of the books at the end of the day on the Closing Date. The Seller shall bear any Non-Proration Items allocable to the pre-Closing portion of any Straddle Period and any other unpaid Taxes with respect to the Purchased Assets for Tax periods ending on or prior to the Closing Date (such Non-Proration Items and other pre-Closing Date Taxes, "Other Seller Taxes"). The amount of all such Proration Items attributable to the Seller and the amount of any Other Seller Taxes shall be estimated as of the Closing Date and deducted from the Purchase Price at the Closing; provided, however that final payments with respect to the Proration Items or Other Seller Taxes that are not able to be calculated as of the Closing Date shall be calculated and the Seller (or any successor thereof or any estate) shall pay over any additional amount as soon as practicable after the Closing Date, but no later than five (5) Business Days after determination of such additional amounts.

## ARTICLE 10

## GENERAL PROVISIONS

Section 10.1    Notices. All notices and other communications under this Agreement must be in writing and are deemed duly delivered when: (a) delivered, if delivered personally or by nationally recognized overnight courier service (costs prepaid); (b) sent by email; or (c) received or rejected by the addressee, if sent by United States of America certified or registered mail, return receipt requested; in each case to the following addresses, emails or facsimile numbers and marked to the attention of the individual (by name or title) designated below (or to such

31

**EXECUTION VERSION**

other address, facsimile number, email or individual as a party may designate by notice to the other party):

       If to the **Seller**:

       Intergalactic Therapeutics, Inc.
       c/o Charles Allen
       330 Cochituate Road #5088
       Framingham, MA 01701

with a copy (which will not constitute notice) to:

       Harold B. Murphy, Esquire
       Murphy and King, P.C.
       28 State Street
       Boston, MA 02109
       Email: hmurphy@murphyking.com

       If to the **Purchaser**:

       Rachel Lei, General Counsel
       Aldevron, LLC
       4055 41st Ave
       South Fargo, North Dakota 58104
       Email: Rachel.Lei@aldevron.com

       Jeff Gold, Chief IP Counsel
       Aldevron, LLC
       4055 41st Ave
       South Fargo, North Dakota 58104
       Email: Jeffrey.Gold@aldevron.com

with a copy (which shall not constitute notice) to:

       George W. Shuster, Jr. & Omar Khan
       WilmerHale
       7 World Trade Center
       250 Greenwich Street
       New York, NY  10007
       Email: george.shuster@wilmerhale.com; omar.khan@wilmerhale.com

       Section 10.2    Amendment. Except as otherwise expressly contemplated by this Agreement, this Agreement may not be amended, supplemented or otherwise modified except in a written document signed by each party hereto and that identifies itself as an amendment to this Agreement.

**EXECUTION VERSION**

Section 10.3     Waiver and Remedies. The parties may, in its discretion, but are not required to: (a) extend the time for performance of any of the obligations or other acts of the other party to this Agreement; (b) waive any inaccuracies in the representations and warranties of the other party to this Agreement contained in this Agreement; or (c) waive compliance with any of the covenants or conditions for the benefit of such party contained in this Agreement. Subject to Section 5.5, (i) any such extension or waiver by a party to this Agreement will be valid only if set forth in a written document signed on behalf of the party against whom the extension or waiver is to be effective; (ii) no extension or waiver will apply to any time for performance, inaccuracy in any representation or warranty, or noncompliance with any covenant or condition, as the case may be, other than that which is specified in the written extension or waiver; and (iii) no failure or delay by a party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant to this Agreement, and no course of dealing between the parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy. Notwithstanding anything to the contrary herein, any deadline set forth in this Agreement that does not fall on a Business Day shall automatically be extended to the next Business Day.

Section 10.4     Entire Agreement. This Agreement (including the Schedules and Exhibits hereto and the documents and instruments referred to in this Agreement that are to be delivered at the Closing) constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations by or between the parties, or either of them, written or oral, with respect to the subject matter of this Agreement.

Section 10.5     Assignment, Successors and No Third Party Rights. This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Seller under chapter 11 or chapter 7 of the Bankruptcy Code and any entity appointed as a successor to the Seller pursuant to a confirmed chapter 11 plan). No party may delegate any performance of its obligations under this Agreement, except that the Purchaser may at any time delegate the performance of its obligations to any Affiliate of the Purchaser so long as the Purchaser remains fully responsible for the performance of the delegated obligation. The Purchaser may designate one or more Affiliates, including any special purpose entities that may be organized by the Purchaser for such purpose, to take title to the Purchased Assets or any portion thereof and operate the business going forward, and upon written notice to the Seller of any such designation by the Purchaser, the Seller agrees to execute and deliver all instruments of transfer with respect to the Purchased Assets directly to, and in the name of, the Purchaser's designees. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as may inure to a successor or permitted assignee under this Section 10.5.

Section 10.6     Severability. In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise

**EXECUTION VERSION**

affected and shall continue to be valid and enforceable to the fullest extent permitted by applicable Law.

Section 10.7  Exhibits and Schedules. The Exhibits and Schedules to this Agreement are incorporated herein by reference and made a part of this Agreement. The Seller Disclosure Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article 3. The disclosure in any section or paragraph of the Seller Disclosure Schedule, and those in any amendment or supplement thereto, shall be deemed to relate to and to qualify only the particular representation or warranty set forth in the corresponding numbered or lettered section or paragraph of Article 3, except to the extent that:

(a)     such information is cross-referenced in another part of the Seller Disclosure Schedule; or

(b)     it is reasonably apparent on the face of the disclosure (without reference to any document referred to therein or any independent knowledge on the part of the reader regarding the matter disclosed) that such information qualifies another representation or warranty of the Seller in Article 3.

Section 10.8  Interpretation. In the negotiation of this Agreement, each party has received advice from its own attorney. The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no provision of this Agreement will be interpreted for or against either party because that party or its attorney drafted the provision.

Section 10.9  Expenses. Except as otherwise provided herein, each party will pay its own direct and indirect expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement, including all fees and expenses of its advisors and representatives.

Section 10.10  Limitation on Liability. Notwithstanding any other provision of this Agreement to the contrary, in no event will any party or any of its Affiliates be liable for any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales) in connection with any claims, losses, damages or injuries arising out of the conduct of such party pursuant to this Agreement, regardless of whether the nonperforming party was advised of the possibility of such damages or not.

Section 10.11  Specific Performance. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by either party in accordance with such party's specific terms or were otherwise breached by such party. The parties accordingly agree that, prior to the termination of this Agreement pursuant to Section 7.1, in addition to any other remedy to which a non-breaching party is entitled at law or in equity, the non-breaching party is entitled to injunctive relief to prevent breaches of this Agreement by the breaching party and otherwise to enforce specifically the provisions of this Agreement against the breaching party; provided that, the non-breaching party shall only be entitled to injunctive relief if such non-breaching party is not otherwise in breach of this Agreement or if the breaching party is not otherwise entitled to terminate this Agreement. Each party expressly waives any requirement that the other party obtains any bond or provides any

indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.

Section 10.12  Governing Law; Jurisdiction; Waiver of Jury Trial. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE IN THE BANKRUPTCY COURT (FOR SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION) AND THEREAFTER IN THE FEDERAL OR STATE COURTS OF COMPETENT JURISDICTION LOCATED IN THE COUNTY OF SUFFOLK IN THE COMMONWEALTH OF MASSACHUSETTS AND EACH OF THE PARTIES HERETO IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, GENERALLY AND UNCONDITIONALLY, AND WAIVES ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT HEREBY.

NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASE AND SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

Section 10.13  No Joint Venture. Nothing in this Agreement creates a joint venture or partnership between the parties. This Agreement does not authorize any party hereto (a) to bind or commit, or to act as an agent, employee or legal representative of, any other party, except as may be specifically set forth in other provisions of this Agreement, or (b) to have the power to control the activities and operations of any other party. Each party agrees not to hold itself out as having any authority or relationship contrary to this Section 10.13.

Section 10.14  Counterparts; Signatures. The parties may execute this Agreement including, by electronic signature, in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. This Agreement is effective upon delivery of one executed counterpart from each party to the other party. The signatures of all parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or electronic transmission that includes a copy of the sending party's signature(s) is as effective as signing and delivering the counterpart in person.

Section 10.15  Preservation of Records; Post-Closing Access and Cooperation.

35

**EXECUTION VERSION**

(a)      For a period equal to the lesser of: (i) eighteen (18) months after the Closing Date; and (ii) the closing of the Chapter 11 Case by the Bankruptcy Court (the "Post-Closing Access and Cooperation Period"), the Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records in its possession that are Purchased Assets (including any documents relating to any governmental or nongovernmental claims, actions, suits, proceedings or investigations) relating to the operation of Business and the Purchased Assets prior to the Closing Date.

(b)      During the Post-Closing Access and Cooperation Period, subject to existing confidentiality agreements and upon reasonable advance notice from the Seller (or its designee or successor), the Purchaser shall afford promptly to the Seller and its representatives (or its designee or successors, which may include the trustee of a liquidating trust) reasonable access during normal business hours to the offices, facilities, books, records, officers and employees of the Business as reasonably requested by the Seller for the purpose of winding-up its affairs and finalizing the administration of the Chapter 11 Case or in furtherance of the purposes set forth herein; provided, that such access does not unreasonably interfere with the Purchaser's business operations. During the Post-Closing Access and Cooperation Period, the Purchaser shall permit former employees of the Seller to cooperate with the Seller (or, its designee or successors) after the Closing, in furnishing information, testimony and other reasonable assistance with respect to the Business or Purchased Assets for periods prior to the Closing Date in connection with any action or proceeding relating to the Chapter 11 Case or in furtherance of the purposes set forth herein; provided, that such access does not unreasonably interfere with the Purchaser's business operations.

[SIGNATURES APPEAR ON THE FOLLOWING PAGES]

The parties have executed and delivered this Agreement as of the date indicated preamble of this Agreement.

**SELLER:**

**INTERGALACTIC THERAPEUTICS, INC.**

By:

Name:

Title:

The parties have executed and delivered this Agreement as of the date indicated preamble of this Agreement.

**PURCHASER:**

**ALDEVRON, LLC**

By _____
Jennifer Meade (Feb 29, 2024 20:54 CST)

Name:    Jennifer Meade

Title:     President

## EXHIBIT A

### FORM OF BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale") is made as of the ___ day of _____, 2024, by and between Intergalactic Therapeutics, Inc. ("Seller"), to and in favor of Aldevron, LLC. ("Purchaser"). Seller and Purchaser are each a "Party" hereto and are collectively referred to herein as the "Parties." All capitalized terms that are not otherwise defined herein shall have the meanings given to such terms in the Agreement (as defined below).

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement dated March 1, 2024 (the "Agreement"), pursuant to which the Seller agreed to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agreed to purchase and acquire from Seller, all of Seller's right, title and interest in and to the Purchased Assets, including, but not limited to, the Assumed Contracts, free and clear of all Liens and Claims other than the Assumed Liabilities, as provided in the Sale Order, in exchange for the Purchase Price (the "Sale");

WHEREAS, the Bankruptcy Court entered the Sale Order on ____, 2024, approving the Sale of the Purchased Assets to Purchaser on the terms set forth in the Agreement and in the Sale Order; and WHEREAS, pursuant to the Agreement, Seller has agreed to execute and deliver this Bill of Sale to effectuate the sale, transfer, assignment, conveyance and delivery of the Purchased Assets to Purchaser and its successors and assigns.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

1.      For and in consideration of delivery of the Purchase Price, all upon the terms and subject to the conditions set forth in the Agreement, the receipt, sufficiency and adequacy of which are hereby acknowledged and accepted by Seller, Seller hereby sells, transfers, assigns, conveys and delivers to Purchaser, its successors and assigns, all of Seller's entire right, title and interest in, to and under the Purchased Assets, as provided in the Sale Order.

2.      Seller and Purchaser hereby agree to execute and deliver any and all additional documents that Seller or Purchaser may reasonably request in order to more fully effect the agreements set forth in this Bill of Sale.

3.      This Bill of Sale shall be subject to the terms and conditions set forth in the Agreement and the Sale Order. Seller and Purchaser hereby acknowledge and agree that the provisions of this Bill of Sale shall not modify or limit the full force and effect of the terms and provisions of the Agreement or the Sale Order, and that in the event of a conflict between the terms and provisions of this Bill of Sale and the terms and provisions of the Agreement as approved by the Sale Order,, the terms and provisions of the Agreement, as approved by the Sale Order, shall prevail, govern and control in all respects without limitation.

4.      Section 10.12 of the Agreement is hereby incorporated by reference into this Bill of Sale and shall apply as if fully set forth herein *mutatis mutandis*.

**EXECUTION VERSION**

5.      The Parties may execute this Bill of Sale in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. This Bill of Sale is effective upon delivery of one executed counterpart from one Party to the other Party. The signatures of all Parties, which may be signed electronically, need not appear on the same counterpart. The delivery of signed counterparts by facsimile or electronically transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.

6.      The undertakings, covenants and agreements set forth herein shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and assigns.

[Signature Page Follows]

38

**EXECUTION VERSION**

      **IN WITNESS WHEREOF**, the Parties have executed this Bill of Sale as of the date first above written.

        **SELLER:**

        **INTERGALACTIC THERAPEUTICS, INC.**

        By:

        Name:

        Title:

        **PURCHASER:**

        **ALDEVRON, LLC**

        By:

        Name:

        Title:

EXECUTION VERSION

[Intentionally Omitted]

**EXECUTION VERSION**

**EXECUTION VERSION**

## EXHIBIT C

FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

**THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT** (this "Assignment"), effective as of [•] (the "Effective Date"), is by and between Aldevron, LLC, a North Dakota limited liability company ("Assignee"), and Intergalactic Therapeutics, Inc., a Delaware corporation ("Assignor").

**W I T N E S S E T H:**

WHEREAS, pursuant to the terms and subject to the conditions of the Asset Purchase Agreement, dated March 1, 2024 (the "Asset Purchase Agreement"), between Assignee and Assignor, Assignor has agreed to sell to Assignee, and Assignee has agreed to purchase from Assignor, among other things, the Purchased Assets; and WHEREAS, pursuant to the Asset Purchase Agreement, Assignor desires to sell, assign, convey, deliver and transfer the entire right, title and interest in, to and under all of the Intellectual Property included in the Purchased Assets, including the Intellectual Property as set forth on Exhibit A hereto (the "Assigned IP"), to Assignee and Assignee desires to acquire the entire right, title and interest in, to and under such Assigned IP.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as more fully set forth in the Asset Purchase Agreement and subject to the terms and conditions therein as approved by e Sale Order, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

2. Assignor hereby irrevocably sells, assigns, conveys, delivers and transfers to Assignee the entire right, title and interest in, to and under (i) the Assigned IP, together with all goodwill associated therewith, in each case to be held and enjoyed by Assignee for its own use and enjoyment as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment and sale had not been made, including the right to claim priority under the International Convention for the Protection of Industrial Property and under any other international arrangement to which the United States of America is or hereafter becomes a signatory (but not, for the avoidance of doubt, any Excluded Liability), (ii) all rights to sue, claim and recover for past, present and future infringement, misappropriation, dilution or other violation of any Assigned IP, and (iii) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing.

3. Concurrent with the execution of this Assignment, Assignor shall transfer any and all domain names and social media accounts included in the Assigned IP from Assignor's account to Assignee's account (such that Assignee will be listed as the registrant and/or owner of such domain names and social media accounts in the applicable registrar) and shall deliver to Assignee all necessary Auth-Info codes and all other required passwords necessary to unlock and control such domain names and social media accounts.

42

**EXECUTION VERSION**

4.      Upon the reasonable request by Assignee, Assignor shall execute all documents and take all actions as may be necessary or desirable to enable Assignee to prosecute, perfect, enforce, defend, register and/or record its right, title and interest in, to and under the Assigned IP, in each case, without further compensation but at the expense of Assignee. In the event that Assignor fails to execute any such document or take any such action as set forth in the preceding sentence, Assignor hereby designates Assignee as Assignor's agent, and hereby grants to Assignee a power of attorney with full power of substitution, which power of attorney shall be deemed coupled with an interest, for the purpose of executing such documents or taking such actions.

5.      Assignor hereby authorizes and requests the officials of the United States Copyright Office and the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign jurisdiction, to record and register Assignee as assignee and owner of the entire right, title and interest in, to and under the Assigned IP.

6.      Section 10.12 of the Purchase Agreement is hereby incorporated by reference into this Agreement and shall apply as if fully set forth herein *mutatis mutandis.*

7.      This Assignment is binding upon, and inures to the benefit of, the parties hereto and their respective legal representatives, successors and assigns. No waiver, modification or change of any provision of this Assignment shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

8.      This Assignment may be executed in counterparts in electronic form or by hand, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**[SIGNATURE PAGE FOLLOWS]**

**EXECUTION VERSION**

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNOR:**

**INTERGALACTIC THERAPEUTICS, INC.** By:

Name:

Title:

STATE OF

COUNTY OF

On the ____ day of ____, before me personally came _____ , who is personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and did depose and say to me that he or she executed the same in his or her capacity as of _____, the entity described in and which executed the foregoing instrument, and that he or she executed and delivered said instrument pursuant to authority given by the board of directors of such entity (or other applicable authority of such entity).

Notary Public

(PLACE STAMP AND SEAL ABOVE)

*[Signature Page to Intellectual Property Assignment Agreement]*

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNEE:**

**ALDEVRON, LLC**

By:

Name:

Title:

STATE OF

COUNTY OF

On the _____ day of _____, before me personally came _____ , who is personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and did depose and say to me that he or she executed the same in his or her capacity as of _____, the entity described in and which executed the foregoing instrument, and that he or she executed and delivered said instrument pursuant to authority given by the board of directors of such entity (or other applicable authority of such entity).

Notary Public

(PLACE STAMP AND SEAL ABOVE)

*[Signature Page to Intellectual Property Assignment Agreement]*

**SCHEDULES**

Schedule 2.1(a) - Purchased Inventory
Schedule 2.1(b) - Personal Property
Schedule 2.1(d) - Acquired Intellectual Property
Schedule 2.1(f) - Governmental Authorizations
Schedule 2.2(k) - Specifically Excluded Assets
Schedule 2.3(f) - Other Assumed Liabilities
Schedule 5.12(a)(ii) - [Intentionally Omitted]

## SELLER DISCLOSURE SCHEDULES

Schedule 3.6 – [Intentionally Omitted]
Schedule 3.9(a) - Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements
Schedule 3.9(b) - Intellectual Property Claims Brought Against the Seller
Schedule 5.2 - Operation of the Business

**<u>Schedule 2.1(a) - Purchased Inventory</u>**

| Item | Description |
|---|---|
| 55082(ABCA4)-RCB | Research cell bank fro ABCA4C3DNA-IG002 |
| 1696-S1037-Altabio electrocompetent cells | These are the cells that are used to convert PreC3to bpC3DNA, they consist of 1696BxB1( integrase) and rep origin (1037), 1696consisting cells (BxB1exists as a BAC-bacterially artificial chromosome and not integrated) |
| S1037-Altabio electrocompetent cells | The cells with rep origin (stellar cells+ 1037), Parent cells |
| 55082-C3DNA | Purified C3DNA |
| 99070-C3DNA | Purified C3DNA |
| 1696-plasmid | This is BxB1encoding plasmid, 2vials, in a ziploc |
| Pre-55024 | This is PreC3plasmid for 55082-ABCA4C3DNA (IG002), in a ziploc |
| 55100+ (labelled as) in white Box PreC3constructs-glycerol stocks | These are confirmed glycerol stocks of PreC3construct |
| 99100+ (labelled as) in Green Box Converted C3constructs-glycerol stocks | These are confirmed glycerol stocks of converted C3DNA from PreC3 |

## <u>Schedule 2.1(b) - Personal Property</u>

1. Research materials including the Research Cell Bank for ABCA4 C3DNA, Purified C3DNA, preC3 Plasmid, glycerol stocks of PreC3 Constructs, and glycerol stocks of converted C3DNA from PreC3, as well as NHP retina samples obtained from Intergalactic's 3239-071 study

2. Lab Consumables.

## Schedule 2.1(d) - Acquired Intellectual Property

**Patents:**

| Family No.<br>MLB Reference | Family Title | Title / Family Description | Country | Application No.<br>(Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| 1<br>5002 (IGT-002) | Synthetic C3DNA 1 | SYNTHETIC DNA VECTORS AND METHODS OF USE<br>Directed to synthetic closed covalent circular DNA (C3DNA), methods of producing synthetic C3DNA, and methods of using C3DNA for treatment of diseases. Includes disclosures directed to C3DNA encoding ABCA4 and other ocular genes for treatment of retinal dystrophies, such as Stargardt disease. | U.S. Provisional | 62/643,336 (3/15/2018) | | Expired provisional |
| | | | U.S. Provisional | 62/749,369 (10/23/2018) | | Expired provisional |
| | | | PCT | PCT/US19/22511 (3/15/2019) | | Published / closed |
| | | | U.S. | 16/980,914 (9/15/2020) | | Pending (Response to Non-Final Office Action due Feb 6 2024, extendable to May 6 2024) |
| | | | Australia | 2019233901 (3/15/2019) | | Pending (Annuity Mar 15 2024) |
| | | | Canada | 3092088 (3/15/2019) | | Pending (Request Examination and Annuity Mar 15 2024) |
| | | | China | 201980019118.X (3/15/2019) | | Abandoned |
| | | | China (Div) | 202311181118.4 (3/15/2019) | | Pending (POA required and Response to Notice of Rectification due Feb 16 2024) |
| | | | Europe | 19766752.0 (3/15/2019) | | Pending (Annuity Mar 15 2024) |
| | | | Hong Kong (from EP) | 62021033338.6 (6/18/2021) | | Pending (Annuity Mar 15 2027) |
| | | | Israel | 276923 (3/15/2019) | | Pending |
| | | | India | 202017037925 (3/15/2019) | | Pending |

| Family No. MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| | | | Japan | 2020545324 (3/15/2019) | | To be abandoned in favor of a divisional application (OA response Jan 4 2024) |
| | | | Japan (Div) | TBD | | To be filed by Jan 4 2024 |
| | | | Korea | 1020207028218 (3/15/2019) | | Pending |
| | | | Mexico | MX/a/2020/00579 (3/15/2019) | | Pending |
| 2 5003 (IGT-003) | Synthetic C$^3$DNA 2 | SYNTHETIC DNA VECTORS AND METHODS OF USE Includes and expands the subject matter of Family 1 (synthetic C3DNA) to include other disease indications, such as oncology. Claims broadly issued in US for synthetic C3DNA lacking an origin of replication, drug resistance gene, and recombination site. | U.S. Provisional | 62/902,084 (9/18/2019) | | Expired provisional |
| | | | PCT | PCT/US20/51507 (9/18/2020) | | Published / closed |
| | | | Taiwan | 109132490 (9/18/2020) | | Pending |
| | | | U.S. | 17/365,805 (7/1/2021) | | Abandoned |
| | | | U.S. | 17/365,808 (7/1/2021) | 11,324,839 | Granted |
| | | | U.S. | 17/365,846 (7/1/2021) | 11,766,490 | Granted |
| | | | U.S. | 17/675,899 (2/18/2022) | 11,602,569 | Granted |
| | | | U.S. | 18/057,032 (11/18/2022) | 11,684,680 | Granted |
| | | | U.S. | 18/308,457 (4/27/2023) | | Pending |
| | | | Europe | 20866548.9 (9/18/2020) | | Pending (Response to Search Report Mar 29 2024) (Annuity Sep 18 2024) |
| | | | United Kingdom | 2204355.8 (9/18/2020) | | Pending (Order for acceptance Mar 18 2024) |
| | | | Australia | 2020351204 (9/18/2020) | | Pending (Annuity Sep 18 2024) |
| | | | Canada | 3151464 (9/18/2020) | | Pending |

| Family No. MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| | | | | | | (Request Examination and Annuity Sep 18 2024) |
| | | | China | 202080080113.0 (9/18/2020) | | Pending |
| | | | Israel | 291437 (9/18/2020) | | Pending |
| | | | India | 202217022159 (9/18/2020) | | Pending |
| | | | Japan | 2022-517337 (9/18/2020) | | Pending |
| | | | Korea | 10-2022-7012373 (9/18/2020) | | Pending |
| | | | Mexico | MX/a/2022/003291 (9/18/2020) | | Pending |
| 3 5004 (IGT-004) | Cell-free production of C³DNA | SYNTHETIC PRODUCTION OF CIRCULAR DNA VECTORS Directed to methods of producing synthetic C3DNA in a cell-free system using restriction endonuclease digestion. | U.S. Provisional | 63/248,801 (9/27/2021) | | Expired provisional |
| | | | PCT | PCT/US22/77108 (9/27/22) | | Published (30M Nat'l entry Mar 27 2024) |
| 4 5005 (IGT-005) | Bacterially produced C³DNA | BACTERIALLY PRODUCED C3DNA Directed to methods of producing C3DNA in bacterial cells, engineered cells for producing C3DNA, and bacterially produced C3DNA compositions. | U.S. Provisional | 63/291,871 (12/23/21) | | Expired provisional |
| | | | PCT | PCT/US22/82078 (12/23/21) | | Published (30M Nat'l entry Jun 23 2024) |
| 5 5013 (IGT-013) | Peptides for gene delivery | POLYPEPTIDES AND METHODS OF USE Directed to peptides and nanoparticles that can improve cellular uptake of non-viral vectors, such as C3DNA. | Provisional / U.S. | 63/331,452 (4/15/2022) | | Expired provisional |
| | | | PCT/ International | PCT/US2023/065763 (4/14/2023) | | Published (30M Nat'l entry Oct 15 2024) |
| 6 5010 (IGT-010) | Ocular electrotransfer | OCULAR DELIVERY OF THERAPEUTIC AGENTS Directed to methods of delivering non-viral vectors to the eye using electrotransfer. Specific embodiments include delivery of C3DNA encoding | U.S. Provisional | 63/163,350 (3/19/2021) | | Expired provisional |
| | | | U.S. Provisional | 63/167,296 (3/29/21) | | Expired provisional |
| | | | U.S. Provisional | 63/167,463 (3/29/21) | | Expired provisional |
| | | | U.S. Provisional | 63/167,437 (3/29/2021) | | Expired provisional |

| Family No. MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| | | genes such as ABCA4 to the retina for treatment of retinal dystrophies, such as Stargardt disease. Also included are electrodes desired for ocular electro transfer. | U.S. Provisional | 63/293,297 (12/23/21) | | Expired provisional |
| | | | U.S. Provisional | 63/316,699 (3/4/22) | | Expired provisional |
| | | | PCT | PCT/US22/21209 (3/21/2022) | | Published / closed |
| | | | U.S. | 17/721,063 (4/14/2022) | | Abandoned |
| | | | U.S. | 18/156,891 (1/19/23) | | To be abandoned |
| | | | U.S. | 18/491,140 (10/20/2023) | | Pending (Response to Notice Jan 2 2024, extendable) |
| | | | Australia | 2022238492 (3/21/2022) | | Pending (Annuity Mar 21 2026) |
| | | | Canada | 3,212,469 (3/21/2022) | | Pending (Annuity Mar 21 2024) |
| | | | China | 202280035586.8 (3/21/2022) | | Pending (Request Examination and Voluntary Claim Amendments Mar 19 2024) |
| | | | Europe | 22772345.9 (3/21/2022) | | Pending (Annuity Mar 21 2024) (Voluntary claim amendments May 10 2024) |
| | | | Israel | 306009 (3/21/2022) | | Pending |
| | | | India | 202317071092 (3/21/2022) | | Pending (POA needed Jan 18 2024) |
| | | | Japan | 2023-557754 (3/21/2022) | | Pending (Request Examination Mar 21 2025) |
| | | | Korea | 10-2023-7035697 (3/21/2022) | | Pending (POA needed Dec 26 2023, extendable) |
| | | | Mexico | MX/a/2023/010899 (3/21/2022) | | Pending (Translation due Jan 28 2024) |

| Family No. MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| 7 5012 (IGT-012) | Front-of-the-eye electrotransfer | GENE THERAPIES FOR THE FRONT OF THE EYE Directed to methods of delivering non-viral vectors to the front of the eye using electrotransfer. Specific embodiments include delivery of C3DNA to the front of the eye for treatment of Fuchs' dystrophy. | U.S. Provisional | 63/444,740 (2/10/2023) | | Provisional Pending (Nonprov due Feb 10 2024) |
| 8 5006 (IGT-006) | Ocular DNA constructs | OCULAR DNA CONSTRUCTS Directed to vector compositions containing regulatory sequences that improve expression in retinal cells. | U.S. Provisional | 63/359,125 (7/7/2022) | | Expired provisional |
| | | | U.S. Provisional | 63/408,353 (9/20/22) | | Expired provisional |
| | | | PCT | PCT/US23/69748 (7/7/2023) | | PCT Pending (30M Nat'l entry Jan 7 2025) |
| | | | U.S. Provisional (BEST1) | 63/408,356 (9/20/2022) | | Expired provisional |
| | | | PCT (BEST1) | PCT/US23/74441 (9/18/2023) | | PCT Pending (30M Nat'l entry Mar 20 2025) |
| 9 5007 (IGT-007) | Respiratory C3DNA and electrotransfer | RESPIRATORY DELIVERY OF THERAPEUTIC AGENTS Directed to methods of delivering non-viral vectors to airway tissue cells using electrotransfer. | U.S. Provisional | 63/256,416 (10/15/2021) | | Expired provisional |
| | | | U.S. Provisional | 63/388,794 (7/13/2022) | | Expired provisional |
| | | | PCT | PCT/US22/78165 (10/14/2022) | | Published (30M Nat'l entry Apr 15 2024) |
| 10 5011 (IGT-011) | Devices for respiratory electrotransfer | DEVICES AND METHODS FOR HOLLOW TISSUE ELECTROTRANSFER Directed to electrode devices for electrotransfer of non-viral vectors to hollow tissues, such as airway. | U.S. Provisional | 63/293,365 (12/23/2021) | | Expired provisional |
| | | | PCT | PCT/US22/82365 (12/23/2022) | | Published (30M Nat'l entry Jun 23 2024) |
| 11 5008 (IGT-008) | Respiratory DNA constructs | RESPIRATORY DNA CONSTRUCTS Directed to vector compositions containing regulatory sequences that improve expression in airway cells. | U.S. Provisional | 63/388,880 (7/13/2022) | | Expired provisional |
| | | | PCT | PCT/US23/70108 (7/13/2023) | | PCT pending (30M Nat'l entry Jan 13 2025) |
| 12 | | NUCLEIC ACID VECTORS AND METHODS OF USE | U.S. Provisional | 63/152,575 (2/23/2021) | | Expired provisional |

| Family No. MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| 5009 (IGT-009) | Oncology vectors and electrotransfer | Directed to vector compositions encoding anticancer agents. | U.S. Provisional | 63/152,540 (2/23/2021) | | Expired provisional |
| | | | PCT | PCT/US22/17575 (2/23/2022) | | Published / closed |
| | | | China | 2022800303312 (2/23/2022) | | Pending (Request Substantive Examination Feb 23 2024) |
| | | | Europe | 22760356.0 (2/23/2022) | | Pending (Voluntary claim amendments Apr 4 2024) (HK extension via EP Jul 3 2024) |
| | | | Japan | 2023-551099 (2/23/2022) | | Pending (Request Examination Feb 23 2025) |
| | | | U.S. | 18/278,235 (8/22/2023) | | Pending |
| 13 5014 (IGT-014) | bacC3DNA Family 2 provisional | GENE THERAPY VECTORS AND METHODS OF PRODUCTION AND USE THEREOF Developments for bacterially-produced $C^3DNA$ including minimal origin of replication and methods for production including using transposase. | U.S. provisional | 63/509,458 (6/21/2023) | | Pending (PCT/US nonprov conversion June 21 2024) |

**Copyrights:** None

**Trademarks**: None

**Other Intellectual Property**:

1.       Domain Names:

a.       ig-tx.com

b.       igtx.bio

c.       ig-tx.us

d.       intergalactic-tx.com

e.       intergalactic-therapeutics.com

f.       pulsar-biotx.com

g.       intergalactictx.com

## Schedule 2.1(f) - Governmental Authorizations

1. Any and all approvals required by the Bankruptcy Court related to the Petition and as otherwise specified in the Sale Order.

## Schedule 2.2(k) - Specifically Excluded Assets

None.

## Schedule 2.3(f) - Other Assumed Liabilities

None.

**<u>Schedule 5.12(a)(ii) - [Intentionally Omitted]</u>**;

# SELLER DISCLOSURE SCHEDULES

**<u>Schedule 3.6 - [Intentionally Omitted</u>]**

**<u>Schedule 3.9(a) - Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements</u>**

See Schedule 2.1(d) for a complete list of Company Owned Intellectual Property.

Company Used Intellectual Property and IP Agreements:
1. Global Life Agreement;
2. Software license with Comsol;
3. Software license with Greenhouse;
4. Software license with Cloud Topco;
5. Software license with Egnyte;
6. Software license with LinkSquares;
7. Software license with Linkedin Corporation;
8. Software license with Carta.

## **Schedule 3.9(b) - Intellectual Property Claims Brought Against the Seller**

Aldevron communicated with the Seller about a potential intellectual property claim related to the below referenced patent application. The Seller responded to Aldevron in writing that the claim had not merit and no formal proceeding has been instituted.

Intergalactic patent application PCT/US2022/077108 (WO 2023/049937) entitled SYNTHETIC PRODUCTION OF CIRCULAR DNA VECTORS.

## <u>Schedule 5.2 - Operation of the Business</u>

None.

**Exhibit A-2**

**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

by and between

INTERGALACTIC THERAPEUTICS, INC.,

SELLER,

and

~~IGTX ACQUISITION, INC.,~~

<u>ALDEVRON, LLC,</u>

PURCHASER

DATED AS OF ~~JANUARY 4~~<u>MARCH 1</u>, 2024

**EXECUTION VERSION**

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS AND CONSTRUCTION** ..................................................... **1**
Section 1.1 Definitions ........................................................................................................ 1
Section 1.2 Construction ..................................................................................................... 10

**ARTICLE 2 THE TRANSACTION** ............................................................................... **11**
Section 2.1 Sale and Purchase of Purchased Assets .......................................................... 11
Section 2.2 Excluded Assets ............................................................................................... 12
Section 2.3 Assumed Liabilities ......................................................................................... 13
Section 2.4 Excluded Liabilities ........................................................................................ ~~14~~13
Section 2.5 Consideration ................................................................................................... 15
Section 2.6 [Intentionally Omitted] .................................................................................... 15
Section 2.7 Allocation of Purchase Price ........................................................................... 15
Section 2.8 Closing ............................................................................................................. 16
Section 2.9 Closing Deliveries ........................................................................................... 16
Section 2.10 Payment of Cure Amounts ............................................................................ 17
Section 2.11 Consents ......................................................................................................... 17

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER** ........ **~~18~~17**
Section 3.1 Organization ..................................................................................................... ~~18~~17
Section 3.2 Authority and Enforceability ........................................................................... ~~18~~17
Section 3.3 No Conflict ....................................................................................................... 18
Section 3.4 Title to Assets; Liens ....................................................................................... ~~19~~18
Section 3.5 Administration of Regulatory Proceedings ...................................................... ~~19~~18
Section 3.6 Contracts .......................................................................................................... ~~19~~18
Section 3.7 Intellectual Property ........................................................................................ ~~19~~18

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ... **~~20~~19**
Section 4.1 Organization and Good Standing ..................................................................... ~~21~~19
Section 4.2 Authority and Enforceability ........................................................................... ~~21~~20
Section 4.3 No Conflict ....................................................................................................... ~~21~~20
Section 4.4 Legal Proceedings ........................................................................................... ~~21~~20
Section 4.5 [Intentionally Omitted] .................................................................................... ~~21~~20
Section 4.6 Independent Investigation ............................................................................... ~~21~~20

**ARTICLE 5 COVENANTS** ............................................................................................. **~~22~~21**
Section 5.1 Access and Investigation ................................................................................. ~~22~~21
Section 5.2 Operation of the Business ................................................................................ ~~22~~21
Section 5.3 [Intentionally Omitted] .................................................................................... ~~23~~22
Section 5.4 Commercially Reasonable Efforts ................................................................... ~~23~~22
Section 5.5 Supplements to Disclosure Schedules ............................................................. ~~24~~23
Section 5.6 Confidentiality ................................................................................................. ~~24~~23
Section 5.7 Public Announcements .................................................................................... ~~25~~24
Section 5.8 Further Actions ................................................................................................ ~~25~~24

**EXECUTION VERSION**

Section 5.9 [Intentionally Omitted .......................................................... 2524
Section 5.10 Bankruptcy Court Matters .................................................. 2524
Section 5.11 Bankruptcy Court Approval; Break-Up Fee and Expense Reimbursement   27       25
Section 5.12 Assumption & Rejection of Executory Contracts ................ 2726
Section 5.13 Back-Up Bidder .................................................................. 2926
Section 5.14 [Intentionally Omitted] ...................................................... 2926
Section 5.15 Payments Received ............................................................. 2926
Section 5.16 Cessation of Use of Acquired Intellectual Property ........... 2927
Section 5.17 Transfer of Permits and Governmental Authorizations ....... 3027

**ARTICLE 6 CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE** ........ **3027**
Section 6.1 Conditions to the Obligation of the Purchaser ..................... 3027
Section 6.2 Conditions to the Obligations of the Seller .......................... 3128

**ARTICLE 7 TERMINATION** ...................................................................... **3229**
Section 7.1 Termination Events ............................................................... 3229
Section 7.2 Effect of Termination ........................................................... 3230

Section 7.3 Break-Up Fee                                                                                  33

**ARTICLE 8 NO SURVIVAL** ....................................................................... **3330**
Section 8.1 No Survival of Representations and Warranties and Certain Covenants ...... 3330

**ARTICLE 9 TAX MATTERS** ...................................................................... **3430**
Section 9.1 Transfer Taxes ...................................................................... 3430
Section 9.2 Proration Items ..................................................................... 3431

**ARTICLE 10 GENERAL PROVISIONS** ..................................................... **3531**
Section 10.1 Notices ................................................................................ 3531
Section 10.2 Amendment ......................................................................... 3532
Section 10.3 Waiver and Remedies ......................................................... 3533
Section 10.4 Entire Agreement ................................................................ 3633
Section 10.5 Assignment, Successors and No Third Party Rights ........... 3633
Section 10.6 Severability ......................................................................... 3633
Section 10.7 Exhibits and Schedules ....................................................... 3734
Section 10.8 Interpretation ...................................................................... 3734
Section 10.9 Expenses ............................................................................. 3734
Section 10.10 Limitation on Liability ...................................................... 3734
Section 10.11 Specific Performance ........................................................ 3734
Section 10.12 Governing Law; Jurisdiction; Waiver of Jury Trial .......... 3835
Section 10.13 No Joint Venture ............................................................... 3835
Section 10.14 Counterparts; Signatures .................................................. 3835
Section 10.15 Preservation of Records; Post-Closing Access and Cooperation ...... 3835

**Exhibits**
Exhibit A – Form of Bill of Sale
Exhibit B – Form of Assignment and Assumption Agreement

**EXECUTION VERSION**

Exhibit C – Form of Intellectual Property Assignment

**EXECUTION VERSION**

**Schedules**
Schedule 2.1(a) - Purchased Inventory
Schedule 2.1(b) - Personal Property
Schedule 2.1(d) - Acquired Intellectual Property
Schedule 2.1(f) - Governmental Authorizations
Schedule 2.2(k) - Specifically Excluded Assets
Schedule 2.3(f) - Other Assumed Liabilities
Schedule 5.12(a)(ii) - Contract & Cure Schedule

**Seller Disclosure Schedules**
Schedule 3.6 - Contracts
Schedule 3.9(a) - Company Owned Intellectual Property, Company Used Intellectual Property
and IP Agreements
Schedule 3.9(b) - Intellectual Property Claims Brought Against the Seller
Schedule 5.2 - Operation of the Business

**EXECUTION VERSION**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of ~~January 4~~March 1, 2024, by and between Intergalactic Therapeutics, Inc., a Delaware corporation (the "Seller"), and ~~IGTX Acquisition, Inc., a Delaware corporation~~Aldevron, LLC, a North Dakota limited liability company (the "Purchaser").

## RECITALS

WHEREAS, the Seller is a biopharmaceutical company focused on the development and commercialization of pharmaceutical products and product candidates (the "Business");

WHEREAS, on December 19, 2023, the Seller filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") (Case No. 23-41067) and is operating and managing its businesses as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, subject to and upon the terms and conditions herein and applicable provisions of the Bankruptcy Code, the Seller desires to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, all of the Purchased Assets (as defined below);

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order (as defined below) approving such sale free and clear of all Liens and Claims, all as more specifically provided in this Agreement, and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bidding Procedures Order (as defined below); and

WHEREAS, the Seller and the Purchaser have negotiated in good faith and at arm's length for the purchase and sale of the Purchased Assets, the assumption of certain Liabilities associated therewith and for certain bid protections in connection therewith, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements, representations and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1

## DEFINITIONS AND CONSTRUCTION

Section 1.1     Definitions. For the purposes of this Agreement:

"Acquired Intellectual Property" has the meaning set forth in Section 2.1(d).

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, under no circumstance will the Purchaser and the Seller be deemed Affiliates of one another notwithstanding the possession by the Purchaser or its Affiliates (whether or not exercised) of any rights of control with respect to the Seller.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in Section 2.7(a).

"Allocation Statement" has the meaning set forth in Section 2.7(a).

"Alternative Transaction" means any transaction or series of related transactions (other than a transaction with Purchaser pursuant to this Agreement), whether effectuated pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed by the Seller, pursuant to which the Seller: (i) accepts a Qualified Bid, other than that of the Purchaser or its Affiliates, as the highest or otherwise best offer; or (ii) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an acquisition, asset sale, stock sale, purchase, merger, reorganization, recapitalization or other similar transaction with or involving any equity securities in the Seller or other interests in the Purchased Assets, including a stand-alone plan of reorganization, plan of liquidation, or refinancing, all or substantially all of the Purchased Assets (or agrees to any of the foregoing) in a transaction or series of transactions to a party or parties other than the Purchaser or its Affiliates.

~~"Assignment and Assumption Agreement" has the meaning set forth in Section 2.9(a)(ii).~~

~~"Assumed Contracts" has the meaning set forth in Section 2.1(e).~~

"Assumed Liabilities" has the meaning set forth in Section 2.3.

~~"Assumption Effective Date" has the meaning set forth in Section 5.12(a).2 "Assumption Procedures" means the procedures for the assumption and assignment of Executory Contracts as contemplated in this Agreement, the Bidding Procedures and the Bidding Procedures Order.~~

"Auction" means the bankruptcy auction of the Seller's assets, as may be conducted by the Seller pursuant to the Bidding Procedures Order and the Bankruptcy Code.

"Back-Up Bidder" has the meaning set forth in Section 5.13.

"Back-Up Period" has the meaning set forth in Section 5.13.

~~"Balance Sheet" has the meaning set forth in Section 3.12.~~

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures" means the procedure governing the solicitation of bids and the conduct of the Auction for the Purchased Assets under the supervision of the Bankruptcy Court to be approved pursuant to the Bidding Procedures Order.

"Bidding Procedures Order" means an order to be entered by the Bankruptcy Court approving the Bidding Procedures.

"Bill of Sale" has the meaning set forth in Section 2.9(a)(i).

~~"Break-Up Fee" has the meaning set forth in Section 7.3.~~

"Budget" has the meaning set forth in the DIP Loan Agreement.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday or any day on which banking institutions in New York are closed either under applicable Law or action of any Governmental Authority.

"Business Payments" has the meaning set forth in Section 5.15.

"Cash Amount" has the meaning set forth in Section 2.5.

"Chapter 5 Actions and Claims" means, with respect to any Person, all avoidance actions, claims or causes of action that constitute property of such Person's bankruptcy estate under section 541 of the Bankruptcy Code, including claims and causes of action under chapter 5 of the Bankruptcy Code or any other applicable law, and all proceeds therefrom.

"Chapter 11 Case" means the case ~~to be~~ commenced by the Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.8.

"Closing Date" has the meaning set forth in Section 2.8.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, including the regulations promulgated thereunder.

"Company Owned Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller.

"Company Used Intellectual Property" means all right, title and interest of Seller in all Intellectual Property owned or controlled by a Third Party that is (i) licensed or sublicensed to Seller or for which Seller has obtained a covenant not to be sued or (ii) otherwise used or held for use in connection with the Business.

"Confidential Information" means any information that is not generally known to the public and that is or has been used, developed or obtained by the Seller and its Affiliates to the extent it relates to the Business, the Purchased Assets or the Assumed Liabilities, including: (i) products or services; (ii) fees, costs and pricing structures; (iii) designs and specifications; (iv) analyses; (v) drawings, photographs and reports; (vi) computer software, including electronic mail, operating systems, applications and program listings; (vii) flow charts, transaction summaries and models, manuals and documentation; (viii) databases; (ix) financial reports, investment summaries, and accounting and business methods; (x) ideas, formulas, compositions, inventions, devices, new developments, methods and processes, whether patentable or unpatentable and whether or not reduced to practice; (xi) supplier, customers and clients and supplier, customer, contact or client lists and other marketing data or plans; (xii) know-how; (xiii) manufacturing and production processes and techniques; (xiv) research and development information; (xv) files and records; and (xvi) all similar and related information in whatever form, except that Confidential Information will not include any information that has been published in a form generally available to the public, other than as a result of a disclosure by the parties hereto or their respective representatives.

"Contract" means any contract, agreement, arrangement, lease, license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond or other instrument or consensual obligation.

~~"Contract & Cure Schedule" has the meaning set forth in Section 5.12(a).~~

"Copyrights" means all copyrights (whether or not registered), copyrightable works and all other corresponding rights, including copyrights in software and in the content contained on any Web site, and registrations and applications for any of the foregoing in any jurisdiction, and all derivative works, moral rights, renewals, extensions, reversions or restorations associated with any of the foregoing.

~~"Cure Amount" means, for any Executory Contract, the amount required to be paid under section 365 of the Bankruptcy Code to effectuate the assumption and assignment of such Executory Contract by the Seller to the Purchaser, as determined by the agreement of the parties to such Executory Contract or by Order of the Bankruptcy Court.~~

"Deposit" means the Purchaser's cash deposit in the amount equal to one hundred thousand U.S. dollars ($100,000) which was delivered to Seller by wire transfer on or before March 1, 2024.

4

"DIP Loan" means all amounts due and owing from time to time under the DIP Loan Agreement.

"DIP Loan Agreement" means the Debtor in Possession Term Sheet, dated as of December 19, 2023, as it may be amended from time to time, by and among the Seller and the Purchaser in its capacity as DIP Lender thereunder.

"DIP Loan Cap" means $800,000.00.

"Employee Plan" means any (i) "employee benefit plan" as defined in Section 3(3) of ERISA, (ii) compensation, employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, agreement, arrangement, program or policy or (iii) other plan, agreement, arrangement, program or policy providing for compensation, bonuses, profit-sharing, equity or equity-based compensation or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangement), medical, dental, vision, prescription or fringe benefits, life insurance, relocation or expatriate benefits, perquisites, disability or sick leave benefits, employee assistance program, workers' compensation, supplemental unemployment benefits or post-employment or retirement benefits (including compensation, pension, health, medical or insurance benefits), in each case whether or not written (x) that is sponsored, maintained, administered, contributed to or entered into by Seller for the current or future benefit of any current or former Service Provider or (y) for which Seller has any direct or indirect liability.

"Environmental Law" means any Law concerning: (i) the treatment, disposal, emission, discharge, Release or threatened Release of, or exposure to, Hazardous Material; (ii) human health and safety, or (iii) the protection of the environment (including natural resources, air and surface or subsurface land or waters or wildlife).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any rules or regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.2(a).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Executory Contract" means a Contract that is an "executory contract" or "unexpired lease", as such terms are used in section 365 of the Bankruptcy Code.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of

Bankruptcy Procedure 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of (i) the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed with Closing, and (ii) any other order that is required hereunder to be a Final Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed.

"Fundamental Representations" means each of the representations and warranties contained in Section 3.2 and Section 3.3~~(a)~~.

~~"Galvanize Agreement" means that certain Collaboration and License Agreement by and between Purchaser and Seller dated September 21, 2021, as amended or supplemented.~~

"Governmental Authority" means any: (i) nation, region, state, county, city, town, village, district or other jurisdiction; (ii) federal, state, local, municipal, foreign or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal); (iv) multinational organization exercising judicial, legislative or regulatory power; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature of any federal, state, local, municipal, foreign or other government.

"Governmental Authorization" means any approval, consent, ratification, waiver, license, Permit, registration or other authorization issued or granted by any Governmental Authority.

"Hazardous Material" means any waste or other substance that is listed, defined, designated or classified as hazardous, radioactive or toxic or a pollutant or a contaminant under, or is otherwise regulated by, any Environmental Law, including any admixture or solution thereof, and including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials in any form or condition and polychlorinated biphenyls.

"Intellectual Property" means all of the following anywhere in the world and all legal rights, title or interest in the following arising under Law: (i) all Patents; (ii) all Copyrights; (iii) all mask works, mask work registrations and mask work applications and all other corresponding rights; (iv) all Trademarks; (v) all inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind; (vi) all computer software (including source and object code), firmware, development tools, algorithms, files, records, technical drawings and

related documentation, data and manuals; (vii) all databases and data collections; (viii) all licenses and permits to the extent transferable; (ix) all other intellectual property rights; and (x) all rights to assert, claim or sue and collect damages for the past, present or future infringement, misappropriation or other violation of any of the foregoing.

"Intellectual Property Assignment" has the meaning set forth in Section 2.9(a)(iv).

"IP Agreements" means all Contracts (including outstanding decrees, orders, judgments, settlement agreements, or stipulations) to which Seller is a party which contain provisions: (i) granting to any Person rights in Company Owned Intellectual Property or Company Used Intellectual Property; (ii) granting to Seller any rights in Company Used Intellectual Property; (iii) consenting to another Person's use of Company Owned Intellectual Property or Company Used Intellectual Property, or covenanting not to sue any Person for infringement, misappropriation or any other violation of any such Intellectual Property; or (iv) restricting Seller's use of Company Owned Intellectual Property or any Company Used Intellectual Property.

"IRS" means the Internal Revenue Service.

"Judgment" means any Order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Knowledge of the Seller" or "the Seller's Knowledge" means: (i) the actual knowledge of Charles Allen after due inquiry into the facts or circumstances supporting any representation, warranty or statement qualified by such terms; and (ii) all such knowledge as would reasonably be obtained by the current Chief Financial Officer of Seller, for the time period of his tenure, in the discharge of such officer's duties.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance or code.

"Liability" means any liability or obligation, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due.

"Lien" means any possessory or non-possessory lien, license (other than with respect to any Company Used Intellectual Property), encumbrance or charge against or other interest in any property or assets, whether voluntary or involuntary and whether statutory or contractual, including any mortgage, deed of trust, deed to secure debt, pledge, assignment, hypothecation, security interest, attachment, judgment, levy, conditional sale agreement, right of first refusal, right of first offer or other arrangement, and including any agreement to give any of the foregoing.

"Material Adverse Effect" means any event, change, circumstance, effect or other matter that has, individually or in the aggregate, a material adverse effect on: (i) the financial condition or results of operations of the Business, taken as a whole; (ii) the condition or value of any material portion of the Purchased Assets or the Assumed Liabilities; or (iii) the ability of the Seller to consummate timely the transactions contemplated by this Agreement; provided, however, none of the following, either alone or in combination, will constitute, or be considered

EXECUTION VERSION

in determining whether there has been, a Material Adverse Effect, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Effect: any event, change, circumstance, effect or other matter to the extent resulting from or related to: (A) any outbreak or escalation of war or major hostilities or any act of terrorism; (B) changes in Laws, United States generally accepted accounting principles or enforcement or interpretation thereof; (C) changes that generally affect the industries and markets in which the Seller operates; (D) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs) or political conditions; (E) any failure, in and of itself, of the Seller to meet any published or internally prepared projections, budgets, plans or forecasts of revenues, earnings or other financial performance measures or operating statistics (provided that the underlying causes of such failure that are not otherwise excluded from the definition of a "Material Adverse Effect" may be taken into account in determining whether there has been a Material Adverse Effect); (F) any action required to be taken or not taken pursuant to or in accordance with this Agreement or at the express written request of, or expressly consented to in writing by, the Purchaser; (G) the filing or continuation of the Chapter 11 Case or any action approved by the Bankruptcy Court (or any other Governmental Authority in connection with any such Proceeding); or (H) the execution or delivery of this Agreement, the consummation of the transactions contemplated by this Agreement or the public announcement or other publicity with respect to any of the foregoing, in each of clauses (A), (B), (C) and (D) to the extent that such event, change, circumstance, effect or matter does not disproportionately affect the Seller compared to other companies that are principally engaged in the Business.

"Non-Proration Items" has the meaning set forth in Section 9.2.

"Order" means any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each case whether preliminary or final).

"Outside Date" means 5:00 p.m. Eastern Time on March 29, 2024.

"Patent" means all national and multinational statutory invention registrations, patents and patent applications of any type issued or applied for in any jurisdiction, including all industrial designs, provisionals, non-provisionals, continuations, divisionals, continuations-in-part, renewals, reissues, extensions, supplementary protection certificates, reexaminations and the equivalents of any of the foregoing in any jurisdiction, and all inventions disclosed in each such registration, patent or patent application.

"Permit" means all permits, licenses, consents, approvals, franchises, accreditations, certifications, easements, rights of way and authorizations related to the operation of the Business.

"Person" means an individual or an entity, including a corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity, or any Governmental Authority.

"Petition" has the meaning set forth in the Recitals.

"Petition Date" means the date the Petition is or was filed with the Bankruptcy Court.

"Post-Closing Access and Cooperation Period" has the meaning set forth in Section 10.15(a).

"Prepaid Expenses" means all prepaid charges and expenses of the Seller to the extent related to the Excluded Assets.

"Prepaid Expenses for Purchased Assets" has the meaning set forth in Section 2.1(c).

"Previously Omitted Contract" has the meaning set forth in Section 5.12(e).

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Proration Items" has the meaning set forth in Section 9.2.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Inventory" has the meaning set forth in Section 2.1(a).

"Purchaser" has the meaning set forth in the Preamble.

"Qualified Bid" means competing bids that are submitted in accordance with the Bidding Procedures and Bidding Procedures Order.

"Receivables" has the meaning set forth in Section 2.1(l).

"Release" means the release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating of any Hazardous Material into the environment.

"Sale Hearing" means the hearing to be conducted by the Bankruptcy Court to approve this Agreement and seeking entry of the Sale Order.

"Sale Order" means, collectively, one or more orders of the Bankruptcy Court in form and substance acceptable to the Purchaser and the Seller: (i) approving the sale of the Purchased Assets (and the assumption and assignment of the Assumed Contracts) to the Purchaser free and clear of all Claims and Liens pursuant to section 363(f) of the Bankruptcy Code, on the terms and conditions set forth in this Agreement; (ii) approving the Back-Up Bidder chosen at the Auction and the asset purchase agreement submitted by such Back-Up Bidder; (iii) authorizing consummation of the transactions contemplated hereby; (iv) containing a finding that the transactions contemplated by this Agreement are undertaken by the Seller and the Purchaser (solely in its capacity as such) at arm's length, without collusion and in good faith by the

EXECUTION VERSION

Purchaser within the meaning of section 363(m) of the Bankruptcy Code; (v) assuring that the Purchaser will not be subject to successor liability for any claims or causes of action of any kind or character against the Seller, whether known or unknown, unless expressly assumed as an Assumed Liability pursuant to this Agreement; (vi) authorizing the Purchaser to freely own and operate the Purchased Assets; (vii) providing that the Bankruptcy Court shall retain jurisdiction to hear any disputes arising in connection with the transactions contemplated by this Agreement, and (viii) permitting the Purchaser to waive, in its sole discretion, the 14-day stay period under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

"Schedule" means a schedule included in the Seller Disclosure Schedule and the other schedules attached hereto.

"Seller" has the meaning set forth in the Preamble.

"Seller Disclosure Schedule" has the meaning set forth in Article 3.

"Seller Names and Marks" means any and all (i) Trademarks of Seller, including all names, marks and logos set forth on Schedule 3.9(a) and the name and mark "Intergalactic Therapeutics" and all design marks and logos therefor and (ii) Trademarks derived from, confusingly similar to or including any of the foregoing.

"Service Provider" means any director, officer, employee or individual independent contractor of Seller.

"Successful Bidder" means the bidder who shall have submitted the highest or otherwise best bid at the conclusion of the Auction in accordance with the Bidding Procedures and Bidding Procedures Order. "Straddle Period" means any taxable period beginning before the Closing Date and ending after the Closing Date.

"Tax" means: (i) any federal, state, local, foreign or other tax, charge, fee, duty (including customs duty), levy or assessment, including any income, gross receipts, net proceeds, alternative or add-on minimum, corporation, ad valorem, turnover, real property, personal property (tangible or intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, profits, occupational, premium, interest equalization, windfall profits, severance, license, registration, payroll, environmental (including Taxes under section 59A of the Code), capital stock, capital duty, disability, estimated, gains, wealth, welfare, employee's income withholding, other withholding, unemployment or social security or other tax of whatever kind (including any fee, assessment or other charges in the nature of or in lieu of any tax) that is imposed by any Governmental Authority; (ii) any interest, fines, penalties or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any related contest or dispute; and (iii) any Liability for the Taxes of another Person.

"Tax Return" means any report, return, declaration, claim for refund, or information return or statement related to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

EXECUTION VERSION

"Third Party" means any Person and/or group of Persons other than the Seller, the Purchaser or any of their respective Affiliates.

"Trademarks" means all trademarks, trade names, service marks, designs, logos, brand names, certification marks, corporate names, trade dress, emblems, signs or insignia, slogans, Internet addresses and domain names, other similar designations of source or origin and general intangibles of like nature, any derivations of any of the foregoing, and all registrations and applications for registrations pertaining to any of the foregoing (including any intent to use applications, supplemental registrations and any renewals or extensions of any of the foregoing), and all goodwill associated with any of the foregoing.

"Transfer Taxes" has the meaning set forth in Section 9.1.

Section 1.2     Construction. Any reference in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" refers to the corresponding Article, Section, Exhibit or Schedule of or to this Agreement, unless the context indicates otherwise. The table of contents and the headings of Articles and Sections are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement. All words used in this Agreement are to be construed to be of such gender or number as the circumstances require. The words "including," "includes" or "include" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance. Where this Agreement states that a party "shall", "will" or "must" perform in some manner or otherwise act or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement. Any reference to a statute is deemed also to refer to any amendments or successor legislation as in effect at the relevant time. Any reference to a Contract or other document as of a given date means the Contract or other document as amended, supplemented and modified from time to time through such date, except with respect to any Contract or other document described in the Seller Disclosure Schedule.

## ARTICLE 2

## THE TRANSACTION

Section 2.1     Sale and Purchase of Purchased Assets. In accordance with the provisions of this Agreement and the Sale Order, and except as set forth in Section 2.2, at the Closing, the Seller will sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all of the Seller's right, title and interest in and to the following assets owned by Seller and used in the conduct of the Business (all of the assets to be sold, conveyed, assigned, transferred or delivered to the Purchaser are referred to as the "Purchased Assets"):

(a)     Inventory. All raw materials (including all active pharmaceutical ingredients), work in process, components, packaging and labeling materials, supplies, finished goods and other inventory listed on Schedule 2.1(a) (the "Purchased Inventory");

(b)     Personal Property. The personal property listed on Schedule 2.1(b) that is in the possession of Seller;

11

(c)     [Intentionally Omitted.];Prepaid Expenses for Purchased Assets. All prepaid expenses related to other Purchased Assets, including fees, costs, and expenses related to registration and maintenance of Intellectual Property comprising Purchased Assets ("Prepaid Expenses for Purchased Assets");

(d)     Intellectual Property. All Company Owned Intellectual Property, including (i) all Seller Names and Marks and (ii) Patents, Copyrights and Trademarks and other Intellectual Property set forth on Schedule 2.1(d) (collectively, the "Acquired Intellectual Property");

(e) Contracts. All Executory Contracts (including IP Agreements of the Seller) assumed by the Seller and assigned to the Purchaser pursuant to Section 5.12 (collectively, the "Assumed Contracts"); provided, however, that if any Assumed Contract is recharacterized by a Final Order to not be an Executory Contract, then personal property that is subject to such Assumed Contract shall be a Purchased Asset;

(e)     [Intentionally Omitted];

(f)     Authorizations. All Governmental Authorizations, including those Governmental Authorizations set forth on Schedule 2.1(f);

(g)     Correspondence. All correspondence with or to any Governmental Authority (including letters, minutes and official contact reports relating to any communications with any Governmental Authority), including (i) all regulatory submissions with respect to any product, and (ii) all original dossiers with respect to any Governmental Authorizations for any product;

(h)     Advertising Materials. All advertising, marketing, sale and promotional files and materials (including any television, radio and print content and materials), point of sale materials and Web site content (together with all source code, design notes and design documents associated therewith solely to the extent it is Company Owned Intellectual Property), including all Company Owned Intellectual Property therein, in each case to the extent capable of electronic delivery;

(i)     Books and Records. All books, records, files and papers, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production reports, information and records, personnel and employment records, and financial and accounting records, that are within the Seller's control or readily accessible to the Seller and that relate to other Purchased Assets, in each case to the extent capable of electronic delivery;

(j)     Claims. All claims, rights, credits, causes of action, defenses and rights of set-off against Third Parties and against Purchaser and its Affiliates, including any commercial tort claims and unliquidated rights under manufacturers' and vendors' warranties and any Chapter 5 Action and/or Claim related to the Purchased Assets being purchased hereunder, but not including any claims against Purchaser in respect of this Agreement;

(k)     Receivables. All accounts receivable and other receivables (together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto), and all

causes of action pertaining to the collection of the foregoing, including any intercompany receivables due to the Seller from ~~the Purchased Subsidiaries or from any other~~any Subsidiary of the Seller (provided that at the Purchaser's sole election, any such intercompany receivable may be terminated or reinstated at the Closing pursuant to Section 5.18) ("Receivables").

Section 2.2    Excluded Assets. Notwithstanding the terms of Section 2.1, the Seller will retain and will not sell, convey, assign, transfer or deliver to the Purchaser, and the Purchaser will not purchase or acquire, and the Purchased Assets do not include, any assets of the Seller which are not Purchased Assets including the following assets described below (the "Excluded Assets"):

(a)    Contracts. All Contracts ~~that are not assumed by the Seller and assigned to the Purchaser pursuant to Section 5.12~~ (each, an "Excluded Contract");

(b)    Books and Records. All minute books and records, stock ledgers, Tax records and all other materials that the Seller is required by Law to retain or primarily relating to an Excluded Asset or Excluded Liability; provided, however, that the Seller shall provide the Purchaser with reasonable access to and copies of any such materials;

(c)    Insurance. All insurance policies, claims and proceeds of insurance;

(d)    Claims. All rights, claims or causes of action of the Seller to the extent relating to any Excluded Assets or Excluded Liability (except to the extent constituting Purchased Assets pursuant to Section 2.1(j));

(e)    Chapter 5 Actions and Claims. All Chapter 5 Actions and Claims not constituting Purchased Assets pursuant to Section 2.1(j);

(f)    Estate Claims. All estate claims of the Seller (except to the extent constituting Purchased Assets pursuant to Section 2.1(j));

(g)    Accounts and Deposits. All: (i) cash, cash equivalents, bank deposits, investment accounts, lockboxes, certificates of deposit, marketable securities, bank accounts, corporate credit cards and other similar cash items, and (ii) deposits, pre-payments, refunds, rebates, credits and similar items, including rent and utility deposits, prepaid rent and all other prepaid charges and expenses, attributable to any period of time (or portion thereof) ending on or prior to the Closing Date, other than Prepaid Expenses for Purchased Assets;

(h)    Prepaid Expenses. All Prepaid Expenses;

(i)    Tax Refunds. All rights to refunds, rebates, credits or other benefits relating to Taxes and other governmental charges of whatever nature attributable to any period of time (or portion thereof) ending on or prior to the Closing Date;

(j)    This Agreement. All of the Seller's rights under this Agreement and all agreements ancillary to this Agreement (including payments comprising part of the Purchase Price); and

13

EXECUTION VERSION

(k)      Specifically Excluded Assets. All assets specifically listed as Excluded Assets on Schedule 2.2(k).

Section 2.3      Assumed Liabilities. In accordance with the provisions of this Agreement and the Sale Order, at the Closing, the Purchaser will assume and pay or perform and discharge when due only the following Liabilities of the Seller and no other Liabilities (the "Assumed Liabilities"), and except for the Assumed Liabilities, the Purchaser shall not be deemed to have assumed any other Liabilities of the Seller or any of its predecessors:

(a)      [Intentionally Omitted];

(b)      [Intentionally Omitted];

(c)      [Intentionally Omitted];

~~(a) Contractual Liabilities. All Liabilities arising after the Closing under the Assumed Contracts, and the Governmental Authorizations included in the Purchased Assets that are incurred from the conduct of the Business by the Purchaser following the Closing;~~

~~(b) Cure Amounts. To the extent set forth next to any Assumed Contract on the Contract & Cure Schedule (including as determined by the Bankruptcy Court or by mutual agreement with the contract counterparty to such Assumed Contract), any Cure Amount with respect to such Assumed Contract;~~

~~(c) Accounts Receivable Obligations. All obligations of the Seller to Third Parties related to or in connection with any Customer Financial Incentives first arising or incurred after the Closing owing or to be owing pertaining to sales of the Seller prior to the Closing but after the Petition Date; provided that all such Customer Financial Incentives in the aggregate relating to the Receivables shall not exceed the outstanding amount of the Receivables on the Closing Date;~~

(d)      Transfer Taxes. All Liabilities for Taxes borne by the Purchaser pursuant to Section 9.1;

(e)      [Intentionally Omitted.]; and

(f)      Other Assumed Liabilities. All Liabilities specifically identified on Schedule 2.3(f)~~ to be delivered by the Purchaser to the Seller on the date that is ten (10) days prior to the date of the Sale Hearing, including trade payables to the extent set forth therein that are not assumed pursuant to Section 2.3(e) or paid as a Cure Amount;~~.

For the avoidance of doubt, all Liabilities arising out of, relating to or incurred in connection with the Business or the Purchased Assets arising after the Closing that ~~were~~are incurred from the conduct of the Business by the Purchaser after the Closing shall be Liabilities of the Purchaser.

Section 2.4      Excluded Liabilities. Notwithstanding any other provision of this Agreement or any other writing to the contrary, the Purchaser is assuming only the Assumed

14

EXECUTION VERSION

Liabilities and is not assuming any other Liability of the Seller or any of its predecessors of whatever nature, whether presently in existence or arising hereafter, which shall be retained by and remain Liabilities of the Seller (the "Excluded Liabilities"). Such Excluded Liabilities include the following:

(a)     Operating Liabilities. All Liabilities which are not Assumed Liabilities to the extent relating to claims (including claims instituted after the Closing), events or conditions arising out of or relating in any way to the conduct or operation of the Business or the ownership of the Purchased Assets prior to the Closing, including as a result of the manufacture, design, use, operation, storage, acquisition, development or construction of, or warranties provided with respect to, a Purchased Asset during the period prior to the Closing;

(b)     Taxes. Any Liability for (i) Taxes of the Seller, (ii) Taxes attributable to the Business or the Purchased Assets for any period of time (or portion thereof) ending on or prior to the Closing Date (other than the Taxes expressly assumed by the Purchaser pursuant to Section 9.1 or Section 9.2), and (iii) Taxes borne by the Seller pursuant to Section 9.1 or Section 9.2;

(c)     Incidents and Events. All Liabilities and obligations arising out of, relating to or in connection with incidents or events occurring prior to the Closing by any Person employed by, or acting as an independent contractor on the property of or on behalf of, the Seller for payment, claims or benefits under workers' compensation Laws or any other Law;

(d)     Costs. All Liabilities of the Seller for fees, costs and expenses incurred in connection with the Chapter 11 Case or negotiating, preparing, closing and carrying out this Agreement and the transactions contemplated hereby, including (i) the fees and expenses of attorneys, investment bankers, finders, brokers, accountants and consultants and (ii) any fees, costs and expenses or payments related to any transaction bonus, discretionary bonus, change-of-control payment, retention or other compensatory payments made to any Employee (including the employer portion of any pre-Closing payroll, social security, unemployment or similar Taxes);

(e)     Litigation Claims. Any litigation claims and any other Liabilities arising from any Proceeding (i) arising prior to the Closing, including any tort claims, breach of contract claims, employment claims and discrimination claims, or (ii) to the extent relating to events or conditions arising out of or relating in any way to the conduct of the Business or the ownership of the Purchased Assets prior to the Closing even if instituted after the Closing;

(f)     Environmental. Any Liabilities arising in connection with or in any way relating to the Seller (or any predecessor or any prior owner of all or part of its business and assets), any property now or previously owned, leased or operated by the Seller or the Purchased Assets or any activities or operations occurring or conducted at any real property used or held for use by the Seller (including offsite disposal), which (i) arise under or relate to any Environmental Law and (ii) relate to actions occurring or conditions existing on or prior to the Closing Date;

(g)      Excluded Assets. Any Liability arising out of or related to any Excluded Asset or not arising out of or related to any of the Purchased Assets;

(h)      Indebtedness. Any Liability in respect of any indebtedness for borrowed money of the Seller or any of its predecessors, including any Liability in respect of the DIP Loan Agreement, provided that all Liabilities in respect of the DIP Loan Agreement are anticipated to be satisfied from the Purchase Price on the Closing Date;

(i)      Employee Benefits and Labor. Any Liabilities of the Seller relating to or arising out of an Employee Plan and any Liabilities relating to any current or former Service Providers;

(j)      Related Persons. Any Liabilities to any (i) owner or former owner of capital stock or other equity interests of the Seller, or (ii) current or former officer or director of the Seller in their capacity as such; and

(k)      Other. Any Liabilities that are not expressly included in the Assumed Liabilities.

Section 2.5      Consideration. The consideration for the Purchased Assets (the "Purchase Price") consists of: (a) cash in the amount of $500,000, (b) the outstanding balance of the DIP Loan at the time of Closing, provided that this component of the Purchase Price shall in no event exceed the DIP Loan Cap (collectively, the "Cash Amount"), and (c) the assumption of the Assumed Liabilities.

Section 2.6      [Intentionally Omitted].

Section 2.7      Allocation of Purchase Price.

(a)      Within sixty (60) days after the Closing Date, the Purchaser will deliver to the Seller, or any trustee appointed under the terms set forth in any bankruptcy plan confirmed by the Seller (as applicable), with a copy to the Official Committee of Unsecured Creditors in the Chapter 11 Case and DIP Lender, an allocation statement (the "Allocation Statement"), setting forth its calculation of the allocation of the sum of the Purchase Price and the Assumed Liabilities, as adjusted for payments made pursuant to Article 9, among the Purchased Assets, in accordance with section 1060 of the Code and any comparable provisions of state or local Law (the "Allocation"). The Seller will review the Allocation Statement and the Allocation, and, to the extent the Seller disagrees with the content of the Allocation Statement, the Seller will inform the Purchaser of such disagreement within thirty (30) days after receipt of the Allocation Statement. The Seller and the Purchaser will attempt in good faith to resolve any such disagreement. If the Seller and the Purchaser are unable to reach a good faith agreement on the content of the Allocation Statement within ninety (90) days of the Closing Date, the Seller and the Purchaser will each use its own allocation statement. For purposes of this Section 2.7, all actions of the Seller may be the obligations or rights of a liquidating trustee of the Seller's estate.

(b)      If the Purchaser and the Seller agree on the Allocation Statement, the Purchaser and the Seller will report the Allocation of the Purchase Price in a manner consistent with the Allocation Statement and will act in accordance with the Allocation Statement in the

16

preparation and filing of all Tax Returns and for all other Tax, financial accounting or other purposes, in any litigation, or otherwise.

(c)     The Purchaser and the Seller will promptly inform one another of any challenge by any Governmental Authority to the Allocation made pursuant to this Section 2.6 and agree to consult with and keep each other informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

Section 2.8     Closing. The closing of the transactions contemplated by this Agreement (the "Closing") will take place electronically as soon as practicable, but in no event later than five (5) Business Days after the date on which all the conditions set forth in Article 6 have been satisfied or (if permissible) waived by the party hereto entitled to waive such condition (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions). The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.9     Closing Deliveries.

(a)     At the Closing, the **Seller** will deliver or cause to be delivered to the Purchaser:

(i)     a bill of sale in the form of Exhibit A (the "Bill of Sale") executed by the Seller;

(ii)     an assignment and assumption agreement in the form of Exhibit B (the "Assignment and Assumption Agreement") executed by the Seller[Intentionally Omitted];

(iii)     a certificate, dated as of the Closing Date, executed by the Seller confirming the satisfaction of the conditions specified in Sections 6.1(a) and 6.1(b);

(iv)     an Intellectual Property assignment agreement in the form of Exhibit C (the "Intellectual Property Assignment") executed by the Seller;

(v)     assignments and assumptions of the Assumed Contracts in the form to be mutually agreed by the Seller and the Purchaser in good faith prior to the Closing Date, duly executed by the Seller and the applicable counterparties;[Intentionally Omitted];

(vi)     a certified copy of the Sale Order;

(vii)     a duly executed certification in accordance with Treasury Regulations Section 1.1445-2(b)(2) to the effect that the Seller is neither a disregarded entity as defined in Treasury Regulations Section 1.1445-2(b)(2)(iii) nor a "foreign person"; and

(viii)     such other instruments of sale, transfer, conveyance and assignment as the Purchaser reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

17

EXECUTION VERSION

(b)    At the Closing, the Deposit will be applied by Seller to the Cash Amount of the Purchase Price, and the **Purchaser** will deliver or cause to be delivered to the Seller or for the Seller's benefit:

(i)    the Cash Amount, less the Deposit, by delivery of cash to the Seller by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing in an amount equal to the Cash Amount;

(ii)    an Assignment and Assumption Agreement executed by the Purchaser[Intentionally Omitted];

(iii)    evidence of the ability to satisfy the Assumed Liabilities (other than those to be satisfied in cash on the Closing Date) to the extent necessary to satisfy the Bankruptcy Code, or as required by order of the Bankruptcy Court;[Intentionally Omitted];

(iv)    the Bill of Sale executed by the Purchaser;

(v)    a certificate, dated as of the Closing Date, executed by the Purchaser confirming the satisfaction of the conditions specified in Sections 6.2(a) and 6.2(b);

(vi)    the Intellectual Property Assignment executed by the Purchaser; and

(vii)    such other instruments of assumption as the Seller reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

Section 2.10    [Intentionally Omitted];

Section 2.11    [Intentionally Omitted];

Section 2.10 Payment of Cure Amounts. The Purchaser shall pay any and all Cure Amounts with respect to the Assumed Contracts, in cash on the Assumption Effective Date in the amount specified on the final Contract & Cure Schedule (or as otherwise fixed by the Bankruptcy Court), or in such other manner as agreed by the Purchaser and the counterparty to an Assumed Contract.

Section 2.11 Consents. Notwithstanding any other provision of this Agreement, this Agreement does not effect an assignment of any Assumed Contract to the extent that such Assumed Contract is not assignable under the Bankruptcy Code without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable.

## ARTICLE 3

### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows, except as (subject to Section 10.7) set forth on the disclosure schedules

EXECUTION VERSION

delivered by the Seller to the Purchaser concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Seller Disclosure Schedule"):

Section 3.1    Organization. Seller is duly organized and validly existing and in good standing under the Laws of its jurisdiction of formation. Except as a result of the filing of the Petition, Seller has all requisite power and authority to conduct the Business as presently conducted. Seller is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not reasonably be expected to have a Material Adverse Effect. The Seller has heretofore delivered to the Purchaser true and complete copies of the certificate of incorporation and bylaws of Seller as currently in effect.

Section 3.2    Authority and Enforceability. Subject only to the entry of the Bidding Procedures Order and the Sale Order, the Seller has all requisite corporate power, authority and capacity to execute and deliver this Agreement and the other agreements contemplated hereunder and to perform its obligations under this Agreement and such other agreements. Subject only to the entry of the Bidding Procedures Order and the Sale Order, the execution, delivery and performance of this Agreement and the other agreements contemplated by this Agreement and the consummation of the transactions contemplated by this Agreement and such other agreements by the Seller have been duly authorized by all necessary action on the part of the Seller. The Seller has duly and validly executed and delivered this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Purchaser and subject to the entry of the Sale Order, this Agreement constitutes the valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, subject to: (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (b) Laws governing specific performance, injunctive relief and other equitable remedies..

Section 3.3    No Conflict. Upon and subject only to the entry of the Bidding Procedures Order and the Sale Order, and except in the case of clauses (b), (c), (d) and (e) that has not had, and would not reasonably be expected to have, a Material Adverse Effect, neither the execution, delivery and performance of this Agreement by the Seller, nor the consummation by the Seller of the transactions contemplated by this Agreement, will: (a) conflict with or violate the Seller's organizational documents; (b) result in a breach or default under, or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any ~~Assumed Contract or~~ Governmental Authorization; (c) violate any Law or Judgment applicable to Seller, the Business or the Purchased Assets; (d) require Seller to obtain any Governmental Authorization or make any filing with or provide any notice to, or, to the Knowledge of the Seller, require any action by, any Governmental Authority (provided that, subject to Section 5.4 and Section 5.17, the transfer of any Permits will be the obligation of the Purchaser, provided further that the Seller shall provide commercially reasonable assistance regarding the transfer of such Permits); or (e) result in the creation of any Lien or Claim on any Purchased Asset.

Section 3.4    Title to Assets; Liens. Subject to the entry of the Sale Order, at Closing, the Purchaser will be vested with good and marketable title to all of the Purchased Assets, which

Purchased Assets shall be conveyed free and clear of any Liens or Claims by order of the Bankruptcy Court.

Section 3.5    Administration of Regulatory Proceedings. To the Knowledge of Seller there are currently no pending Proceedings, concerning or against Seller or to which the Business or any of the Purchased Assets is subject.

~~Section 3.6 Contracts. Schedule 3.6 of the Seller Disclosure Schedule sets forth a true and complete list of Contracts (i) [Intentionally Omitted.]; (ii) under which there were payments by Seller in excess of $25,000 for 2023 or under which an amount in excess of $25,000 would reasonably be expected to be paid by Seller and/or an assignee thereof in 2023; (iii) pursuant to which Seller leases from a Third Party any personal property that is material to the Business; (iv) limiting or purporting to limit the freedom of Seller (or, after the Closing, that would so limit the Purchaser or any of its Affiliates) to engage in the Business or compete with any Person or in any geographic region; (v) granting to any Person a first refusal, first offer or similar preferential right to purchase or acquire any Purchased Asset; (vi) that requires the purchase of all or substantially all of a particular product or material from a supplier, or containing a minimum purchase or supply commitment, or which provides for "best pricing" or "most favored nations" terms or establishes an exclusive or priority sale or purchase obligation; or (vii) that includes any powers of attorney with respect to any product manufactured, developed or sold by the Business or any Purchased Asset. Seller has not, and, to the Seller's Knowledge, no other party to any Assumed Contract has, commenced any Proceeding against Seller that has not been withdrawn or dismissed except to the extent such Proceeding will be resolved as a result of the payment of the applicable Cure Amount. Assuming payment of the Cure Amounts, to the Knowledge of Seller, each Assumed Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms. . To Seller's Knowledge, Seller has not received any written notice that any other party to an Assumed Contract intends to cancel or terminate such Contract, except as would not be material to the Business.~~

Section 3.6    [Intentionally Omitted].

Section 3.7    Intellectual Property.

(a)    Schedule 3.9(a) sets forth a true and complete list of all of the Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements known to Seller, including a true and complete list of all United States, foreign, international and state: (i) Patents, including serial numbers for each filed Patent application and Patent numbers for each issued Patent, included in the foregoing; (ii) Trademark registrations, applications and material unregistered Trademarks included in the foregoing; (iii) domain names, included in the foregoing; and (iv) Copyright registrations, applications and material unregistered Copyrights included in the foregoing. To the Knowledge of Seller, Seller has provided prior to the date hereof, subject to applicable confidentiality agreements, to the Purchaser true and complete copies of all IP Agreements known by Seller to be in Seller's possession, together with all written notices and amendments known to Seller relating thereto. The listing of IP Agreements set forth on Schedule 2.1(d) includes for each agreement the title, the parties and the date executed.

(b)    Except as disclosed on Schedule 3.9(b), ~~to the Knowledge of Seller,~~ Seller solely and exclusively owns all Company Owned Intellectual Property and ~~to the Knowledge of Seller~~ is properly licensed under or has the valid and enforceable right to use all Company Used Intellectual Property, and, ~~to the Knowledge of Seller,~~ none of such rights will be materially adversely affected by the consummation of the transactions contemplated by this Agreement. Except as disclosed on Schedule 3.9(b), ~~to the Knowledge of the Seller,~~ there are no pending inquiries, investigations or Claims, and, ~~to the Knowledge of Seller,~~ Seller has not received written notice from any Third Party: (i) alleging infringement, misappropriation or other violation by Seller or the Business of Intellectual Property of any Person; or (ii) challenging or threatening to challenge Seller's right, title, or interest with respect to its ownership or use of, or continued use or right to preclude others from using, any Company Owned Intellectual Property or Company Used Intellectual Property as currently used, or the inventorship, validity, enforceability or registrability of any such Intellectual Property. ~~To the Knowledge of the Seller, (x)~~ Seller has not infringed, misappropriated or otherwise violated any Intellectual Property of any Person and ~~(y)~~ no Person has infringed, misappropriated or otherwise violated any Company Owned Intellectual Property or Seller's interest in any Company Used Intellectual Property.

(c)    ~~To the Knowledge of Seller,~~ Seller has not brought or threatened in writing a Claim against any Person: (i) alleging infringement, misappropriation or other violation of Company Owned Intellectual Property or Company Used Intellectual Property; or (ii) challenging any Person's ownership or use of, or the inventorship, validity, enforceability or registrability of any Intellectual Property.

(d)    ~~To the Knowledge of Seller, any~~Any existing Patents, Copyrights and Trademarks~~,~~: (i) have been duly maintained; (ii) are subsisting, in full force and effect; (iii) have not been cancelled, expired or abandoned or adjudged invalid or unenforceable; and (iv) is valid and enforceable (except for pending Patent applications in various jurisdictions, which by their nature as applications are not yet enforceable).

(e)    To the Knowledge of Seller, Seller has taken reasonable steps in accordance with normal industry practice to maintain the confidentiality of all Company Owned Intellectual Property and Company Used Intellectual Property, the value of which to Seller is contingent upon maintaining the confidentiality thereof and, to the Knowledge of Seller, no such Intellectual Property has been disclosed other than to employees, representatives and agents of Seller, all of whom are bound by written confidentiality agreements, or to third parties who are subject to customary written non-disclosure agreements.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller as of the date hereof and as of the Closing Date as follows:

Section 4.1    Organization and Good Standing. The Purchaser is a ~~corporation~~limited liability company duly organized, validly existing and in good standing under the Laws of the

State of ~~Delaware~~North Dakota and has all requisite corporate power and authority to conduct its business as it is presently conducted.

Section 4.2    Authority and Enforceability. The Purchaser has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Purchaser. The Purchaser has duly and validly executed and delivered this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Seller this Agreement constitutes the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to: (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (b) Laws governing specific performance, injunctive relief and other equitable remedies.

Section 4.3    No Conflict. Neither the Purchaser's execution, delivery and performance of this Agreement, nor the consummation by the Purchaser of the transactions contemplated by this Agreement, will: (a) conflict with or violate the Purchaser's organizational documents; (b) result in a breach or default under or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any Contract to which the Purchaser is a party or by which the Purchaser is bound, in any case with or without due notice or lapse of time or both; (c) result in the imposition of any Lien or other encumbrance on any of the assets of the Purchaser; (d) violate any Law or Judgment applicable to the Purchaser; or (e) require the Purchaser to obtain any Governmental Authorization or make any filing with any Governmental Authority.

Section 4.4    Legal Proceedings. There is no Proceeding pending or, to the Purchaser's knowledge, threatened against the Purchaser that questions or challenges the validity of this Agreement or that may prevent, delay, make illegal or otherwise interfere with the ability of the Purchaser to consummate any of the transactions contemplated by this Agreement.

Section 4.5    [Intentionally Omitted]

Section 4.6    Independent Investigation. The Purchaser has conducted its own independent investigation, review and analysis of Seller, the Purchased Assets, the Assumed Liabilities and the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Business as it has deemed appropriate, which investigation, review and analysis was done by the Purchaser and its representatives. The Purchaser acknowledges that it and its representatives have been provided adequate access to the Purchased Assets, the Assumed Liabilities, personnel, properties, premises and records of the Business for such purpose. In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis by Purchaser and its representatives and not on any factual representations or opinions of the Seller or its representatives (except the representations and warranties set forth in Article 3). The Purchaser hereby acknowledges and agrees that: (a) the Purchaser is purchasing the Purchased Assets from the Seller "as is" and "where is" and, other than the representations and warranties set forth in Article 3, none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders make or have made any representation or

22

EXECUTION VERSION

warranty, express or implied, at law or in equity, as to any matter whatsoever relating to Seller, the Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to: (i) merchantability or fitness for any particular use or purpose; (ii) the operation of the Business by the Purchaser after the Closing in any manner; or (iii) the probable success or profitability of the Business after the Closing; and (b) none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders will have or will be subject to any Liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to Seller, the Purchased Assets, the Assumed Liabilities or the Business or any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Purchaser or in any other form in expectation of the transactions contemplated by this Agreement. Nothing in this Section 4.6 shall be deemed to constitute a waiver of fraud.

## ARTICLE 5

## COVENANTS

Section 5.1    Access and Investigation. Until the Closing, subject to existing confidentiality agreements and upon reasonable advance notice from the Purchaser, the Seller will allow the Purchaser and its representatives reasonable access during normal business hours and without unreasonable interference with the operation of the Business to: (a) such materials and information about the Business as the Purchaser may reasonably request; and (b) specified members of management of the Business as the Purchaser may reasonably request.

Section 5.2    Operation of the Business.

(a)    Until the Closing, except: (i) as required by Law, including in connection with the Chapter 11 Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code); (ii) as expressly set forth in this Agreement or Schedule 5.2 of the Seller Disclosure Schedule; or (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), the Seller will pay all administrative claims in accordance with the Budget, and maintain in effect all Governmental Authorizations.

(b)    Until the Closing, except: (i) as required by Law, including in connection with the Chapter 11 Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code); (ii) as expressly set forth in this Agreement or Schedule 5.2 of the Seller Disclosure Schedule; (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed); or (iv) pursuant to any orders approving debtor in possession financing

and/or use of cash collateral entered by the Bankruptcy Court in the Chapter 11 Case, the Seller will not:

(i)    ~~amend in any material respect or terminate or reject any Contract~~[Intentionally Omitted];

(ii)    waive or release any material right or claim of the Business (other than any right or claim to the extent relating to any Excluded Assets or Excluded Liabilities), other than in the ordinary course of business consistent with past practice;

(iii)    sell, lease, transfer, license or otherwise dispose of, abandon or permit to lapse, fail to take any action necessary to maintain, enforce or protect, or permit or create any Lien or Claim on, any assets or properties (other than Excluded Assets)~~, other than (A) granting non-exclusive licenses of Intellectual Property, (B) the sale of inventory or (C) the disposition of obsolete equipment, in each case of clauses (A), (B) and (C) in the ordinary course of business consistent with past practice;~~;

(iv)    incur or suffer to exist any indebtedness for borrowed money except for the DIP Loan, up to the DIP Loan Cap, and any such indebtedness that is an Excluded Liability;

(v)    acquire, by merger or consolidation with, or by purchase of all or a substantial portion of the assets or stock of, or by any other manner, any business or entity, make any investment in any Person or enter into any joint venture, partnership or other similar arrangement for the conduct of the Business;

(vi)    except as required by applicable Law or an Employee Plan, grant any severance, retention or termination pay to, or enter into or amend any severance, retention, termination, employment, consulting, bonus, change in control or severance agreement with, any Service Provider;

(vii)    fail to pay any material Tax on or before the date when it becomes due and payable; or

(viii)    ~~(viii)~~ agree in writing to take any of the foregoing actions.

Section 5.3    [Intentionally Omitted].

Section 5.4    Commercially Reasonable Efforts.

(a)    Subject to the terms and conditions of this Agreement, the Bankruptcy Code and the Bidding Procedures Order, each of the parties will use their respective commercially reasonable efforts: to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement.

(b)    The Seller, on the one hand, and the Purchaser, on the other hand, will promptly notify the other of any communication it or any of its Affiliates receives from any

24

EXECUTION VERSION

Governmental Authority relating to the transactions contemplated by this Agreement, and will permit the other party to review in advance any proposed communication by such party to any Governmental Authority. Neither the Seller, on the one hand, nor the Purchaser, on the other hand, will agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry relating to the transactions contemplated by this Agreement unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority, gives the other party the opportunity to attend and participate at such meeting. The Seller, on the one hand, and the Purchaser, on the other hand, will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing. The Seller, on the one hand, and the Purchaser, on the other hand, will provide each other with copies of all correspondence, filings or communications from and after the date of this Agreement between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement.

(c)     The Seller will promptly notify the Purchaser of any written communication that, to Seller's Knowledge Seller receives from any Person (other than a Governmental Authority) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.

Section 5.5     Supplements to Disclosure Schedules. The Seller may, from time to time prior to ten (10) Business Days prior to the Closing by written notice to the Purchaser, supplement the Seller Disclosure Schedule or add a schedule to the Seller Disclosure Schedule (such added schedule to be deemed a supplement hereunder) in order to disclose any matter which, if occurring prior to the date of this Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule or to correct any inaccuracy or breach in the representations and warranties made by the Seller in this Agreement. Subject to this Section 5.5, none of such supplements to the Seller Disclosure Schedule will be deemed to cure the representations and warranties to which such matters relate with respect to the satisfaction of the conditions set forth in Section 6.1(a) or otherwise affect any other term or condition contained in this Agreement; provided, however, that, unless the Purchaser delivers a notice of termination with respect to such matter as contemplated by Section 7.1(a)(ii) (to the extent the Purchaser is entitled to deliver such notice pursuant to Section 7.1(a)(ii)) within ten (10) Business Days of the receipt by the Purchaser of any supplement to the Seller Disclosure Schedule pursuant to this Section 5.5, the Purchaser will be deemed to have waived any and all rights to terminate this Agreement pursuant to Section 7.1(a)(ii) or otherwise arising out of or relating to the contents of such supplement and the resulting breach or breaches of the representations and warranties and the Purchaser will be deemed to have accepted the contents of such supplement for all purposes of this Agreement; and provided, further, that from and after the Closing, the Seller will have no Liability for any inaccuracy or breach in the representations and warranties made by the Seller in this Agreement or for any matters disclosed on the Seller Disclosure Schedule, as supplemented or amended by the Seller prior to the Closing.

Section 5.6     Confidentiality.

(a)    Effective upon the Closing, any confidentiality agreement between the Seller and Purchaser or its predecessor shall terminate.

(b)    Following the Closing, the Seller will, and will instruct its directors, officers, employees and advisors to, hold in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all Confidential Information, except to the extent that such Confidential Information: (a) must be disclosed in connection with the obligations of the Seller pursuant to this Agreement; (b) can be shown to have been in the public domain through no fault of the Seller, any of its Affiliates or any of their respective representatives; (c) becomes a matter of public record as required by the Bankruptcy Code or the Chapter 11 Case and filings made with the Bankruptcy Court with respect thereto; or (d) was later lawfully acquired by the Seller from sources other than those related to its prior ownership of the Business. Notwithstanding the foregoing, in no event will this Section 5.6 limit or otherwise restrict the right of the Seller to disclose such Confidential Information: (i) to its and its Affiliates' respective directors, officers, employees, agents and advisors to the extent reasonably required to facilitate any delivery or performance of this Agreement; (ii) to any Governmental Authority or arbitrator to the extent reasonably required in connection with the Chapter 11 Case or any other Proceeding relating to the enforcement of this Agreement; or (iii) as otherwise required by applicable Law.

Section 5.7    Public Announcements. Prior to the Closing, neither the Purchaser, on the one hand, nor the Seller, on the other hand, will issue any press release or make any other public announcement relating to this Agreement or the transactions contemplated hereby without the prior written approval of the other party (which approval will not be unreasonably withheld, conditioned or delayed), unless required by the Bankruptcy Court (or made through Bankruptcy Court filings in the sale process), applicable Law or by any listing agreement with any national securities exchange. Prior to issuing any such press release or making any such other public announcement as required by the Bankruptcy Court, applicable Law or listing agreement with any national securities exchange and without the other party's prior written approval, the disclosing party will give the other party a copy of the proposed press release or other public announcement and reasonable opportunity to comment on the same, provided this sentence shall not apply to filings made with the Bankruptcy Court in the sale process.

Section 5.8    Further Actions. Subject to the other express provisions of this Agreement, upon the request of either the Purchaser, on the one hand, or the Seller, on the other hand, following the Closing, the other party will execute and deliver such other documents, instruments and agreements as the requesting party may reasonably require for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement.

Section 5.9    [Intentionally Omitted.].

Section 5.10    Bankruptcy Court Matters.

(a)    The Purchaser and the Seller will use their respective good faith and commercially reasonable efforts to cause the Sale Order to become a Final Order as soon as

practicable after its entry, subject in all cases to the requirements of the Bankruptcy Court and the Bankruptcy Code.

(b)    The Seller shall, subject in all cases to the requirements of the Bankruptcy Court and the Bankruptcy Code, to use commercially reasonable efforts to:

(i) request the Bankruptcy Court to hold the Sale Hearing and enter the Sale Order by 11:59 p.m. prevailing Eastern time on or before March 1, 2024; and

(i)    (ii) consummate the Closing as promptly as practicable after entry of the Sale Order, but in no event later than 11:59 p.m. prevailing Eastern Time on or before March 2129, 2024.

(c)    The Seller will provide the Purchaser with a reasonable opportunity to review and comment upon all motions, applications, petitions, schedules and supporting papers relating to the transactions contemplated by this Agreement prepared by the Seller (including forms of Orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Case. All motions, applications, petitions, schedules and supporting papers prepared by the Seller and relating to the transactions contemplated by this Agreement to be filed on behalf of the Seller after the date hereof must be reasonably satisfactory in form and substance to the Purchaser. The Seller shall use commercially reasonable efforts to obtain entry of the Sale Order. From and after the date hereof, the Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order.

(d)    The Seller will promptly take such actions as are reasonably requested by the Purchaser to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Seller of its obligations under this Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered in connection with the transactions contemplated by this Agreement and demonstrating that the Purchaser is a good faith buyer under section 363(m) of the Bankruptcy Code.

(e)    If an appeal is taken, or petition for certiorari or motion for rehearing or re-argument filed, or a stay pending appeal is requested from either the Bidding Procedures Order or the Sale Order, the Seller will promptly notify the Purchaser of such appeal, petition, motion or stay request and the Seller, with input from the Purchaser, will take all reasonable steps to defend against such appeal, petition, motion or stay request. Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and the Purchaser, in its sole discretion, waives in writing the condition set forth in Section 6.1(d) that the Sale Order be a Final Order.

(f)    The Seller and the Purchaser shall comply with all of their respective obligations under the Bidding Procedures Order and Sale Order (after the entry of such order by the Bankruptcy Court).

EXECUTION VERSION

(g)     The Seller shall comply (or obtain an order waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement. The Seller shall serve on all required Persons, including: (i) all Persons who are known to possess or assert a Claim or Lien against or interest in the Purchased Assets; (ii) all applicable Governmental Authorities; (iii) all other Persons required by any order of the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules; and (iv) using commercially reasonable efforts to serve any other Persons that the Purchaser reasonably may request, any notice of the motions, hearings, or orders necessary to comply with its obligations under this Section 5.10 and to consummate the transactions contemplated hereby.

Section 5.11    Bankruptcy Court Approval~~; Break-Up Fee and Expense Reimbursement.~~

(a)     The Purchaser and the Seller acknowledge that, under the Bankruptcy Code, the sale of Purchased Assets is subject to approval of the Bankruptcy Court. ~~The Purchaser and the Seller acknowledge that to obtain such approval, the Seller must demonstrate that it has taken reasonable steps to obtain the highest or best value possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Purchased Assets to prospective bidders, entertaining higher or better offers from qualified bidders and, if necessary, conducting an Auction and selling the Purchased Assets to another qualified bidder.~~

~~(b) The Bid Procedures Order shall provide that any overbid shall be in a cash amount equal to $500,000, plus the outstanding balance of the DIP Loan at the time of Closing, plus (ii) $150,000.~~

~~(c) As consideration for substantial expenditures of time, effort and expense undertaken and continuing by the Purchaser (solely in its capacity as such) in connection with the completion of its due diligence review of the Business and the preparation, negotiation, and execution of this Agreement, the Seller acknowledges and agrees that: (i) subject to the entry of the Bidding Procedures Order, the Purchaser will be the stalking horse bidder at the Auction; (ii) the Seller will not participate in any negotiations for the purpose of naming any Person other than the Purchaser as the stalking horse bidder in the Auction, and subject to the entry of Bidding Procedures Order, no Person other than the Purchaser will be the stalking horse bidder at the Auction; and (iii) the Seller will actively oppose any effort by any other Person to be the stalking horse bidder; provided, however, that consistent with its fiduciary duties to elicit the highest and best offer for the Purchased Assets and to conduct the Auction, notwithstanding any provision in this Agreement to the contrary, the Seller and its representatives and Affiliates may, following the entry of the Bidding Procedures Order, solicit, encourage and negotiate higher or better offers for the Purchased Assets under the terms of the Bidding Procedures Order.~~

~~(d) The Seller's obligation to pay the Break-Up Fee pursuant to Section 7.3 shall survive termination of this Agreement and shall constitute an administrative expense of the Seller under section 503(b) of the Bankruptcy Code.~~

Section 5.12    ~~Assumption & Rejection of Executory Contracts.~~[Intentionally Omitted];

(a)    [Intentionally Omitted];

(b)    [Intentionally Omitted];.

(c)    [Intentionally Omitted];.

(d)    [Intentionally Omitted];

(e)    [Intentionally Omitted];.

(f)    [Intentionally Omitted];

~~(a) Schedule 3.6 of the Seller Disclosure Schedule sets forth a list of all Contracts to which the Seller is a party. Schedule 5.12(a)(ii) (the "Contract & Cure Schedule") sets forth a list of all Executory Contracts that the Purchaser has advised the Seller it wants the Seller to assume and assign to the Purchaser under section 365 of the Bankruptcy Code and in accordance with Section 5.12(b) below. The Cure Amounts in respect of each Executory Contract are also set forth in the Contract and Cure Schedule. From the date of this Agreement until the date that is ten (10) days prior to the Sale Hearing, the Purchaser, in its sole and absolute discretion, may amend the Contract & Cure Schedule to add or remove any Executory Contract, other than the Galvanize Agreement, in accordance with the conditions concerning notice and service to contract counterparties set forth in the Bidding Procedures and Bidding Procedures Order. Unless the Bankruptcy Court orders otherwise, each Executory Contract included on the Contract & Cure Schedule will be deemed to have been assigned to the Purchaser and become an Assumed Contract on the date (the "Assumption Effective Date") that is the later of: (i) the Closing Date, or (ii) contemporaneously with the resolution of any objections to the assumption and assignment of such Executory Contract or to a proposed Cure Amount.~~

~~(b) Each Executory Contract that is listed on Schedule 3.6 of the Seller Disclosure Schedule but not the Contract & Cure Schedule will not be assumed by the Purchaser, subject to approval by the Bankruptcy Court. Each Executory Contract that is listed on Schedule 3.6 of the Seller Disclosure Schedule but not the Contract & Cure Schedule will be deemed to be an Excluded Contract under this Agreement.~~

~~(c) The Seller and the Purchaser will comply with the procedures set forth in the Assumption Procedures and the Bidding Procedures Order with respect to the assumption and assignment or rejection of any Executory Contract pursuant to, and in accordance with, this Section 5.12.~~

~~(d) No designation of any Executory Contract for assumption and assignment or rejection in accordance with this Section 5.12, the Bidding Procedures, the Bidding Procedures Order or the Sale Order will give rise to any right to any adjustment to the Purchase Price.~~

~~(e) If prior to the Closing, it is discovered that a Contract should have been listed on Schedule 3.6 of the Seller Disclosure Schedule but was not so listed (any such Contract, a "Previously Omitted Contract"), the Seller shall, promptly following the discovery thereof (but~~

~~in no event later than five (5) Business Days following the discovery thereof), notify the Purchaser in writing of such Previously Omitted Contract and provide the Purchaser with a copy of such Previously Omitted Contract and the Cure Amount (if any) in respect thereof. The Purchaser shall thereafter deliver written notice to the Seller, no later than five (5) Business Days following such notice of such Previously Omitted Contract from the Seller, if the Purchaser elects to so include such Previously Omitted Contract on the Contract & Cure Schedule.~~

~~(f) If the Purchaser includes a Previously Omitted Contract on the Contract & Cure Schedule in accordance with Section 5.12(e), the Seller shall file and serve a notice on the contract counterparties to such Previously Omitted Contract notifying such counterparties of the Seller's intention to assume and assign to the Purchaser such Previously Omitted Contract, including the proposed Cure Amount (if any). Such notice shall provide such contract counterparties with ten (10) Business Days to object, in writing, to the Seller and the Purchaser to the assumption of its Contract. If such counterparties, the Seller and the Purchaser are unable to reach a consensual resolution with respect to the objection, the Seller will seek an expedited hearing before the Bankruptcy Court to seek approval of the assumption and assignment of such Previously Omitted Contract. If no objection is timely served on the Seller and the Purchaser, then such Previously Omitted Contract shall be deemed assumed by the Seller and assigned to the Purchaser pursuant to the Sale Order. The Seller and the Purchaser shall execute, acknowledge and deliver such other instruments and take commercially reasonable efforts as are reasonably practicable for the Purchaser to assume the rights and obligations under such Previously Omitted Contract.~~

Section 5.13   Back-Up Bidder. If an Auction is conducted, and the Court does not select the Purchaser as the Successful Bidder, but instead selects the Purchaser as the bidder having submitted the next highest or otherwise best bid at the conclusion of such Auction (the "Back-Up Bidder"), the Purchaser shall be the Back-Up Bidder. If the Purchaser is selected as the Back-Up Bidder, the Purchaser shall be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Purchaser prior to or at the Auction) open and irrevocable until the earlier of: (i) the date of closing on the sale of the Purchased Assets to the Successful Bidder; and (ii) twenty-five (25) Business Days following the date the order approving the sale of the Purchased Assets to the Successful Bidder shall have become a Final Order (such date, the "Back-Up Period"); provided, however, that if the Successful Bidder shall fail to close on its purchase of the Purchased Assets within the period set forth above, the ~~BackUp~~Back-Up Bidder shall be deemed to be the Successful Bidder and the Seller will be authorized, without further order of the Bankruptcy Court, to, and the Back-Up Bidder shall, consummate the transactions contemplated by this Agreement within ten (10) Business Days of becoming the Successful Bidder on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Purchaser prior to or at the Auction).

Section 5.14   [Intentionally Omitted].

Section 5.15   Payments Received. The Seller, on the one hand, and the Purchaser, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into

EXECUTION VERSION

cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts. Without limiting the generality of the foregoing, the Seller (prior to the entry by the Bankruptcy Court of an order confirming a Chapter 11 plan or dismissing the Chapter 11 Case, and at the sole cost of the Purchaser) agrees to cooperate with the Purchaser, at the sole cost of the Purchaser, to inform parties owing payments to the Business after the Closing that constitute Purchased Assets (the "Business Payments") of the accounts of the Purchaser that should receive such Business Payments following the Closing and otherwise reasonably assist the Purchaser to ensure that such Business Payments are made to such accounts. The Seller, on the one hand, and the Purchaser, on the other hand, hereto hereby agrees that any payments mistakenly received by it or its respective Affiliates shall be promptly transferred and delivered back to the other party or its Affiliate, as applicable.

Section 5.16    Cessation of Use of Acquired Intellectual Property. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, (a) the Seller acknowledges and agrees that, from and after the Closing, the Seller shall not have any right, title or interest in or to any Acquired Intellectual Property (including any Seller Names and Marks) and (b) from and after the Closing, the Seller shall cease and discontinue any and all use or other exploitation of any and all Acquired Intellectual Property (including all Seller Names and Marks).

Section 5.17    Transfer of Permits and Governmental Authorizations. From and after the date hereof, the Seller, on the one hand (subject to the availability of funds for such purpose), and the Purchaser, on the other hand, shall reasonably cooperate with Purchaser in Purchaser's efforts to seek the transfer to Purchaser as of the Closing (or as soon as reasonably practicable thereafter) all Governmental Authorizations included in the Purchased Assets necessary for the import, manufacture, distribution, marketing and sale by the Purchaser of the products of the Business under applicable Law; provided that (a) any reasonable, documented out-of-pocket costs associated with such cooperation by the Seller after the Closing (including the *pro rata* portion of the costs of any employee directly providing such cooperation after the Closing, as determined by the amount of time dedicated by such employee to such cooperation as a proportion of all time dedicated by such employee to the Seller) shall be borne by the Purchaser and (b) nothing in this Section shall be deemed to require the Seller to remain a debtor in the Chapter 11 Case or maintain its corporate existence for any period of time beyond 30 days after the Closing Date; provided that the foregoing shall not be deemed to require the Seller to take

**ARTICLE 6**

**CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE**

Section 6.1    Conditions to the Obligation of the Purchaser. The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the Purchaser becoming the Successful Bidder (whether following the conclusion of the Auction or thereafter as a result of the Purchaser becoming the Back-Up Bidder) and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Purchaser, in whole or in part, in its sole and absolute discretion):

EXECUTION VERSION

(a)     Accuracy of Representations and Warranties. (i) Each of the Fundamental Representations (disregarding all materiality and "Material Adverse Effect" or similar qualifiers contained therein for this purpose) must be true and correct in all material respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all material respects as of such date), and (ii) the representations and warranties of the Seller in Article 3 (other than the Fundamental Representations) must be true and correct in all material respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all respects as of such date), except in the case of this clause (ii) where the failure of such representations and warranties to be so true and correct (disregarding all materiality and "Material Adverse Effect" or similar qualifiers contained therein for this purpose) has not had, and would not reasonably be expected to have, a Material Adverse Effect;

(b)     Performance of Covenants. All of the covenants and obligations that the Seller is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)     No Action. There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement;

(d)     Sale Order. The Sale Order must be a Final Order and must be in form and content satisfactory to the Purchaser in its reasonable discretion;

(e)     No Material Adverse Effect. There shall not have occurred any event or occurrence (regardless of whether such event or occurrence constitutes a breach of any representation, warranty, or covenant of the Seller under this Agreement) after the date of this Agreement which has had, or would reasonably be expected to have, a Material Adverse Effect; and

(f)     Transaction Documents. The Seller must have delivered or caused to be delivered each document under Section 2.9(a).

Section 6.2     Conditions to the Obligations of the Seller. The obligation of the Seller to perform any obligations hereunder, including to consummate the transactions contemplated by this Agreement, is subject to the Purchaser becoming the Successful Bidder (whether following the conclusion of the Auction or thereafter as a result of the Purchaser becoming the Back-Up Bidder) and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Seller, in whole or in part):

(a)     Accuracy of Representations and Warranties. The representations and warranties of the Purchaser in Article 4 must be true and correct in all respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all respects as of such date), except where the failure of such representations and warranties to be so true and correct (disregarding all materiality qualifiers contained therein for this purpose) has not had, and would not reasonably be expected to have, a material adverse effect on the Purchaser's ability to timely complete the transactions contemplated by this Agreement;

EXECUTION VERSION

(b)     Performance of Covenants. All of the covenants and obligations that the Purchaser is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)     No Action. There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement;

(d)     Sale Order. The Sale Order must be a Final Order and must be in form and content satisfactory to the Seller; and

(e)     Transaction Documents. The Purchaser must have taken the actions required to be taken under Section 2.9(b) and delivered or caused to be delivered to the Seller each document that Section 2.9(b) requires it to deliver.

# ARTICLE 7

## TERMINATION

Section 7.1     Termination Events.

(a)     This Agreement may, by written notice given before the Closing, be terminated:

(i)     by mutual consent of the Purchaser and the Seller;

(ii)     by the Purchaser (so long as the Purchaser is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if there has been a breach of any of the Seller's representations, warranties or covenants contained in this Agreement which would result in the failure of the condition set forth in Section 6.1(a) or Section 6.1(b), as applicable, to be satisfied, and which breach has not been cured within ten (10) days after written notice of such breach has been delivered to the Seller from the Purchaser or cannot be cured by the Outside Date;

(iii)     by the Seller (so long as the Seller is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if there has been a breach of any of the Purchaser's representations, warranties or covenants contained in this Agreement which would result in the failure of a condition set forth in Section 6.2(a) or Section 6.2(b), as applicable, to be satisfied, and which breach has not been cured within ten (10) days after written notice of such breach has been delivered to the Purchaser from the Seller or cannot be cured by the Outside Date;

(iv)     by either the Purchaser or the Seller, if there is in effect a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, however, that the right to terminate this Agreement under this Section 7.1(a)(iv) will not be available to any party whose failure to fulfill any covenant or obligation under this Agreement is the cause of or resulted in the action or event described in this Section 7.1(a)(iv) occurring; or

(v)      by the Purchaser if (a) the Chapter 11 Case is dismissed or converted into a case under chapter 7 of the Bankruptcy Code or (b) an examiner with expanded powers or trustee is appointed in the Chapter 11 Case.

(b)      This Agreement shall terminate automatically in the event that (i) an Alternative Transaction has been consummated following approval by the Bankruptcy Court, (ii) the Purchaser is not chosen at the Auction to be the Successful Bidder or the Back-Up Bidder or (iii) the Purchaser is chosen at the Auction to be the Back-Up Bidder, upon the expiration of the Back-Up Period.

Section 7.2      Effect of Termination.

(a)      If this Agreement is terminated pursuant to Section 7.1, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any other party or its Affiliates, except that Section 4.6 (*Independent Investigation*), Section 5.7 (*Public Announcements*), Section 5.13 (*Back-Up Bidder*), Section 7.3 (*Termination Payment*), Article 10 (*General Provisions*) (except for Section 10.11 (*Specific Performance*)) and this Section 7.2 shall remain in full force and survive any termination of this Agreement. Notwithstanding the foregoing and subject to Section 7.3, in the event this Agreement is terminated by a party pursuant to Section 7.1 of this Agreement because of breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal rights and remedies hereunder and under applicable Law will survive such termination unimpaired.

~~Section 7.3 Break-Up Fee. Subject to approval of the Bankruptcy Court, in consideration of the substantial commitment of time and resources by the Purchaser to the preparation, negotiation, execution and performance of this Agreement the Seller shall, upon closing of an Alternative Transaction, promptly (but no event later than two (2) Business Days following such closing) pay to the Purchaser an amount equal to a breakup fee equal to $50,000 and all reasonable and documented costs and out of pocket expenses incurred by the Purchaser in connection with this Agreement up to $50,000 (collectively, the "Break-Up Fee"). Subject to approval of the Bankruptcy Court in the Bidding Procedures Order, the Break-Up Fee shall have first priority administrative expense claim status without the need for any further application or motion of the Seller or the Purchaser, or the entry of any further order of the Bankruptcy Court. The parties agree that the amount of actual damages which the Purchaser would suffer as a result of a termination of this Agreement as contemplated by this Section 7.3 would be extremely difficult to determine and have agreed that the amount of the Break-Up Fee is a reasonable estimate of the Purchaser's damages and is intended to constitute a fixed amount of liquidated damages in lieu of other remedies available to the Purchaser and is not intended to constitute a penalty.~~

(b)      If this Agreement is terminated pursuant to Section 7.1, other than pursuant to Section 7.1(iii), the Deposit shall be returned to Purchaser within three (3) business days following such termination. If this Agreement is terminated pursuant to Section 7.1(iii), Seller may retain any part of the Deposit required to compensate Seller for actual damages

EXECUTION VERSION

resulting from the cause of such termination and shall return any excess to Purchaser within three (3) business days following determination by Seller of such damages.

## ARTICLE 8

## NO SURVIVAL

Section 8.1     No Survival of Representations and Warranties and Certain Covenants. Each of the representations, warranties and covenants (other than covenants that, by their terms, survive the Closing or termination of this Agreement) in this Agreement or any agreement or certificate to be executed or delivered in connection with the transactions contemplated by this Agreement, and claims for breach or violation thereof, shall terminate at the Closing or upon termination of this Agreement pursuant to Section 7.1, subject to Section 7.2, and, following the Closing or the termination of this Agreement, as the case may be, no party shall make any claim whatsoever for any breach of any such representation, warranty or covenant hereunder, subject to Section 7.2.

## ARTICLE 9

## TAX MATTERS

Section 9.1     Transfer Taxes. Any sales, use, *ad valorem*, property, transfer, conveyance, documentary, recording, notarial, value added, excise, registration, stamp, gross receipts and similar Taxes and fees ("Transfer Taxes"), arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement, including expenses and fees relating to registering Acquired Intellectual Property in the name of the Purchaser or its designee, regardless of whether such Transfer Taxes, expenses and fees are imposed by Law on the Purchaser, the Purchased Assets or the Seller , shall be borne by the Purchaser. Purchaser shall provide Seller evidence of timely payment of such Transfer Taxes, expenses or fees. Any Tax Returns that must be filed in connection with any Transfer Taxes will be prepared by the party that customarily has primary responsibility for filing such Tax Returns pursuant to the applicable Law under and according to which the respective Tax Returns are due to be filed; provided, however, that the preparing party will deliver such Tax Returns for the other party's review and approval (not to be unreasonably withheld, conditioned or delayed) at least ten (10) Business Days prior to the applicable due date. The parties will cooperate with each other in the provision of any information or preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any such Transfer Taxes.

Section 9.2     Proration Items. Personal property Taxes, other similar Taxes payable by Seller (the "Proration Items") with respect to the Purchased Assets for any Taxable period beginning before the Closing Date and ending after the Closing Date shall be prorated on a per diem basis between the Purchaser and the Seller as of the Closing Date. The amount of the Proration Items attributable to the Seller shall be equal to the amount of Tax for the period multiplied by a fraction, the numerator of which shall be the number of days from the beginning of the period through and including the Closing Date and the denominator of which shall be the entire number of days in the period. For purposes of allocating all other Taxes ("Non-Proration

Items") with respect to the Purchased Assets for any Straddle Period, such Taxes shall be allocated between the pre-Closing portion of such Straddle Period and the post-Closing portion of such Straddle Period based on an interim closing of the books at the end of the day on the Closing Date. The Seller shall bear any Non-Proration Items allocable to the pre-Closing portion of any Straddle Period and any other unpaid Taxes with respect to the Purchased Assets for Tax periods ending on or prior to the Closing Date (such Non-Proration Items and other pre-Closing Date Taxes, "Other Seller Taxes"). The amount of all such Proration Items attributable to the Seller and the amount of any Other Seller Taxes shall be estimated as of the Closing Date and deducted from the Purchase Price at the Closing; provided, however that final payments with respect to the Proration Items or Other Seller Taxes that are not able to be calculated as of the Closing Date shall be calculated and the Seller (or any successor thereof or any estate) shall pay over any additional amount as soon as practicable after the Closing Date, but no later than five (5) Business Days after determination of such additional amounts.

## ARTICLE 10

## GENERAL PROVISIONS

Section 10.1   Notices. All notices and other communications under this Agreement must be in writing and are deemed duly delivered when: (a) delivered, if delivered personally or by nationally recognized overnight courier service (costs prepaid); (b) sent by ~~facsimile with confirmation of transmission by the transmitting equipment (or, the first Business Day following such transmission if the date of transmission is not a Business Day) or by~~ email; or (c) received or rejected by the addressee, if sent by United States of America certified or registered mail, return receipt requested; in each case to the following addresses, emails or facsimile numbers and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number, email or individual as a party may designate by notice to the other party):

If to the **Seller**:

Intergalactic Therapeutics, Inc.
c/o Charles Allen
330 Cochituate Road #5088
Framingham, MA 01701

with a copy (which will not constitute notice) to:

Harold B. Murphy, Esquire
Murphy and King, P.C.
28 State Street
Boston, MA 02109
~~Fax: (617) 423-0498~~
Email: hmurphy@murphyking.com

If to the **Purchaser**:

36

EXECUTION VERSION

Rachel Lei, General Counsel
Aldevron, LLC
4055 41st Ave
South Fargo, North Dakota 58104
Email: Rachel.Lei@aldevron.com
Eric Winston, Esquire
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Fax: (213) 443-3100
Email: ericwinston@quinnemanuel.com
Jeff Gold, Chief IP Counsel
Aldevron, LLC
4055 41st Ave
South Fargo, North Dakota 58104
Email: Jeffrey.Gold@aldevron.com

with a copy (which shall not constitute notice) to:

George W. Shuster, Jr. & Omar Khan
WilmerHale
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Email:  george.shuster@wilmerhale.com; omar.khan@wilmerhale.com

Section 10.2   Amendment. Except as otherwise expressly contemplated by this Agreement, this Agreement may not be amended, supplemented or otherwise modified except in a written document signed by each party hereto and that identifies itself as an amendment to this Agreement.

Section 10.3   Waiver and Remedies. The parties may, in its discretion, but are not required to: (a) extend the time for performance of any of the obligations or other acts of the other party to this Agreement; (b) waive any inaccuracies in the representations and warranties of the other party to this Agreement contained in this Agreement; or (c) waive compliance with any of the covenants or conditions for the benefit of such party contained in this Agreement. Subject to Section 5.5, (i) any such extension or waiver by a party to this Agreement will be valid only if set forth in a written document signed on behalf of the party against whom the extension or waiver is to be effective; (ii) no extension or waiver will apply to any time for performance, inaccuracy in any representation or warranty, or noncompliance with any covenant or condition, as the case may be, other than that which is specified in the written extension or waiver; and (iii) no failure or delay by a party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant to this Agreement, and no course of dealing between the parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy. Notwithstanding anything to the contrary

37

EXECUTION VERSION

herein, any deadline set forth in this Agreement that does not fall on a Business Day shall automatically be extended to the next Business Day.

Section 10.4    Entire Agreement. This Agreement (including the Schedules and Exhibits hereto and the documents and instruments referred to in this Agreement that are to be delivered at the Closing) constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations by or between the parties, or either of them, written or oral, with respect to the subject matter of this Agreement.

Section 10.5    Assignment, Successors and No Third Party Rights. This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Seller under chapter 11 or chapter 7 of the Bankruptcy Code and any entity appointed as a successor to the Seller pursuant to a confirmed chapter 11 plan). No party may delegate any performance of its obligations under this Agreement, except that the Purchaser may at any time delegate the performance of its obligations to any Affiliate of the Purchaser so long as the Purchaser remains fully responsible for the performance of the delegated obligation. The Purchaser may designate one or more Affiliates, including any special purpose entities that may be organized by the Purchaser for such purpose, to take title to the Purchased Assets or any portion thereof and operate the business going forward, and upon written notice to the Seller of any such designation by the Purchaser, the Seller agrees to execute and deliver all instruments of transfer with respect to the Purchased Assets directly to, and in the name of, the Purchaser's designees. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as may inure to a successor or permitted assignee under this Section 10.5.

Section 10.6    Severability. In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by applicable Law.

Section 10.7    Exhibits and Schedules. The Exhibits and Schedules to this Agreement are incorporated herein by reference and made a part of this Agreement. The Seller Disclosure Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article 3. The disclosure in any section or paragraph of the Seller Disclosure Schedule, and those in any amendment or supplement thereto, shall be deemed to relate to and to qualify only the particular representation or warranty set forth in the corresponding numbered or lettered section or paragraph of Article 3, except to the extent that:

(a)    such information is cross-referenced in another part of the Seller Disclosure Schedule; or

EXECUTION VERSION

(b)      it is reasonably apparent on the face of the disclosure (without reference to any document referred to therein or any independent knowledge on the part of the reader regarding the matter disclosed) that such information qualifies another representation or warranty of the Seller in Article 3.

Section 10.8   Interpretation. In the negotiation of this Agreement, each party has received advice from its own attorney. The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no provision of this Agreement will be interpreted for or against either party because that party or its attorney drafted the provision.

Section 10.9   Expenses. Except as otherwise provided herein, each party will pay its own direct and indirect expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement, including all fees and expenses of its advisors and representatives.

Section 10.10  Limitation on Liability. Notwithstanding any other provision of this Agreement to the contrary, in no event will any party or any of its Affiliates be liable for any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales) in connection with any claims, losses, damages or injuries arising out of the conduct of such party pursuant to this Agreement, regardless of whether the nonperforming party was advised of the possibility of such damages or not.

Section 10.11  Specific Performance. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by either party in accordance with such party's specific terms or were otherwise breached by such party. The parties accordingly agree that, prior to the termination of this Agreement pursuant to Section 7.1, in addition to any other remedy to which a non-breaching party is entitled at law or in equity, the non-breaching party is entitled to injunctive relief to prevent breaches of this Agreement by the breaching party and otherwise to enforce specifically the provisions of this Agreement against the breaching party; provided that, the non-breaching party shall only be entitled to injunctive relief if such non-breaching party is not otherwise in breach of this Agreement or if the breaching party is not otherwise entitled to terminate this Agreement. Each party expressly waives any requirement that the other party obtains any bond or provides any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.

Section 10.12  Governing Law; Jurisdiction; Waiver of Jury Trial. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE IN THE BANKRUPTCY COURT (FOR SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION) AND THEREAFTER IN THE FEDERAL OR STATE COURTS OF COMPETENT JURISDICTION

EXECUTION VERSION

LOCATED IN THE COUNTY OF SUFFOLK IN THE COMMONWEALTH OF MASSACHUSETTS AND EACH OF THE PARTIES HERETO IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, GENERALLY AND UNCONDITIONALLY, AND WAIVES ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT HEREBY.

NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASE AND SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

Section 10.13  No Joint Venture. Nothing in this Agreement creates a joint venture or partnership between the parties. This Agreement does not authorize any party hereto (a) to bind or commit, or to act as an agent, employee or legal representative of, any other party, except as may be specifically set forth in other provisions of this Agreement, or (b) to have the power to control the activities and operations of any other party. Each party agrees not to hold itself out as having any authority or relationship contrary to this Section 10.13.

Section 10.14  Counterparts; Signatures. The parties may execute this Agreement including, by electronic signature, in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. This Agreement is effective upon delivery of one executed counterpart from each party to the other party. The signatures of all parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or electronic transmission that includes a copy of the sending party's signature(s) is as effective as signing and delivering the counterpart in person.

Section 10.15  Preservation of Records; Post-Closing Access and Cooperation.

(a)     For a period equal to the lesser of: (i) eighteen (18) months after the Closing Date; and (ii) the closing of the Chapter 11 Case by the Bankruptcy Court (the "~~PostClosing~~Post-Closing Access and Cooperation Period"), the Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records in its possession that are Purchased Assets (including any documents relating to any governmental or nongovernmental claims, actions, suits, proceedings or investigations) relating to the operation of Business and the Purchased Assets prior to the Closing Date.

(b)     During the Post-Closing Access and Cooperation Period, subject to existing confidentiality agreements and upon reasonable advance notice from the Seller (or its designee or successor), the Purchaser shall afford promptly to the Seller and its representatives (or its designee or successors, which may include the trustee of a liquidating trust) reasonable access during normal business hours to the offices, facilities, books, records, officers and employees of the Business as reasonably requested by the Seller for the purpose of winding-up

40

EXECUTION VERSION

its affairs and finalizing the administration of the Chapter 11 Case or in furtherance of the purposes set forth herein; provided, that such access does not unreasonably interfere with the Purchaser's business operations. During the Post-Closing Access and Cooperation Period, the Purchaser shall permit former employees of the Seller to cooperate with the Seller (or, its designee or successors) after the Closing, in furnishing information, testimony and other reasonable assistance with respect to the Business or Purchased Assets for periods prior to the Closing Date in connection with any action or proceeding relating to the Chapter 11 Case or in furtherance of the purposes set forth herein; provided, that such access does not unreasonably interfere with the Purchaser's business operations.

[SIGNATURES APPEAR ON THE FOLLOWING PAGES]

EXECUTION VERSION

## EXHIBIT A

### FORM OF BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale") is made as of the ___ day of _____, 2024, by and between Intergalactic Therapeutics, Inc. ("Seller"), to and in favor of [x]Aldevron, LLC. ("Purchaser"). Seller and Purchaser are each a "Party" hereto and are collectively referred to herein as the "Parties." All capitalized terms that are not otherwise defined herein shall have the meanings given to such terms in the Agreement (as defined below).

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement dated January 3March 1, 2024 (the "Agreement"), pursuant to which the Seller agreed to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agreed to purchase and acquire from Seller, all of Seller's right, title and interest in and to the Purchased Assets, including, but not limited to, the Assumed Contracts, free and clear of all Liens and Claims other than the Assumed Liabilities, as provided in the Sale Order, in exchange for the Purchase Price (the "Sale");

WHEREAS, the Bankruptcy Court entered the Sale Order on ____, 2024, approving the Sale of the Purchased Assets to Purchaser on the terms set forth in the Agreement and in the Sale Order; and WHEREAS, pursuant to the Agreement, Seller has agreed to execute and deliver this Bill of Sale to effectuate the sale, transfer, assignment, conveyance and delivery of the Purchased Assets to Purchaser and its successors and assigns.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

1.      For and in consideration of delivery of the Purchase Price, all upon the terms and subject to the conditions set forth in the Agreement, the receipt, sufficiency and adequacy of which are hereby acknowledged and accepted by Seller, Seller hereby sells, transfers, assigns, conveys and delivers to Purchaser, its successors and assigns, all of Seller's entire right, title and interest in, to and under the Purchased Assets, as provided in the Sale Order.

2.      Seller and Purchaser hereby agree to execute and deliver any and all additional documents that Seller or Purchaser may reasonably request in order to more fully effect the agreements set forth in this Bill of Sale.

3.      This Bill of Sale shall be subject to the terms and conditions set forth in the Agreement and the Sale Order. Seller and Purchaser hereby acknowledge and agree that the provisions of this Bill of Sale shall not modify or limit the full force and effect of the terms and provisions of the Agreement or the Sale Order, and that in the event of a conflict between the terms and provisions of this Bill of Sale and the terms and provisions of the Agreement as approved by the Sale Order,, the terms and provisions of the Agreement, as approved by the Sale Order, shall prevail, govern and control in all respects without limitation.

**EXECUTION VERSION**

4.      Section 10.12 of the Agreement is hereby incorporated by reference into this Bill of Sale and shall apply as if fully set forth herein *mutatis mutandis*.

5.      The Parties may execute this Bill of Sale in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. This Bill of Sale is effective upon delivery of one executed counterpart from one Party to the other Party. The signatures of all Parties, which may be signed electronically, need not appear on the same counterpart. The delivery of signed counterparts by facsimile or electronically transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.

6.      The undertakings, covenants and agreements set forth herein shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and assigns.

[Signature Page Follows]

EXECUTION VERSION

**IN WITNESS WHEREOF**, the Parties have executed this Bill of Sale as of the date first above written.

**SELLER:**

**INTERGALACTIC THERAPEUTICS, INC.**

By:

Name:

Title:

**PURCHASER:**

~~**IGTX ACQUISITION, INC.**~~

**ALDEVRON, LLC**

By:

Name:

Title:

44

**EXECUTION VERSION**

### EXHIBIT B

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This **ASSIGNMENT AND ASSUMPTION AGREEMENT**, dated as of [ ], 2024 (the "Agreement"), among Intergalactic Therapeutics, Inc., as assignor (the "Assignor") and IGTX Acquisition Inc., a Delaware corporation, in its capacity as assignee (the "Purchaser"), of the Assumed Liabilities. Assignor and Assignee are each a "Party" hereto and are collectively referred to herein as the "Parties". Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Purchase Agreement (as defined below).

WHEREAS, the Assignor and Purchaser are parties to the Asset Purchase Agreement, dated as of January 3, 2024 (the "Purchase Agreement"), pursuant to which the Assignor has agreed to sell, assign, transfer, convey and deliver to the Purchaser all of the Assignor's right, title and interest in and to the Purchased Assets and assign to the Purchaser the Assumed Liabilities and the Purchaser has agreed to purchase, acquire and accept all of the Assignor's right, title and interest in the Purchased Assets and assume the Assumed Liabilities from and after the Closing Date; and WHEREAS, this Agreement is being provided to evidence the Assignor's assignment to the Purchaser, and the Purchaser's assumption, of the Assumed Liabilities, pursuant to the terms and conditions of the Purchase Agreement and the Sale Order from and after the Closing Date.

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.      Assignment and Assumption of Liabilities. The Assignor hereby assigns, transfers and sets over unto the Purchaser all of the Assumed Liabilities and the Purchaser hereby assumes the Assumed Liabilities pursuant to the terms and conditions of the Purchase Agreement and Sale Order, including, without limitation, liability for the due performance of all the terms, covenants and conditions of the Assignor pursuant to, arising under or related to the Assumed Liabilities from and after the Closing, including, without limitation, payment of the Cure Amount (as defined in the Purchase Agreement and as approved by the Sale Order). Notwithstanding anything herein to the contrary, this Agreement shall not be deemed to be an assignment by the Assignor to the Purchaser or an assumption by the Purchaser of any of the Excluded Liabilities or Excluded Assets.

2.      Purchase Agreement. This Agreement shall be subject to the terms and conditions set forth in the Purchase Agreement and the Sale Order. The Assignor and the Purchaser hereby acknowledge and agree that the provisions of this Agreement shall not modify or limit the full force and effect of the terms and provisions of the Purchase Agreement or the Sale Order and that in the event of a conflict between the terms and provisions of this Agreement and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement, as approved by the Sale Order, shall prevail, govern and control in all respects.

3.      Headings. The section headings used herein are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**EXECUTION VERSION**

4.     ~~Governing Law; Jurisdiction; Waiver of Jury Trial. Section 10.12 of the Purchase Agreement is hereby incorporated by reference into this Agreement and shall apply as if fully set forth herein *mutatis mutandis*.~~

5.     ~~Severability; Conflicts. In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by applicable Law.~~

6.     ~~Successors and Assigns. This Agreement shall bind the Parties, their legal representatives, and their permitted successors and assigns.~~

7.     ~~Entire Agreement. This Agreement and the Purchase Agreement constitute the entire agreement between the Parties. No amendment or modification of this Agreement shall be binding or valid unless set forth in writing and executed by the Parties~~

8.     ~~Counterparts. The Parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. This Agreement is effective upon delivery of one executed counterpart from one Party to the other Party. The signatures of all Parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.~~

[~~Signature Page Follows~~<u>Intentionally Omitted</u>]

**EXECUTION VERSION**

~~**IN WITNESS WHEREOF**, the Parties have caused this agreement to be executed on the date first above written.~~

~~**SELLER:**~~

~~**INTERGALACTIC THERAPEUTICS, INC.**~~

~~By:~~

~~Name:~~

~~Title:~~

~~**PURCHASER:**~~

~~**IGTX ACQUISITION, INC.**~~

~~By:~~

~~Name:~~

~~Title:~~

## EXHIBIT C

FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

**THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT** (this "Assignment"), effective as of [•] (the "Effective Date"), is by and between ~~IGTX Acquisition, Inc., a Delaware corporation~~Aldevron, LLC, a North Dakota limited liability company ("Assignee"), and Intergalactic Therapeutics, Inc., a Delaware corporation ("Assignor").

### W I T N E S S E T H :

WHEREAS, pursuant to the terms and subject to the conditions of the Asset Purchase Agreement, dated ~~January 3~~March 1, 2024 (the "Asset Purchase Agreement"), between Assignee and Assignor, Assignor has agreed to sell to Assignee, and Assignee has agreed to purchase from Assignor, among other things, the Purchased Assets; and WHEREAS, pursuant to the Asset Purchase Agreement, Assignor desires to sell, assign, convey, deliver and transfer the entire right, title and interest in, to and under all of the Intellectual Property included in the Purchased Assets, including the Intellectual Property as set forth on Exhibit A hereto (the "Assigned IP"), to Assignee and Assignee desires to acquire the entire right, title and interest in, to and under such Assigned IP.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as more fully set forth in the Asset Purchase Agreement and subject to the terms and conditions therein as approved by e Sale Order, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

2.      Assignor hereby irrevocably sells, assigns, conveys, delivers and transfers to Assignee the entire right, title and interest in, to and under (i) the Assigned IP, together with all goodwill associated therewith, in each case to be held and enjoyed by Assignee for its own use and enjoyment as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment and sale had not been made, including the right to claim priority under the International Convention for the Protection of Industrial Property and under any other international arrangement to which the United States of America is or hereafter becomes a signatory (but not, for the avoidance of doubt, any Excluded Liability), (ii) all rights to sue, claim and recover for past, present and future infringement, misappropriation, dilution or other violation of any Assigned IP, and (iii) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing.

3.      Concurrent with the execution of this Assignment, Assignor shall transfer any and all domain names and social media accounts included in the Assigned IP from Assignor's account to Assignee's account (such that Assignee will be listed as the registrant and/or owner of such domain names and social media accounts in the applicable registrar) and shall deliver to Assignee all necessary Auth-Info codes and all other required passwords necessary to unlock and control such domain names and social media accounts.

**EXECUTION VERSION**

4.      Upon the reasonable request by Assignee, Assignor shall execute all documents and take all actions as may be necessary or desirable to enable Assignee to prosecute, perfect, enforce, defend, register and/or record its right, title and interest in, to and under the Assigned IP, in each case, without further compensation but at the expense of Assignee. In the event that Assignor fails to execute any such document or take any such action as set forth in the preceding sentence, Assignor hereby designates Assignee as Assignor's agent, and hereby grants to Assignee a power of attorney with full power of substitution, which power of attorney shall be deemed coupled with an interest, for the purpose of executing such documents or taking such actions.

5.      Assignor hereby authorizes and requests the officials of the United States Copyright Office and the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign jurisdiction, to record and register Assignee as assignee and owner of the entire right, title and interest in, to and under the Assigned IP.

6.      Section 10.12 of the Purchase Agreement is hereby incorporated by reference into this Agreement and shall apply as if fully set forth herein *mutatis mutandis.*

7.      This Assignment is binding upon, and inures to the benefit of, the parties hereto and their respective legal representatives, successors and assigns. No waiver, modification or change of any provision of this Assignment shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

8.      This Assignment may be executed in counterparts in electronic form or by hand, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**[SIGNATURE PAGE FOLLOWS]**

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNOR:**

**INTERGALACTIC THERAPEUTICS, INC.** By:

Name:

Title:

STATE OF              )

                      ) ss

COUNTY OF             )

On the ____ day of ____, before me personally came _____ , who is personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and did depose and say to me that he or she executed the same in his or her capacity as of _____, the entity described in and which executed the foregoing instrument, and that he or she executed and delivered said instrument pursuant to authority given by the board of directors of such entity (or other applicable authority of such entity).

Notary Public

(PLACE STAMP AND SEAL ABOVE)

**EXECUTION VERSION**

*[Signature Page to Intellectual Property Assignment Agreement]*

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNEE:**

**~~ACQUISITION NEWCO~~ALDEVRON, LLC**

By:

Name:

Title:

STATE OF                    )

                    ) ss

COUNTY OF                    )

On the ____ day of ____, before me personally came _____ , who is personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and did depose and say to me that he or she executed the same in his or her capacity as of _____, the entity described in and which executed the foregoing instrument, and that he or she executed and delivered said instrument pursuant to authority given by the board of directors of such entity (or other applicable authority of such entity).

Notary Public

(PLACE STAMP AND SEAL ABOVE)

*[Signature Page to Intellectual Property Assignment Agreement]*

## SCHEDULES

Schedule 2.1(a) - Purchased Inventory
Schedule 2.1(b) - Personal Property
Schedule 2.1(d) - Acquired Intellectual Property
Schedule 2.1(f) - Governmental Authorizations
Schedule 2.2(k) - Specifically Excluded Assets
Schedule 2.3(f) - Other Assumed Liabilities
Schedule 5.12(a)(ii) - ~~Contract & Cure Schedule~~[Intentionally Omitted]

## SELLER DISCLOSURE SCHEDULES

Schedule 3.6 – ~~Contracts~~ [Intentionally Omitted]
Schedule 3.9(a) - Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements
Schedule 3.9(b) - Intellectual Property Claims Brought Against the Seller
Schedule 5.2 - Operation of the Business

**<u>Schedule 2.1(a) - Purchased Inventory</u>**

| Item | Description |
|---|---|
| 55082(ABCA4)-RCB | Research cell bank fro ABCA4C3DNA-IG002 |
| 1696-S1037-Altabio electrocompetent cells | These are the cells that are used to convert PreC3to bpC3DNA, they consist of 1696BxB1( integrase) and rep origin (1037), 1696consisting cells (BxB1exists as a BAC-bacterially artificial chromosome and not integrated) |
| S1037-Altabio electrocompetent cells | The cells with rep origin (stellar cells+ 1037), Parent cells |
| 55082-C3DNA | Purified C3DNA |
| 99070-C3DNA | Purified C3DNA |
| 1696-plasmid | This is BxB1encoding plasmid, 2vials, in a ziploc |
| Pre-55024 | This is PreC3plasmid for 55082-ABCA4C3DNA (IG002), in a ziploc |
| 55100+ (labelled as) in white Box PreC3constructs-glycerol stocks | These are confirmed glycerol stocks of PreC3construct |
| 99100+ (labelled as) in Green Box Converted C3constructs-glycerol stocks | These are confirmed glycerol stocks of converted C3DNA from PreC3 |

### Schedule 2.1(b) - Personal Property

1. Research materials including the Research Cell Bank for ABCA4 C3DNA, Purified C3DNA, preC3 Plasmid, glycerol stocks of PreC3 Constructs, and glycerol stocks of converted C3DNA from PreC3, as well as NHP retina samples obtained from Intergalactic's 3239-071 study

2. Lab Consumables.

**Schedule 2.1(d) - Acquired Intellectual Property**

**Patents:**

| Family No.<br><br>MLB Reference | Family Title | Title / Family Description | Country | Application No.<br>(Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| 1<br><br>5002<br>(IGT-002) | Synthetic C3DNA 1 | SYNTHETIC DNA VECTORS AND METHODS OF USE<br><br>Directed to synthetic closed covalent circular DNA (C3DNA), methods of producing synthetic C3DNA, and methods of using C3DNA for treatment of diseases. Includes disclosures directed to C3DNA encoding ABCA4 and other ocular genes for treatment of retinal dystrophies, such as Stargardt disease. | U.S. Provisional | 62/643,336<br>(3/15/2018) | | Expired provisional |
| | | | U.S. Provisional | 62/749,369<br>(10/23/2018) | | Expired provisional |
| | | | PCT | PCT/US19/22511<br>(3/15/2019) | | Published / closed |
| | | | U.S. | 16/980,914<br>(9/15/2020) | | Pending<br><br>(Response to Non-Final Office Action due Feb 6 2024, extendable to May 6 2024) |
| | | | Australia | 2019233901<br>(3/15/2019) | | Pending<br><br>(Annuity Mar 15 2024) |
| | | | Canada | 3092088 (3/15/2019) | | Pending<br><br>(Request Examination and Annuity Mar 15 2024) |
| | | | China | 201980019118.X<br>(3/15/2019) | | Abandoned |

| Family No.<br><br>MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| | | | China (Div) | 202311181118.4 (3/15/2019) | | Pending<br><br>(POA required and Response to Notice of Rectification due Feb 16 2024) |
| | | | Europe | 19766752.0 (3/15/2019) | | Pending<br><br>(Annuity Mar 15 2024) |
| | | | Hong Kong (from EP) | 62021033338.6 (6/18/2021) | | Pending<br><br>(Annuity Mar 15 2027) |
| | | | Israel | 276923 (3/15/2019) | | Pending |
| | | | India | 202017037925 (3/15/2019) | | Pending |
| | | | Japan | 2020545324 (3/15/2019) | | To be abandoned in favor of a divisional application (OA response Jan 4 2024) |
| | | | Japan (Div) | TBD | | To be filed by Jan 4 2024 |
| | | | Korea | 1020207028218<br><br>(3/15/2019) | | Pending |
| | | | Mexico | MX/a/2020/00579 (3/15/2019) | | Pending |

| Family No.<br><br>MLB Reference | Family Title | Title / Family Description | Country | Application No.<br>(Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| 2<br><br>5003<br>(IGT-003) | Synthetic C³DNA 2 | SYNTHETIC DNA VECTORS AND METHODS OF USE<br><br>Includes and expands the subject matter of Family 1 (synthetic C3DNA) to include other disease indications, such as oncology. Claims broadly issued in US for synthetic C3DNA lacking an origin of replication, drug resistance gene, and recombination site. | U.S. Provisional | 62/902,084<br><br>(9/18/2019) | | Expired provisional |
| | | | PCT | PCT/US20/51507<br>(9/18/2020) | | Published / closed |
| | | | Taiwan | 109132490<br>(9/18/2020) | | Pending |
| | | | U.S. | 17/365,805<br>(7/1/2021) | | Abandoned |
| | | | U.S. | 17/365,808<br>(7/1/2021) | 11,324,839 | Granted |
| | | | U.S. | 17/365,846<br>(7/1/2021) | 11,766,490 | Granted |
| | | | U.S. | 17/675,899<br>(2/18/2022) | 11,602,569 | Granted |
| | | | U.S. | 18/057,032<br>(11/18/2022) | 11,684,680 | Granted |
| | | | U.S. | 18/308,457<br>(4/27/2023) | | Pending |
| | | | Europe | 20866548.9<br>(9/18/2020) | | Pending<br><br>(Response to Search Report<br><br>Mar 29 2024) |

| Family No.<br><br>MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| | | | | | | (Annuity Sep 18 2024) |
| | | | United Kingdom | 2204355.8 (9/18/2020) | | Pending<br><br>(Order for acceptance Mar 18 2024) |
| | | | Australia | 2020351204 (9/18/2020) | | Pending<br><br>(Annuity Sep 18 2024) |
| | | | Canada | 3151464 (9/18/2020) | | Pending<br><br>(Request Examination and Annuity Sep 18 2024) |
| | | | China | 202080080113.0 (9/18/2020) | | Pending |
| | | | Israel | 291437 (9/18/2020) | | Pending |
| | | | India | 202217022159 (9/18/2020) | | Pending |
| | | | Japan | 2022-517337 (9/18/2020) | | Pending |
| | | | Korea | 10-2022-7012373 (9/18/2020) | | Pending |
| | | | Mexico | MX/a/2022/003291 (9/18/2020) | | Pending |

| Family No.<br><br>MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| 3<br><br>5004<br>(IGT-004) | Cell-free production of C³DNA | SYNTHETIC PRODUCTION OF CIRCULAR DNA VECTORS<br><br>Directed to methods of producing synthetic C3DNA in a cell-free system using restriction endonuclease digestion. | U.S. Provisional | 63/248,801 (9/27/2021) | | Expired provisional |
| | | | PCT | PCT/US22/77108 (9/27/22) | | Published<br><br>(30M Nat'l entry Mar 27 2024) |
| 4<br><br>5005<br>(IGT-005) | Bacterially produced C³DNA | BACTERIALLY PRODUCED C3DNA<br><br>Directed to methods of producing C3DNA in bacterial cells, engineered cells for producing C3DNA, and bacterially produced C3DNA compositions. | U.S. Provisional | 63/291,871 (12/23/21) | | Expired provisional |
| | | | PCT | PCT/US22/82078 (12/23/21) | | Published<br><br>(30M Nat'l entry Jun 23 2024) |
| 5<br><br>5013<br>(IGT-013) | Peptides for gene delivery | POLYPEPTIDES AND METHODS OF USE<br><br>Directed to peptides and nanoparticles that can improve cellular uptake of non-viral vectors, such as C3DNA. | Provisional / U.S. | 63/331,452 (4/15/2022) | | Expired provisional |
| | | | PCT/ International | PCT/US2023/065763 (4/14/2023) | | Published<br><br>(30M Nat'l entry Oct 15 2024) |
| 6<br><br>5010<br>(IGT-010) | Ocular electrotransfer | OCULAR DELIVERY OF THERAPEUTIC AGENTS<br><br>Directed to methods of delivering non-viral vectors to the eye using electrotransfer. Specific embodiments include delivery of C3DNA encoding genes such as ABCA4 to the retina for treatment of retinal dystrophies, such as | U.S. Provisional | 63/163,350 (3/19/2021) | | Expired provisional |

| Family No.<br><br>MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| | | Stargardt disease. Also included are electrodes desired for ocular electro transfer. | U.S. Provisional | 63/167,296 (3/29/21) | | Expired provisional |
| | | | U.S. Provisional | 63/167,463 (3/29/21) | | Expired provisional |
| | | | U.S. Provisional | 63/167,437 (3/29/2021) | | Expired provisional |
| | | | U.S. Provisional | 63/293,297 (12/23/21) | | Expired provisional |
| | | | U.S. Provisional | 63/316,699 (3/4/22) | | Expired provisional |
| | | | PCT | PCT/US22/21209 (3/21/2022) | | Published / closed |
| | | | U.S. | 17/721,063 (4/14/2022) | | Abandoned |
| | | | U.S. | 18/156,891 (1/19/23) | | To be abandoned |
| | | | U.S. | 18/491,140 (10/20/2023) | | Pending<br><br>(Response to Notice Jan 2 2024, extendable) |
| | | | Australia | 2022238492 (3/21/2022) | | Pending<br><br>(Annuity Mar 21 2026) |
| | | | Canada | 3,212,469 (3/21/2022) | | Pending<br><br>(Annuity Mar 21 2024) |

| Family No.  MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| | | | China | 202280035586.8 (3/21/2022) | | Pending  (Request Examination and Voluntary Claim Amendments Mar 19 2024) |
| | | | Europe | 22772345.9 (3/21/2022) | | Pending  (Annuity Mar 21 2024) (Voluntary claim amendments May 10 2024) |
| | | | Israel | 306009  (3/21/2022) | | Pending |
| | | | India | 202317071092 (3/21/2022) | | Pending  (POA needed Jan 18 2024) |
| | | | Japan | 2023-557754 (3/21/2022) | | Pending  (Request Examination Mar 21 2025) |
| | | | Korea | 10-2023-7035697 (3/21/2022) | | Pending  (POA needed Dec 26 2023, extendable) |
| | | | Mexico | MX/a/2023/010899 (3/21/2022) | | Pending (Translation due Jan 28 2024) |

| Family No. MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| 7 5012 (IGT-012) | Front-of-the-eye electrotransfer | GENE THERAPIES FOR THE FRONT OF THE EYE<br><br>Directed to methods of delivering non-viral vectors to the front of the eye using electrotransfer. Specific embodiments include delivery of C3DNA to the front of the eye for treatment of Fuchs' dystrophy. | U.S. Provisional | 63/444,740 (2/10/2023) | | Provisional Pending (Nonprov due Feb 10 2024) |
| 8 5006 (IGT-006) | Ocular DNA constructs | OCULAR DNA CONSTRUCTS<br><br>Directed to vector compositions containing regulatory sequences that improve expression in retinal cells. | U.S. Provisional | 63/359,125 (7/7/2022) | | Expired provisional |
| | | | U.S. Provisional | 63/408,353 (9/20/22) | | Expired provisional |
| | | | PCT | PCT/US23/69748 (7/7/2023) | | PCT Pending (30M Nat'l entry Jan 7 2025) |
| | | | U.S. Provisional (BEST1) | 63/408,356 (9/20/2022) | | Expired provisional |
| | | | PCT (BEST1) | PCT/US23/74441 (9/18/2023) | | PCT Pending (30M Nat'l entry Mar 20 2025) |
| 9 5007 (IGT-007) | Respiratory C3DNA and electrotransfer | RESPIRATORY DELIVERY OF THERAPEUTIC AGENTS<br><br>Directed to methods of delivering non-viral vectors to airway tissue cells using electrotransfer. | U.S. Provisional | 63/256,416 (10/15/2021) | | Expired provisional |
| | | | U.S. Provisional | 63/388,794 (7/13/2022) | | Expired provisional |
| | | | PCT | PCT/US22/78165 (10/14/2022) | | Published<br><br>(30M Nat'l entry Apr 15 |

| Family No.<br><br>MLB Reference | Family Title | Title / Family Description | Country | Application No. (Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| | | | | | | 2024) |
| 10<br><br>5011<br>(IGT-011) | Devices for respiratory electrotransfer | DEVICES AND METHODS FOR HOLLOW TISSUE ELECTROTRANSFER<br><br>Directed to electrode devices for electrotransfer of non-viral vectors to hollow tissues, such as airway. | U.S. Provisional | 63/293,365 (12/23/2021) | | Expired provisional |
| | | | PCT | PCT/US22/82365 (12/23/2022) | | Published<br><br>(30M Nat'l entry Jun 23 2024) |
| 11<br><br>5008<br>(IGT-008) | Respiratory DNA constructs | RESPIRATORY DNA CONSTRUCTS<br><br>Directed to vector compositions containing regulatory sequences that improve expression in airway cells. | U.S. Provisional | 63/388,880 (7/13/2022) | | Expired provisional |
| | | | PCT | PCT/US23/70108 (7/13/2023) | | PCT pending (30M Nat'l entry Jan 13 2025) |
| 12<br><br>5009<br>(IGT-009) | Oncology vectors and electrotransfer | NUCLEIC ACID VECTORS AND METHODS OF USE<br><br>Directed to vector compositions encoding anticancer agents. | U.S. Provisional | 63/152,575 (2/23/2021) | | Expired provisional |
| | | | U.S. Provisional | 63/152,540 (2/23/2021) | | Expired provisional |
| | | | PCT | PCT/US22/17575 (2/23/2022) | | Published / closed |
| | | | China | 2022800303312 (2/23/2022) | | Pending<br><br>(Request Substantive Examination Feb 23 2024) |
| | | | Europe | 22760356.0 (2/23/2022) | | Pending<br><br>(Voluntary claim |

| Family No.<br><br>MLB Reference | Family Title | Title / Family Description | Country | Application No.<br>(Filing Date) | Patent No. | Status (Action) |
|---|---|---|---|---|---|---|
| | | | | | | amendments Apr 4 2024)<br><br>(HK extension via EP Jul 3 2024) |
| | | | Japan | 2023-551099<br>(2/23/2022) | | Pending<br><br>(Request Examination Feb 23 2025) |
| | | | U.S. | 18/278,235<br>(8/22/2023) | | Pending |
| 13<br><br>5014<br>(IGT-014) | bacC3DNA<br><br>Family 2 provisional | GENE THERAPY VECTORS AND METHODS OF PRODUCTION AND USE THEREOF<br><br>Developments for bacterially-produced C$^3$DNA including minimal origin of replication and methods for production including using transposase. | U.S. provisional | 63/509,458<br>(6/21/2023) | | Pending<br><br>(PCT/US nonprov conversion June 21 2024) |

**Copyrights:** None

**Trademarks**: None

**Other Intellectual Property**:

1.      Domain Names:

      a.      ig-tx.com

      b.      igtx.bio

      c.      ig-tx.us

      d.      intergalactic-tx.com

      e.      intergalactic-therapeutics.com

      f.      pulsar-biotx.com

      g.      intergalactictx.com

## **Schedule 2.1(f) - Governmental Authorizations**

1. Any and all approvals required by the Bankruptcy Court related to the Petition and as otherwise specified in the Sale Order.

## <u>Schedule 2.2(k) - Specifically Excluded Assets</u>

None.

## Schedule 2.3(f) - Other Assumed Liabilities

~~To be supplied by Purchaser to Seller ten (10) days prior to the Sale Hearing, including trade payables to the extent set forth in the APA that are not assumed pursuant to Section 2.3(e) or paid as a Cure Amount.~~

None.

**Schedule 5.12(a)(ii) - ~~Contract & Cure Schedule~~[Intentionally Omitted]:**

~~From the date of the Agreement until the date that is ten (10) days prior to the Sale Hearing, the Purchaser, in its sole and absolute discretion, may amend this Contract & Cure Schedule to add or remove any Executory Contract, other than the Galvanize Agreement, in accordance with the conditions concerning notice and service to contract counterparties set forth in the Bidding Procedures and Bidding Procedures Order.~~

| ~~CONTRACT~~ | ~~CURE AMOUNT~~ |
|---|---|
| ~~Galvanize Therapeutics, Inc. - Collaboration and License Agreement dated 9/23/21~~ | ~~$1,422,458~~ |

**SELLER DISCLOSURE SCHEDULES**

### Schedule 3.6 - ~~Contracts~~[Intentionally Omitted]

~~(i) None.~~

~~(ii)~~

~~1.  Software license with Global Life Sciences Solutions for June 30, 2023 to June 29, 2024 (the "Global Life Agreement").~~
~~2.  The aggregate amount of those software licenses referenced in Schedule 3.9(a) exceed $25,000.~~
~~3.  Lease of real property with Prime Property Fund, LLC dba PPF OFF 150 Cambridge Park Drive LLC.~~
~~4.  Agreement with ABD Insurance & Financial Services, Inc.~~
~~5.  Any and all employee benefit plans contracts and agreements along with insurance policies of the company, including without limitation:~~
   ~~a.  Blue Cross Blue Shield;~~
   ~~b.  EyeMed;~~
   ~~c.  SunLife;~~
   ~~d.  ADP.~~
~~6.  Agreement with Jin H Huh;~~
~~7.  Agreement with Jose Lora;~~
~~8.  Agreement with Robert Farra;~~
~~9.  Agreement with Theresa Heah;~~
~~10. Agreement with Vincent Hennemand.~~

~~(iv) That certain Collaboration and License Agreement by and between Intergalactic Therapeutics, Inc. and Galvanize Therapeutics, Inc. dated September 23, 2021 (the "Galvanize Agreement").~~

~~(v) None.~~

~~(vi) None.~~

~~(vii) None.~~

**<u>Schedule 3.9(a) - Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements</u>**

See Schedule 2.1(d) for a complete list of Company Owned Intellectual Property.

Company Used Intellectual Property and IP Agreements:
1. Global Life Agreement;
2. Software license with Comsol;
3. Software license with Greenhouse;
4. Software license with Cloud Topco;
5. Software license with Egnyte;
6. Software license with LinkSquares;
7. Software license with Linkedin Corporation;
8. Software license with Carta.

## Schedule 3.9(b) - Intellectual Property Claims Brought Against the Seller

Aldevron communicated with the Seller about a potential intellectual property claim related to the below referenced patent application. The Seller responded to Aldevron in writing that the claim had not merit and no formal proceeding has been instituted.

Intergalactic patent application PCT/US2022/077108 (WO 2023/049937) entitled SYNTHETIC PRODUCTION OF CIRCULAR DNA VECTORS.

**<u>Schedule 5.2 - Operation of the Business</u>**

None.

**<u>Exhibit B</u>**

DocuSign Envelope ID: 50697620-3E95-4477-A2B0-C8C9AE76B634

March 1, 2024

Aldevron, LLC
4055 41st Avenue South
Fargo, North Dakota 58104

Re:    **Danaher Corporation's Financial Support Regarding Aldevron LLC's
        Acquisition of Certain Assets of Intergalactic Therapeutics, Inc. f/k/a IGTX, LLC**

To Whom It May Concern:

Danaher Corporation ("Danaher") understands that Aldevron LLC ("Aldevron"),
Danaher's wholly-owned subsidiary, has made a counteroffer for certain assets of Intergalactic
Therapeutics, Inc. f/k/a IGTX, LLC with a purchase price of $1,450,000.00, to be paid in full at
closing from cash on hand.

With respect to Aldevron's contemplated transaction, Danaher makes the following
statements in support thereof:

- Danaher is a publicly-traded company, and its financial information is publicly
  available at https://investors.danaher.com/sec-filings.

- As indicated by that public information, Danaher has sufficient cash on hand to
  pay in full the Purchase Price indicated in the Asset Purchase Agreement dated
  March 1, 2024, and delivered by Aldevron to Intergalactic Therapeutics as part of
  Aldevron's bid to purchase assets of Intergalactic Therapeutics, and Danaher
  commits to provide Aldevron with such cash on or before the Closing described
  in such Asset Purchase Agreement, subject only to the terms and conditions
  specified in such Asset Purchase Agreement.

- Danaher consents to Aldevron's inclusion of this letter in its bid documents, and
  Intergalactic Therapeutics may rely on this letter for the sole purposes of
  evaluating and qualifying Aldevron's bid.

Regards,

DocuSigned by:

*Matt McGrew*

8F87E9BE0BB5433...
Matt McGrew
Executive Vice President and Chief Financial Officer
Danaher Corporation
2200 Pennsylvania Avenue, NW Suite 800W
Washington, DC 20037