**THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125 OF THE BANKRUPTCY CODE. THIS FORM OF DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT, BUT HAS NOT BEEN APPROVED**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>**INTERGALACTIC THERAPEUTICS, INC. f/k/a IGTX, LLC**<br><br>Debtor. | **Chapter 11**<br><br>**Case No. 23-41067-EDK** |

**[Proposed]**
**DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF LIQUIDATION OF INTERGALACTIC THERAPEUTICS, INC. f/k/a IGTX, LLC,**

MURPHY & KING, P.C.
28 State Street, Suite 3101
Boston, MA 02109
Harold B. Murphy, Esq.
Andrew G. Lizotte, Esq.
Leah A. O'Farrell, Esq.

Email: alizotte@murphyking.com
Telephone: (617) 423-0400

Dated: April 11, 2024

## I.      INTRODUCTION

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Intergalactic Therapeutics, Inc. ("Intergalactic" or the "Debtor") provides this disclosure statement (the "Disclosure Statement") to all of the Debtor's known creditors and parties in interest.  The purpose of this Disclosure Statement is to provide the information deemed necessary for creditors to make an informed decision in exercising their rights to vote on the *Plan of Liquidation of Intergalactic Therapeutics, Inc.* (the "Plan"') dated as of this Disclosure Statement.  The Debtor has filed the Plan simultaneously with the filing of this Disclosure Statement.  The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.

The information contained in this Disclosure Statement has been provided by the Debtor based upon the knowledge of the Debtor's records, business and affairs.  Except as otherwise expressly indicated, such information has not been subject to audit or independent review.  Although great effort has been made to be accurate, neither the Debtor not its respective professional advisors warrant the accuracy of the information contained in this Disclosure Statement.

No representations concerning the Debtor, including the value of its Assets[1] or the aggregate dollar amount of Claims which may be allowed, are authorized other than as set forth in this Disclosure Statement.  Any representations, warranties, or agreements made to secure acceptance or rejection of the Plan that differ from those contained in this Disclosure Statement should not be relied upon in voting on the Plan.

Any description of legal principles contained in this Disclosure Statement do not constitute a legal opinion and may not be relied upon by any creditor or part in interest.  Each creditor or party in interest should consult with its own legal advisors with respect to any legal principles described in this Disclosure Statement.

This Disclosure Statement has been prepared by the Debtor to provide creditors with adequate information so that they can make an informed judgment about the Plan. Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtor's business or Assets other than the information contained in this Disclosure Statement.

The Debtor believes that the Plan provides the quickest recovery to creditors and will maximize the return to such parties.  **ACCORDINGLY, THE DEBTOR URGES ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN.**

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

## II.    SUMMARY OF THE PLAN

The Plan is a liquidating plan that utilizes the proceeds of the Sale (as defined below) to fund payments to the holders of Allowed Claims in the order of priority established under the Bankruptcy Code.  The primary source of funds to implement the wind down of the Estate and to make distributions to creditors will be $3,625,000 of Cash realized from the sale of substantially all of the Debtor's assets to Aldevron, LLC, excluding additional consideration from the Sale that was used to satisfy the postpetition debtor-in-possession loan facility.  A full description of the Sale is set forth in Section 5.4 of this Disclosure Statement.  A summary of the Plan, the estimated claims against the Debtor and the Debtor's Assets is set forth below.

The Plan proposes that Craig R. Jalbert be appointed as the sole officer and director of the Reorganized Debtor and serve as the Liquidating Supervisor to supervise the process of liquidating the Debtor's Assets, determining claims, effecting distributions, and otherwise administering the Plan.  Mr. Jalbert is an experienced restructuring professional who has served in a similar capacity in numerous bankruptcy cases and out-of-court liquidations.

After payment and reserve for payment of Administrative Expense Claims, Secured Claims, Priority and Priority Tax Claims and Plan Administration Expenses, the Debtor currently projects that holders of Allowed General Unsecured Claims shall receive a distribution of approximately fifteen percent (15%) of their Allowed Claims.  The Debtor has not completed its review of the Claims to determine whether the Claims, or any portion thereof, should be disallowed.  The actual dividend may vary based on the final review and allowance of the Claims.

The Debtor filed this Bankruptcy Case with the goal of maximizing the value of its assets and expediting the distribution of the proceeds of those Assets to creditors.  As a result of the competitive auction, the Debtor has generated proceeds sufficient to pay the DIP loan in full, approximately $660,600, and approximately $3,625,000 in Cash.  The Debtor believes that the Plan will provide an equal or greater to recovery to creditors, on a more expedited time frame, than if the Bankruptcy Case were converted to one under Chapter 7.

This Disclosure Statement has been prepared by the Debtor to provide creditors with adequate information so that they can make an informed judgment about the Plan.  Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.  No solicitation of votes on the Plan may be made except pursuant to this Disclosure statement, and no Person has been authorized to utilize any information concerning the Debtor's business or Assets other than the information contained herein for purposes of solicitation.

## III.    INFORMATION ABOUT THE REORGANIZATION PROCESS

### 3.1    Purpose of Disclosure Statement

This Disclosure Statement includes background information about the Debtor and also identifies the Classes into which creditors and equity holders have been placed by the Plan.  In addition, this Disclosure Statement contains information concerning the treatment of creditors

3

and equity holders in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon approval by the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code, this Disclosure Statement and any exhibits will have been found to contain adequate information of a kind and in sufficient detail that would enable a reasonable hypothetical investor typical of a holder of Impaired Claims to make an informed judgment about the Plan. Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

### 3.2   Voting Procedures

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot accompanying this Disclosure Statement to be returned to the following address:

Andrew G. Lizotte, Esq.

Murphy & King, Professional Corporation

28 State Street, Suite 3101

Boston, Massachusetts 02109

Ballots must be completed in accordance with the instructions set forth therein and must be received at the address above **on or before 4:30 P.M. (Eastern Time) on _____, 2024** to be counted in the voting. Ballots received after this time will not be counted in the voting unless the Bankruptcy Court so orders.

The Debtor recommends a vote for "<u>ACCEPTANCE</u>" of the Plan.

### 3.3   Ballots

Accompanying this Disclosure Statement is a ballot for acceptance or rejection of the Plan (a "<u>Ballot</u>"). Each party in interest entitled to vote on the Plan will receive a Ballot. Classes 1 and 3 are Impaired and may vote on the Plan. Each member of a voting Class will be asked to vote for acceptance or rejection of the Plan. A party who holds claims in more than one Class should complete a Ballot for each Class with respect to the applicable portion of its claim included in each Class.

### 3.4   The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence on **_____, 2024, at ____ Eastern**, or as soon thereafter as the parties can be heard. The Confirmation Hearing will be held before the United States Bankruptcy Court, Honorable Elizabeth D. Katz, Donohue Federal Building, 595 Main Street, Courtroom 3, Worcester, MA 01608-2076. At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interests of holders of Claims and Equity Interests. The Bankruptcy Court will also

receive and consider a Report of Plan Voting prepared by the Debtor and its agents and summarizing the votes for acceptance or rejection of the Plan by the parties entitled to vote.

### 3.5 Acceptances Necessary to Confirm Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether each Impaired Class has accepted the Plan.  Under Section 1126 of the Bankruptcy Code, an Impaired Class of Claims is deemed to have accepted the Plan if at least two-thirds (2/3) in amount and more than half (1/2) in number of the Claims of Class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.  Unless there is acceptance of the Plan by all members of an Impaired Class, the Bankruptcy Court must also determine that Class members will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Class members would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

### 3.6 Confirmation of the Plan without the Necessary Acceptances.

The Plan may be confirmed notwithstanding that one or more Impaired Classes have not accepted the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly against and is fair and equitable as to such Class or Classes.  This provision is set forth in Section 1129(b) of the Bankruptcy Code and requires that, among other things, the class of Claims or Equity Interests must either receive the full value of their Claims or Equity Interests or, if they receive less, no Class with junior distribution priority may receive or retain anything on account of such junior interest unless the junior class provides "new value" or other consideration to the Debtor.  The Debtor intends to proceed toward confirmation provided that at least one Impaired Class has voted to accept the Plan.  The Debtor reserves the right to seek to confirm the Plan under Section 1129(b) of the Bankruptcy Code.

## IV.   GENERAL INFORMATION

### 4.1 Description of the Debtor

The Debtor commenced this Chapter 11 case by filing a voluntary Chapter 11 petition on December 19, 2023 (the "Petition Date").  The Debtor continues to operate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is an early stage, life sciences company that was initially established in March 2020 as IGTX, LLC, a Delaware limited liability company and, immediately thereafter, was converted to a Delaware corporation under the name Intergalactic Therapeutics, Inc.  The Debtor developed a technology platform to enable the broad application of non-viral gene therapies by combining synthetic biology and precision engineering to develop tunable, persistent, and safe non-viral DNA *in vivo*.   The Debtor's main focus was an inherited retinal disease.  As of the Petition Date, the Debtor had not started human trials and its product was not commercialized.  The Debtor's operations were largely funded from investments made by its majority shareholder, ATP Life Sciences ("ATP"), in the approximate amount of $96,000,000. The Debtor had no operating revenue.

In 2020, the Debtor incurred a net loss of $10,789,000 and used cash in operations of $10,031,000.  In 2021, the Debtor incurred a net loss of $28,941,000 and used cash in operations of $24,869,000.  In 2022, the Debtor incurred a net loss of $51,830,000 and used cash in operations of $39,535,000. In the six-month period January 1, 2023 through June 30, 2023, the Debtor incurred a net loss of $12,969,000 and used cash in operations of $14,482,000.  As of the Petition Date, the Debtor's cash position had declined to approximately $200,000.

### 4.2    The Debtor's Liabilities

As of the Petition Date, the Debtor had no known secured creditors.  Prior to the Petition Date, the Debtor leased office equipment and lab equipment from CSC Leasing Co. ("CSC") pursuant to a Master Lease Agreement dated August 2021. Pursuant to that agreement, CSC holds a security deposit from the Debtor in the amount of $54,261.00 (the "CSC Deposit").  CSC has filed a proof of claim in the total amount of $2,044,849.72, which includes a Secured Claim in the amount of the CSC Deposit.  The Debtor does not believe there are any other secured claims.

The total amount of Priority Claims asserted against the Debtor is $32,636.94, of which $2,895.69 are Priority Tax Claims.  Upon initial review, the Debtor believes that a portion of these claims may not be entitled to priority status.

Prior to the Petition Date, the Debtor leased office space at 150 Cambridgepark Drive, Suite 800 in Cambridge, Massachusetts ("Premises") pursuant to a lease (the "Real Property Lease") between the Debtor and PPF OFF 150 Cambridge Park Drive, LLC (the "Landlord").  The Real Property Lease was terminated on October 2, 2023, and the Debtor vacated the Premises prior to the Petition Date.  The Landlord has filed a proof of claim in the amount of $5,235,356.81.

According to the filed proofs of claim and the Debtor's Schedules of Assets and Liabilities filed by the Debtor on December 26, 2023 [ECF No. 11], and amended on January 9, 2024 [ECF No. 38] the General Unsecured Claims total approximately $19,000,000.  The Allowed amount of General Unsecured Claims will not be determined until the claims resolution process has been completed.[2]

## V.    SIGNIFICANT POST PETITION EVENTS

### 5.1    General Information

On December 19, 2023, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts. The Debtor continues to operate as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

---

[2] The Debtor has not completed its review and analysis of proofs of claim filed in this case, and therefore reserves all of its right to object to Claims asserted therein.

### 5.2    Debtor-in-Possession Financing

On the Petition Date, the Debtor filed an *Emergency Motion for Approval of Debtor-in-Possession Financing* (the "DIP Motion") [ECF No. 3] seeking authority to borrow up to $750,000 (the "DIP Loan") from IGTX Acquisition, LLC ("IGTX"), an ATP affiliate. IGTX agreed to provide the postpetition financing in connection with the proposed sale of the Intellectual Property to IGTX. The amount borrowed was intended to satisfy administrative costs over a three (3) month period while the Debtor undertook a sale process. The DIP Motion was granted by order dated January 10, 2024 [ECF No. 46].

### 5.3    Retention of Debtor's Professionals

Shortly after filing its Chapter 11 petition, the Debtor filed applications to retain the following Professionals:

(a)    Murphy& King, as its general bankruptcy counsel [ECF No. 16], which was granted by order dated January 17, 2024 [ECF No. 56];

(b)    Verdolino & Lowey, P.C., as financial advisor [ECF No. 18], which was granted by order dated January 17, 2024 [ECF No. 57];

(c)    Morgan, Lewis & Bockius, LLP, as special intellectual property counsel [ECF No. 22], which was granted by order dated January 22, 2204 [ECF No. 63];

(d)    Cassel, Salpter & Co., LLC, as investment banker [ECF No. 26], which was granted by order dated February 21, 2024 [ECF No. 73].

The Debtor also filed a motion to establish procedures for interim compensation of professionals [ECF No. 58], which was granted by order dated February 21, 2024 [ECF No. 77].

### 5.4    The Sale

On January 4, 2024, the Debtor entered into an Asset Purchase Agreement (the "APA") with IGTX. The APA provided that substantially all of the Debtor's assets (the "Purchased Assets") would be sold to IGTX for the sum of: (i) $500,000; (ii) the outstanding balance of the DIP Loan at the time of closing; and (iii) the payment of cure costs associated with the assumption and assignment of designated executory contracts and unexpired leases. IGTX designated the Collaboration Agreement with Galvanize as the sole contract to be assumed and assigned, which had an estimated cure amount of $1,400,000. The Debtor ascribed a value of $1,365,000 to the IGTX bid, consisting of $500,000 in Cash, the estimated DIP Loan balance at closing of $725,000, a credit for the break-up fee in the event of higher offers of $100,000, and $40,000 as the value to the estate of the payment of cure costs to Galvanize.

In connection with the proposed sale to IGTX, the Debtor filed its *Motion by Debtor and Debtor-in-Possession to Sell Substantially all Assets by Private Sale Free and Clear of Liens, Claims, Interests, and Encumbrances* (the "Sale Motion") [ECF No. 24] and its *Expedited Motion by Debtor-in-Possession for Approval of Bid Procedures in Connection with Debtor's*

*Motion to Sell Free and Clear of Liens, Claims, Interests and Encumbrances* (the "Bidding Procedures Motion") [ECF No. 25].

After a hearing held on January 11, 2024, the Court granted the Bidding Procedures Motion by order dated January 12, 2024 (the "Bid Procedures Order") [ECF No. 12]. In accordance with the Bid Procedures Order, the Court approved the proposed bid procedures, established the bidding deadline as March 1, 2024 (the "Bidding Deadline"), set the objection deadline as March 5, 2024, and scheduled a hearing to consider approval of the Sale Motion on March 8, 2024 (the "Sale Hearing").

On or before the Bidding Deadline, Aldevron, LLC ("Aldevron") filed a qualifying bid [ECF No. 91] in the amount of $1,375,000 (consisting of Cash of $650,000 and satisfaction of the DIP Loan estimated to be $725,000) and executed an asset purchase agreement (the "Sale Agreement") substantially similar to the APA. At the Sale Hearing, the Debtor conducted an open auction (the "Auction"). Aldevron submitted the highest and best bid at the Sale Hearing, in the amount of $4,350,000, which consisted of cash and satisfaction of the outstanding balance of the DIP Loan.

On March 21, 2024, and in accordance with the Court's March 11, 2024 Order (the "Sale Order") authorizing the Debtor to sell the Purchased Assets, as defined in the Sale Agreement, the Debtor and Aldevron closed the Sale. After satisfaction of the outstanding balance of the DIP Loan, in the amount of $660,597.63, and payment of the Break-Up Fee to IGTX in the amount of $78,440.01, the Estate received $3,546,559.99 in cash.

### 5.5   Bar Date

Upon motion by the Debtor filed on January 17, 2024 [ECF No. 59], the Court established March 18, 2024, as the deadline for creditors to file prepetition claims in this case [ECF No. 61].

## VI.   DESCRIPTION OF THE PLAN

The following is a summary of the significant provisions of the Plan and is qualified in its entirety by the provisions of the Plan, a copy of which accompanies this Disclosure Statement. In the event and to the extent that the description of the Plan contained in this Disclosure Statement is inconsistent with any provisions of the Plan, the provisions of the Plan shall control and take precedence. All creditors are urged to carefully read the Plan.

### 6.1   Unclassified Claims

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims against the Debgtor are not classified for the purposes of voting on, or receiving distributions under, the Plan. All such Claims are instead treated separately in accordance with the terms set forth in Article II of the Plan.

### A.      Administrative Expense Claims

(a)      <u>General</u>.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date, (b) the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or (c) the date on which an Allowed Administrative Expense Claim becomes payable under any agreement or applicable law relating thereto, each holder of such Allowed Administrative Expense Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, such Allowed Administrative Expense Claim, Cash equal to the unpaid portion of such Allowed Administrative Expense Claim. Notwithstanding the foregoing, (y) any Allowed Administrative Expense Claim based on a liability incurred by the Debtor in the ordinary course of business during the Bankruptcy Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Expense Claim may be paid when payable under applicable law or on such other terms as may be agreed to between the holder of such Claim and the Reorganized Debtor.

(b)      <u>U.S. Trustee's Fees</u>.  The outstanding fees due to the United States Trustee pursuant to 11 U.S.C. § 1930 shall be paid in full on or before the Effective Date.

(c)      <u>Professional Compensation and Expense Reimbursement Claims</u>.

> Within thirty (30) days after the Effective Date, each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.

> Any Allowed Professional Fee Claim shall receive: (i) payment within seven (7) business days upon entry of a Final Order approving such Claim, or (ii) payment as agreed between the holder of the Allowed Administrative Expense Claim and the Reorganized Debtor.

> All fees and expenses of Professionals retained by the Liquidating Supervisor for services rendered after the Effective Date shall be paid by the Reorganized Debtor upon the receipt of reasonably detailed invoices in such amounts and on such terms as such Professional and the Reorganized Debtor agree.  No further order or authorization from the Bankruptcy Court shall be necessary to permit the payment of the fees and expenses of Professionals for services rendered after the Effective Date.

The following Professionals have been retained in the Bankruptcy Case.  Assuming an Effective Date under the Plan of June 30, 2024, the estimated Administrative Expense Claims for services rendered and reimbursable expenses incurred during the Bankruptcy Case are as follows: [AMOUNTS TO BE PROVIDED INCIDENT TO HEARING TO APPROVE DISCLOSURE STATEMENT]:

| Professional | Administrative Expense Claim (Estimate) |
|---|---|
| Murphy & King, P.C. (counsel for the Debtor) | |
| Morgan Lewis & Bockius, LLP (special IP counsel for the Debtor) | |
| Verdolino & Lowey, P.C. (financial advisor to the Debtor) | |
| Cassel Salpeter (investment banker to the Debtor | |

The foregoing amounts do not include reduction for interim compensation received during the pendency of the Bankruptcy Case.  Through _____, 2024, Professionals have received interim compensation as follows: (i) Murphy & King, P.C. $_____; (ii) Morgan Lewis & Bockius, LLP $_____; (iii) Verdolino & Lowey, P.C. $_____; and (iv) Cassel Salpeter $_____.

Apart from the fees due to the United States Trustee and the Professional Fee Claims, any entity holding a Claim that arose on or after the Petition Date but prior to the Effective Date (whether or not such Claim is entitled to priority as an Administrative Expense Claim) and who has not received payment for such Claim from the Debtor, must, to preserve such Claim and the holder's entitlement to receive a payment on account of such Claim, file a request for payment of such Claim with the Bankruptcy Court by _____, 2024.

### B.    Priority Tax Claims.

There are three timely filed Priority Tax Claims filed totaling $25,189.57.  The Debtor has not completed its review of the Claims to determine whether the Claims, or any portion thereof, should be disallowed.  Under the Plan, Allowed Priority Tax Claims are treated as follows:

On or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, such Allowed Priority Tax Claim, (i) payment in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, or (ii) payment as agreed between the holder of the Allowed Priority Tax Claim and the Reorganized Debtor.

### 6.2.    Classified Claims.

A claim is "secured" when a creditor holds a lien on particular assets to assure payment of the claim. CSC holds a Secured Claim against the Debtor in the amount of its security deposit, $54,261.00 plus accrued interest ("Security Deposit"), to secure amounts due in connection with the Debtor's personal property lease with CSC.  The Plan allows CSC's secured claim and authorizes CSC to apply the Security Deposit against its Allowed Secured Claim.  The Debtor is not aware of any other Secured Claims.

### A.    Class 1 - CSC Secured Claim

(a)    <u>Classification</u>.  Class 1 consists of the Secured Claim of CSC, which is allowed in the amount of $54,261.00 plus any accrued interest on the Security Deposit.

(b)    <u>Impairment and Voting</u>.  Class 1 is unimpaired under the Plan and is entitled to vote to accept or reject the Plan.

(c)    <u>Claim Treatment</u>.  CSC shall be authorized to apply its Security Deposit in full satisfaction of its Allowed Secured Claim in the amount of $54,261.00 plus any accrued interest on the Security Deposit.

### B.    Class 2 – Miscellaneous Secured Claims

(a)    <u>Classification</u>.  Class 2 consists of the Allowed Miscellaneous Secured Claims. The Debtor is not presently aware of any such Claims.

(b)    <u>Impairment and Voting</u>.  Class 2 may be impaired under the Plan.  Each holder of a Miscellaneous Secured Claim shall be entitled to vote to accept or reject the Plan.

(c)    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, discharge and release of their respective Allowed Miscellaneous Secured Claim, each holder of an Allowed Miscellaneous Secured Claim shall receive, as soon as practicable after the later of the Effective Date or entry of an order of the Bankruptcy Court allowing such Claim, either (i) payment of the Net Proceeds of the Collateral securing its Allowed Secured Claim up to the amount of such Claim, (ii) return of the Collateral securing its Allowed Secured Claim, (iii) treatment as agreed between the Reorganized Debtor and the holder of the Allowed Miscellaneous Secured Claim, or (iv) treatment as determined by the Bankruptcy Court.

(d)    <u>Liens</u>.  The Liens held by the holder of an Allowed Miscellaneous Secured Claim shall be treated as follows:

(i)    <u>Retention of Liens</u>.  Any Liens held by the holder of an Allowed Miscellaneous Secured Claim shall be retained by the holder of an Allowed Miscellaneous Secured Claim to secure the payment of the Allowed Miscellaneous Secured Claim pursuant to the Plan.

(ii)    <u>Discharge of Liens</u>.  Upon payment of an Allowed Miscellaneous Secured Claim pursuant to the Plan: (i) all Liens securing the Allowed Miscellaneous Secured Claim shall be deemed canceled, discharged, and released, and (ii) the holder of the Allowed Miscellaneous Secured Claim shall deliver to the Reorganized Debtor, within five (5) Business Days of the payment in full of the Allowed Miscellaneous Secured Claim, all UCC terminations, mortgage

discharges and any other documents necessary to effect the discharge and release of such Liens.

**C.  Class 3 - Priority Claims**

Class 3 consists of Allowed Priority Claims, or those Claims entitled to priority under the Bankruptcy Code other than Priority Tax Claims and Administrative Expense Claims. The Priority Claims asserted against the Debtor total approximately $29,741.25.  The Debtor has not completed its review of the Claims to determine whether the Claims, or any portion thereof, should be disallowed.  To the extent such Claims are Allowed as Priority Claims, they will be classified and treated as follows under the Plan:

(a)    Classification.  Class 3 consists of Allowed Priority Claims.

(b)    Impairment and Voting.  The Priority Claims are Unimpaired under the Plan and shall be deemed to have accepted the Plan.

(c)    Claim Treatment.  In full and complete satisfaction, settlement, and release of the Allowed Priority Claims, the holders of Allowed Class 3 Claims shall be paid in full in Cash as soon as practicable after the later of the Effective Date or entry of an order of the Bankruptcy Court allowing such Claim.

**D.  Class 4 – General Unsecured Claims**

Class 4 consists of Allowed General Unsecured Claims.  There are approximately eighty (80) General Unsecured Claims totaling approximately $19,000,000, including proofs of claim filed and Claims scheduled by the Debtor as liquidated, undisputed and noncontingent as to which no proof of claim was filed.  The Debtor has not completed its review of the Claims to determine whether the Claims, or any portion thereof, should be disallowed.  Class 4 Claims shall be classified and treated as follows:

(a)    Classification.  Class 4 consists of Allowed General Unsecured Claims.

(b)    Impairment and Voting.  The General Unsecured Claims are Impaired under the Plan.  Each holder of a General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

(c)    Claim Treatment. In full and complete satisfaction, settlement, and release of the Allowed General Unsecured Claims, each holder of an Allowed General Unsecured Claim be paid in Cash as soon as practicable after the later of the Effective Date or entry of an order of the Bankruptcy Court allowing such Claim a *Pro Rata* share of the proceeds of Assets after payment or reserve for payment of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Claims in Classes 1, 2, 3, and Plan Administration Expenses.

**E.  Class 5 – Equity Interest.**

Class 5 consists of the ownership interest in the Debtor.  The Plan provides that Class 5

Equity Interests will be paid a *Pro Rata* share of the proceeds of the Assets, if and to the extent proceeds of the Assets remain after payment in full of Allowed Class 4 Claims.  It is highly unlikely there will be a distribution to holders of Class 5 Equity Interests. Class 5 Equity Interests shall be classified and treated as follows:

(a)    <u>Classification.</u>  Class 5 consists of all Equity Interests in the Debtor.

(b)    <u>Impairment and Voting</u>.  Class 5 is Impaired under the Plan.  Each holder of an Equity Interest shall be entitled to vote to accept or reject the Plan.

(c)    <u>Treatment</u>. The holders of Class 5 Equity Interests shall retain their shares in the Debtor and shall be entitled to receive a *Pro Rata* share of the proceeds of Assets after payment in full or reserve for payment in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Claims in Classes 1, 2, 3, 4, and Plan Administration Expenses.

Except the right to receive the foregoing distribution, if any, the holders of Class 5 Equity Holders shall retain no other rights in or against the Reorganized Debtor including, without limitation, the right to vote their shares or take any action to interfere or otherwise affect the Reorganized Debtor's and Liquidating Supervisor's rights and responsibilities under the Plan.

## VII.    MEANS FOR IMPLEMENTATION OF THE PLAN

### 7.1    Plan Implementation.

(a) <u>Effectuation of Plan</u>.  Confirmation of the Plan shall constitute authorization for the Debtor to effectuate the Plan and to enter into all documents, instruments, and agreements reasonably necessary to effectuate the terms of the Plan.  The Debtor shall remain in existence as the Reorganized Debtor until dissolved pursuant to the Plan.

(b) <u>Appointment of Liquidating Supervisor, Administration of Reorganized Debtor.</u>  As of the Effective Date, Craig Jalbert shall be appointed the Liquidating Supervisor.  The Liquidating Supervisor's rights and powers shall include, subject to any limitations set forth in the Plan, the right and power on behalf of the Reorganized Debtor to:

i.    Sell at public or private sale, lease, exchange, transfer, convey or otherwise dispose of, on such terms and conditions, and at such time or times as the Liquidating Supervisor shall determine, any or all of the Reorganized Debtor's remaining Assets (whether tangible or intangible);

ii.    Grant options, make contracts, retain brokers, deliver deeds or other instruments of conveyance or transfer, and/or delegate to an attorney in fact the power to execute all documents necessary to accomplish a sale, lease, exchange, transfer, conveyance or other disposal of any Asset;

iii.   Obtain and maintain such space, facilities, equipment, supplies and personnel as shall be reasonably necessary for the performance of the Liquidating Supervisor's duties;

iv.   Open and close accounts on behalf of the Reorganized Debtor with any banking, financial or investment institution, make deposits and withdrawals of cash and other property into or from any such account, make or endorse checks with respect to any such account;

v.   Complete and file federal and state tax returns on behalf of the Reorganized Debtor;

vi.   Pay all reasonable and necessary costs of administration, including professional fees, associated with the administration of the Plan, the Reorganized Debtor and/or the Assets;

vii.   Subject to the limitations contained in the Plan, pay, compromise, settle, adjust, agree to, investigate, pursue, or contest any and all Claims;

viii.   Make the distributions in accordance with the terms of the Plan;

ix.   Investigate, prosecute, litigate, sell, transfer or abandon any Cause of Action, including, but not limited to, Avoidance Actions;

x.   Employ and consult with counsel, brokers, consultants, custodians, investment advisors, asset services, auditors, accountants, other agents and any other individuals and/or professionals (any of which may be the Liquidating Supervisor and his or her firm) in connection with the administration of the Plan, the Reorganized Debtor and/or the Assets;

xi.   File a suit in interpleader or in the nature of interpleader in any court of competent jurisdiction with respect to any Asset;

xii.   File any other appropriate action for relief in a court of competent jurisdiction; and

xiii.   Take such steps as provided as necessary and proper to close the Bankruptcy Case and dissolve the Reorganized Debtor.

(c) Corporate Authority. As of the Effective Date, the Liquidating Supervisor shall have the exclusive right and duty to manage the Reorganized Debtor and to exercise the powers of the Debtor's board of directors and officers subject, however, to any limitations of liability set forth in the Plan. As of the Effective Date, the Liquidating Supervisor is empowered and authorized to exercise such powers without any further corporate authority (such as approval by any shareholders) that may have been required prior to the Effective Date. As of the Effective Date, all actions of the Reorganized Debtor shall be taken by the Liquidating Supervisor, or his designee, in the name of and on behalf of the Reorganized Debtor and/or the Estate.

### 7.2    Sales of Assets.

Confirmation of the Plan and the occurrence of the Effective Date shall constitute authorization for the Reorganized Debtor, without further order of the Bankruptcy Court, to sell, lease, exchange, transfer, convey or otherwise dispose of any Assets free and clear of all liens, claims and interests.

### 7.3    Corporate Action.

All matters provided for in the Plan involving any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to be authorized, and shall be in effect, without any requirement of further action by the Debtor or the Reorganized Debtor, their agents, representatives, members, managers, officers, directors or Affiliates.

### 7.4    Organization Documents and Good Standing.

As of the Effective Date, the Debtor's Organization Documents shall be amended as necessary to effectuate the terms of the Plan and shall become the Organization Documents of the Reorganized Debtor.  To the extent that there is any inconsistency between the Plan and any of the Organization Documents, the terms of the Plan shall control.  To the extent the Debtor is not in compliance as of the Effective Date with any state or local law requirements necessary to remain as an organized legal entity in good standing and/or remain authorized as organized legal entities to conduct business in any jurisdiction, the Debtor and/or the Reorganized Debtor, as the case may be, shall be deemed to be in compliance with any such laws if they comply with such laws within six months after the Effective Date.

### 7.5    Vesting of Property and Estate Powers

Upon the Effective Date, the Assets shall vest in the Reorganized Debtor.  Except as may be expressly provided in the Plan or in a Final Order of the Bankruptcy Court, no Assets shall be deemed abandoned and no defense, set-off, counterclaim or right of recoupment of the Debtor shall be deemed waived, released or compromised.

Upon the Effective Date, the Reorganized Debtor shall be vested with the standing of and with all rights, powers and benefits afforded to a "trustee" under the Bankruptcy Code with respect to all Assets and rights belonging to the Estate, including, without limitation the standing and authority to commence, prosecute and compromise objections to Claims and Causes of Action, whether initially filed by the Debtor or as may be filed by the Reorganized Debtor.  The Reorganized Debtor shall stand in the same position as the Debtor and/or the Estate with respect to any claim the Debtor and/or the Estate may have had to an attorney-client privilege, the work product doctrine, or any other privilege against production, and the Reorganized Debtor shall succeed to all of the Debtor's and/or the Estate's rights to preserve, assert or waive any such privilege.

### 7.6    Preservation of Causes of Action

Except as provided in, and unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, the Confirmation Order, any Final Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Reorganized Debtor will exclusively retain and may enforce, and the Debtor expressly reserves and preserves for these purposes, in accordance with sections 1123(a)(5)(A) of the Bankruptcy Code, any Claims, Causes of Action and demands and rights relating thereto that the Debtor or its Estate may hold against any person or entity.  No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to it by virtue of or in connection with the confirmation, consummation of effectiveness of the Plan.  The Causes of Action that are preserved include, without limitation, the following: (a) Avoidance Actions, including, without limitation, those set forth on the Debtor's Statement of Financial Affairs that have been filed with the Bankruptcy Court; (b) rights of setoff, counterclaim and recoupment; (c) claims and defenses on contracts or for breaches of duties imposed by law; (d) the right to object to claims or interests; (e) claims and defenses pursuant to Section 362 of the Bankruptcy Code; (f) claims and defenses for fraud, negligence, conversion, mistake, duress, indemnification and usury; (g) claims and defenses for the violation of M.G.L. c. 93A; (h) claims and defenses for unjust enrichment; (i) claims for tax refunds; (j) pre-petition litigation in which the Debtor was the plaintiff; and (k) claims and defenses arising out of the Asset Purchase Agreement. The Debtor has not completed its review of potential Causes of Action but based upon its preliminary review, the Debtor does not believe there will be any significant recovery from Causes of Action. The Reorganized Debtor will conduct an investigation and pursue recovery actions appropriate.

### 7.7    Compromises

After the Effective Date and except as otherwise provided in the Plan, the Reorganized Debtor is authorized, without further Bankruptcy Court order or notice to creditors and/or parties in interest, to compromise, settle and/or otherwise dispose of any disputed Claims and/or Causes of Action.

### 7.8    Default.

No event of default under the Plan shall occur unless, in the event of a breach of the Debtor's obligations under the Plan, the holder of the Allowed Claim asserting the default shall provide written notice of such breach to the Reorganized Debtor and such breach is not cured: (i) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Reorganized Debtor's receipt of such notice; and (ii) for any other breach, within thirty (30) days of the Reorganized Debtor's receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Reorganized Debtor has commenced curing such breach and continues to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

### 7.9    Retention of Professionals

The Reorganized Debtor may retain such attorneys (including special counsel) accountants, advisors, expert witnesses, and other Professionals as it considers advisable without necessity of approval of the Court.  Persons who served as Professionals to the Debtor prior to the Effective Date may provide services to the Reorganized Debtor.  The fees and expenses of the Liquidating Supervisor and the professionals retained by the Reorganized Debtor shall be paid by the Reorganized Debtor in the ordinary course of business without the need for the approval of the Bankruptcy Court.

### 7.10    Tax Returns

In the event that any required tax returns are not filed by the Debtor prior to the Effective Date, the Reorganized Debtor shall prepare or cause to be prepared, and shall file on behalf of the Debtor and the Estate, all state and federal tax returns required to be filed under applicable law, and shall pay all taxes due in connection with such returns.  The Reorganized Debtor is hereby authorized to file such returns on behalf of the Debtor.  The Reorganized Debtor shall have all of the rights and benefits of a "trustee" under Section 505 of the Bankruptcy Code for all periods until a Final Decree is entered closing the Bankruptcy Case.  No entity shall be entitled to assert any claim for any excise or property tax accruing after the Confirmation Date.

### 7.11    Dissolution of the Debtor.

Upon the completion of the administration of all of the Debtor's Assets pursuant to the Plan, the Reorganized Debtor shall be deemed to be dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Reorganized Debtor or payments to be made in connection therewith.  The Reorganized Debtor shall not be required to file any documents, or take any other action, to withdraw their business operations from any states in which the Debtor was previously conducting business operations.

### 7.12    Resignation of Officers and Directors.

Upon the Effective Date, all of the Debtor's officers and directors shall be deemed to have resigned without the necessity of any further action or writing, and the Liquidating Supervisor shall be appointed as the sole and director to the extent required under applicable non-bankruptcy law, and shall exercise all powers of such parties to the extent necessary to effectuate the Plan.

### 7.13    Final Decree

It shall be the exclusive duty of the Reorganized Debtor to prepare and file a motion requesting that the Court enter a Final Decree in the Bankruptcy Case.

## VIII.   DISTRIBUTIONS ON CLAIMS AND EQUITY AND RESOLUTIONS OF DISPUTED CLAIMS

### 8.1    Method of Distributions Under the Plan.

(a)    <u>In General</u>. Subject to Bankruptcy Rule 9010, and except as otherwise provided in the Plan, all distributions under the Plan to be made by, or on behalf of, the Reorganized Debtor to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules unless the Reorganized Debtor have been notified in writing of a change of address as of the Distribution Record Date, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.  The Reorganized Debtor shall have no obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.

(b)    <u>Form of Distributions</u>.  Except as otherwise provided in the Plan, any payment of Cash made by, or on behalf of, the Reorganized Debtor pursuant to the Plan shall be made by check.

(c)    <u>Distributions to be on Business Days</u>.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)    <u>Fractional Dollars</u>.  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (rounding down in the case of $0.50 or less, and rounding up in the case of more than $0.50).

(e)    <u>Distributions to Holders as of the Distribution Record Date</u>.  As of the close of business on the Distribution Record Date, the claims register shall be closed.  The Reorganized Debtor shall have no obligation to recognize any transfer of any Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of record as of the close of business on the Distribution Record Date.

### 8.2    Objections to Disputed Claims.

The Reorganized Debtor may file any objections to Claims against the Debtor.

### 8.3    Deadline for Objecting to Disputed Claims.

Except as otherwise provided by order of the Bankruptcy Court and except with respect to an objection to a Claim based on Section 6.6 of the Plan, the Reorganized Debtor may file objections to Claims against the Debtor until the later of: (a) the date that such Claim becomes due and payable in accordance with its terms, or (b) 120 days after the Effective Date.

**8.4     Estimation of Claims.**

The Debtor or the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall have jurisdiction to estimate a Disputed Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim.  In the event the Bankruptcy Court estimates any Disputed Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the Bankruptcy Court determines the maximum limitation of a Disputed Claim, such determination shall not preclude the Debtor and/or the Reorganized Debtor from pursuing any supplemental proceedings to object to any payment of such Claim.  All of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not exclusive remedies.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**8.5     Disputed Claims Reserve.**

(a)     <u>Establishment</u>. A reserve shall be maintained equal to 100% of the distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims or such lesser amount as required by a Final Order.

(b)     <u>Investment of Cash</u>.  Cash in the Disputed Claims Reserve may be invested only in Cash Equivalents having maturities sufficient to enable the holder of the Dispute Claim Reserve to make all necessary payments to holders of Disputed Claims if, and when, such Disputed Claims become Allowed Claims.  Any interest, income, distributions or accretions on account of such investment in Cash Equivalents in the Disputed Claims Reserve shall be for the sole benefit and account of the Reorganized Debtor, and the Reorganized Debtor shall be solely responsible for the payment of any income or other taxes arising therefrom.

(c)     <u>Distributions Upon Allowance of Disputed Claims</u>.  The holder of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall receive distributions of Cash from the Disputed Claims Reserve as soon as practicable following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.  Such distributions shall be made in accordance with the Plan based upon the distributions that would have been made to the holder of such a Claim under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date.  No holder of a Disputed Claim shall have any claim against the respective Disputed Claims Reserve or the Reorganized Debtor with respect to such Claim until the Disputed Claim shall become an Allowed Claim.

**8.6     Reversion of Unclaimed Checks and Disputed Claims Reserve.**

The following amounts shall revert to and be vested in the Reorganized Debtor free and clear of any liens, claims, encumbrances, and interests: (a) the amount of any checks issued for distributions to the holders of Allowed Claims under the Plan that remain uncashed for a period

of 180 days after the date of such distribution; and (b) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the amount of Cash or Cash Equivalents in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash actually distributed on account of such Disputed Claim.

### 8.7    Obligation to Provide Tax Documents.

No Person entitled to a payment or distribution under the Plan, from the Estate or from the Reorganized Debtor shall receive such distribution or payment until the Person provides the Reorganized Debtor with: (a) a W-9 or similar federal or state tax form, and (b) such other tax forms as are reasonably requested by the Liquidating Supervisor (collectively the "Tax Forms"). If any Person holding an Allowed Claim fails to provide a Tax Form to the Liquidating Supervisor after two written requests for a Tax Form, such Person's Allowed Claim shall be disallowed and expunged without further order of the Bankruptcy Court.

## IX.    LIQUIDATING SUPERVISOR

### 9.1    Limitation on Liquidating Supervisor's Liabilities as to Losses.

The Liquidating Supervisor shall not be responsible, and shall have no liability whatsoever to any Person for any loss to the Reorganized Debtor resulting from the investment of the Assets, or their proceeds, in any Permitted Investments.  The Liquidating Supervisor shall not invest or reinvest any Assets other than in a Permitted Investment.  The Liquidating Supervisor shall not have any liability to any retirement, employee benefit, or pension plan of the Debtor in excess of the amounts available to be distributed from such plans.

### 9.2    Selection of Agents.

The Liquidating Supervisor may retain his or her firm or company to provide professional services in conjunction with his duties under the Plan.  The Liquidating Supervisor shall not be liable for any loss to the Reorganized Debtor or any person with an interest in the Reorganized Debtor by reason of any mistake or default of any such agent or consultant unless such mistake or default breaches the standard of care set forth in Section 7.4(a) of the Plan.  The Liquidating Supervisor may retain the services of any firm that served as counsel for an Estate representative during the Bankruptcy Case.

### 9.3    Maintenance of Register.

The Liquidating Supervisor shall at all times maintain a register of the names, addresses, and amount of the Claims and Equity Interests in the Reorganized Debtor as of the Effective Date and as revised from time to time thereafter.

**9.4    Liability of Liquidating Supervisor.**

(a)    <u>Standard of Care</u>.  The Liquidating Supervisor shall not be liable for any action taken or omitted to be taken by him in good faith and in the exercise of reasonable judgment and believed to be within the discretion or power conferred by the Plan, or be responsible for the consequences of any act or failure to act, except for bad faith, gross negligence or willful misconduct.  The Liquidating Supervisor shall not have any fiduciary relationship with any party by virtue of the Plan except as specifically set forth in this Plan:

(i)    The Liquidating Supervisor shall not, solely by virtue of his position as Liquidating Supervisor, be liable or in any way responsible for the acts or omissions of the Debtor, their boards of directors, officers, employees, or agents, that occurred prior to the Effective Date.

(ii)    Unless indemnified to his satisfaction against liability and expense, the Liquidating Supervisor shall not be compelled to do any act or to take any action toward the execution or enforcement of the powers created under the Plan or to prosecute or defend any suit in respect of the Plan.  If the Liquidating Supervisor requests approval from the Bankruptcy Court with respect to any act or action in connection with the Plan, the Liquidating Supervisor shall be entitled (but shall not be required) to refrain (without incurring any liability to any person by so refraining) from such act or action unless and until he has received such instructions or approval.  In no event shall the Liquidating Supervisor or any of his representatives be required to take any action, which he reasonably determines could lead to criminal or civil liability.

(iii)    The Liquidating Supervisor shall not be responsible in any manner to the Debtor, the Estate, any holder of a Claim or Interest, or any party-in-interest for:

(A)    the creditworthiness of any party and the risks involved to the Reorganized Debtor or such holder or party-in-interest;

(B)    the effectiveness, enforceability, genuineness, validity, or any due execution of the Plan as to any person other than the Liquidating Supervisor;

(C)    any representation, warranty, document, certificate, report, or statement made herein or furnished hereunder or in connection with the Plan that does not constitute a breach of the standard of care set forth in Section 7.4(a) of the Plan on the part of the Liquidating Supervisor;

(D)    the existence, priority or perfection of any existing Lien; or

(E)    the observation or compliance with any of the terms, covenants, or conditions of the Plan on the part of any party thereto other than the Liquidating Supervisor.

(iv)    The holders of Claims or Equity Interests and parties-in-interest, by voting for the Plan and/or accepting the benefits of the Plan, have agreed not to sue or otherwise pursue or seek damages from the Liquidating Supervisor except for actions or omissions which violate the standard of care set forth in Section 7.4(a) of the Plan.

(b)    <u>No Liability for Acts of Predecessor</u>.  No successor Liquidating Supervisor shall be in any way responsible for the acts or omissions of any preceding Liquidating Supervisor, nor shall he be obligated to inquire into the validity or propriety of any such act or omission unless such successor Liquidating Supervisor expressly assumes such responsibility.  Any successor Liquidating Supervisor shall be entitled to accept as conclusive any final accounting and statement of Assets furnished to such successor Liquidating Supervisor by any preceding Liquidating Supervisor and shall be responsible only for those Assets included in such statement.

(c)    <u>No Implied Obligations</u>.  The Liquidating Supervisor's liability shall be limited to the performance of such duties and obligations as are specifically set forth in the Plan.  The Liquidating Supervisor shall not be responsible in any manner whatsoever for the correctness of any recitals, statements, representations, or warranties in the Plan, in the Disclosure Statement or in any documents or instrument evidencing or otherwise constituting a part of the Assets.  The Liquidating Supervisor makes no representations as to the value of the Assets.

(d)    <u>Reliance by Liquidating Supervisor on Documents or Advice of Counsel or Other persons</u>.  The Liquidating Supervisor may rely conclusively and shall be protected in acting upon any order, notice, demand, certificate, opinion or advice of counsel, statement, instrument, report or other paper or document (not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information therein contained) which is believed by the Liquidating Supervisor to be genuine and to be signed or presented by the proper persons.  Subject to his obligation to meet the standard of care in Section 7.4(a), the Liquidating Supervisor shall have no liability for any act which he may do or omit to do in reliance upon the foregoing.

(e)    <u>No Personal Obligation for the Debtor's Liabilities</u>.  Holders of Claims and Equity Interests, and other persons transacting business with the Liquidating Supervisor in his capacity as Liquidating Supervisor, shall be limited to the Assets to satisfy any liability incurred by the Liquidating Supervisor to such person in carrying out the terms of the Plan, and the Liquidating Supervisor shall have no personal obligation to satisfy any such liability.

**9.5    Reports; Tax Returns.**

The Liquidating Supervisor shall prepare and submit any and all reports required under the Plan and as may be further ordered by the Bankruptcy Court.  After the Effective Date, the Liquidating Supervisor shall be responsible for the filing of any and all federal and state tax returns required by law to be filed by the Reorganized Debtor, including all final tax returns and shall pay all tax liabilities arising from such tax return.

### 9.6     Liquidating Supervisor's Compensation.

The Liquidating Supervisor shall be paid $2,500 per month, exclusive of any services rendered by the Liquidating Supervisor's firm as financial advisor to the Reorganized Debtor. The Liquidating Supervisor shall be entitled to reimbursement for all reasonable out-of-pocket expenses incurred in the performance of his duties under the Plan.  The Liquidating Supervisor shall not be entitled to a commission.

### 9.7     Liquidating Supervisor's Indemnification.

The Liquidating Supervisor shall be indemnified by, held harmless, and receive reimbursement from the Assets for any and all claims, actions, demands, losses, damages, expenses, and liabilities, including without limitation court costs, attorneys' fees and accountants' fees incurred, except in the event that a court of competent jurisdiction determines that such losses or claims were the result of a breach of the standard of care set forth in Section 7.4(a) of the Plan.

### 9.8     Removal of Liquidating Supervisor.

The Liquidating Supervisor may be removed only for cause upon a motion to the Court. If the Liquidating Supervisor is removed for cause, the Liquidating Supervisor shall not be entitled to any accrued but unpaid fees, reimbursements or other compensation.  The term "cause" shall mean: (a) the Liquidating Supervisor's gross negligence or willful failure to perform his duties under the Plan, (b) the Liquidating Supervisor's misappropriation or embezzlement of any Assets or the proceeds of the Assets, or (c) the Liquidating Supervisor's continued or repeated negligence or failure to perform his duties under the Plan.  If a Liquidating Supervisor is unwilling or unable to serve by virtue of his inability to perform his duties due to death, illness, or other physical or mental disability, subject to a final accounting, such Liquidating Supervisor shall be entitled to receive all accrued and unpaid fees, reimbursement of expenses, and other compensation incurred before his removal, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Liquidating Supervisor.

### 9.9     Resignation of Liquidating Supervisor.

A Liquidating Supervisor may resign upon motion to the Bankruptcy Court, which resignation shall become effective at the time specified by the Court.  If a Liquidating Supervisor resigns from his position hereunder, subject to a final accounting, such Liquidating Supervisor shall be entitled to receive all accrued unpaid fees, reimbursement of expenses, and other compensation incurred before his resignation, and any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties to the successor Liquidating Supervisor.

**9.10    Successor Liquidating Supervisor.**

In the event that a Liquidating Supervisor is removed, resigns, or otherwise ceases to serve as Liquidating Supervisor, Keith Lowey shall be appointed as the successor Liquidating Supervisor.  In the event that Keith Lowey is removed, resigned, or otherwise ceases to serve as Liquidating Supervisor, a successor Liquidating Supervisor may be appointed by motion of counsel to the Reorganized Debtor, subject to approval by the Bankruptcy Court.

**9.11    Liquidating Supervisor Authority.**

There is no obligation on the part of any party transacting business with the Reorganized Debtor or any agent of the Reorganized Debtor (including the Liquidating Supervisor) to: (a) inquire into the validity, expediency, or propriety of any transaction, (b) inquire into the authority of the Liquidating Supervisor, or any agent of the Liquidating Supervisor, to enter into or consummate the transaction, or (c) to monitor the application of the purchase money or other consideration paid or delivered to the Reorganized Debtor.

## X.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 10.1    Assumption/Rejection of Executory Contracts and Unexpired Leases

Pursuant to Sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies) that (a) has not expired by its own terms on or prior to the Confirmation Date, (b) has not been assumed, assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, (c) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, or (d) is not designated by the Debtor as being an executory contract or unexpired lease to be assumed at the time of confirmation of the Plan, shall be deemed rejected on the Effective Date.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute the approval of the rejection of executory contracts and unexpired leases pursuant to this section of the Plan and Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

### 10.2    Payments Related to the Assumption of Executory Contracts and Unexpired Leases

(a)    <u>Payment of Claims Arising From Assumed Contracts And Leases</u>.  Except as provided in the Asset Purchase Agreement or any other written agreement with a counter-party to an executory contract or unexpired lease, any Allowed Claims arising from the assumption of an executory contract or unexpired lease will receive, in full and complete satisfaction, settlement, release and discharge of such Claims, payment in the ordinary course of business as and when such Allowed Claims become due pursuant to such executory contract or unexpired lease.

(b)    <u>Disputed Claims and Bar Date</u>.  If there is a dispute regarding (i) the amount of any claim arising from the assumption or rejection of an executory contract or unexpired lease, (ii) the ability of the applicable Debtor or any assignee to provide "adequate assurance of further

performance," within the meaning of Section 365 of the Bankruptcy Code, under a contract or lease to be assumed, or (iii) any other matter pertaining to the assumption or assumption and assignment of any contract or lease, the payment of any Claim related to the foregoing will be made following entry of a Final Order resolving the dispute and approving the assumption.

### 10.3    Rejection Damage Claims

If the rejection of an executory contract or unexpired lease by the Debtor results in a Claim by the other party or parties to such contract or lease, any claim for damages, if not previously evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, the Reorganized Debtor and their respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Reorganized Debtor on or before thirty (30) days following the later to occur of: (a) the rejection of such executory contract or unexpired lease, and (b) the Confirmation Date.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan.  The Reorganized Debtor shall have the right to object to any such Claim for rejection damages.

## XI.    RELEASE AND SATISFACTION OF CLAIMS

### 11.1    Satisfaction of Claims.

Except as otherwise provided in the Plan or in an agreement by the Debtor that has been approved by the Bankruptcy Court, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement and release as against the Debtor and the Reorganized Debtor of any debt or obligation of the Debtor that arose before the Effective Date, and any debt of the Debtor of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims against the Debtor or the Estate of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of claim based on such debt, obligation or Equity Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim is Allowed under Section 502 of the Bankruptcy Code, or (iii) the holder of such Claim has accepted the Plan.

### 11.2    Injunction Relating to the Plan

As of the Effective Date, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor, the Estate, and/or the Reorganized Debtor, on account of, or respecting any Claims, debts, rights, obligations, Causes of Action or liabilities against the Debtor, except to the extent expressly permitted under the Plan.

### 11.3    Discharge

The Plan is a plan of the type described in Section 1141(d)(3) of the Bankruptcy Code and, accordingly, the Debtor shall not receive a discharge.

### 11.4    Cancellation of Existing Indebtedness and Liens.

Except as may otherwise be provided in the Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtor, together with any and all Liens securing same, shall be canceled and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtor thereunder shall be deemed cancelled and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtor.  To the extent deemed necessary or advisable by the Reorganized Debtor, any holder of a Claim shall promptly provide the Reorganized Debtor with an appropriate instrument of cancellation or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation or release, including the cancellation or release of any Lien securing such Claim.

### 11.5    Exculpation.

Except as otherwise set forth in the Plan, neither the Debtor, the Reorganized Debtor, the Liquidating Supervisor nor any of their respective employees, advisors, attorneys, agents, successors or assigns, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of the Bankruptcy Case, the pursuit of confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan occurring prior to the Effective Date, provided that the terms of this Section 9.5 shall not apply to any liability for willful misconduct or ultra vires acts.

### 11.6    Setoff

Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute a waiver or release by the Estate and/or the Reorganized Debtor of any right of setoff the Estate and/or the Reorganized Debtor may have against any Person.  Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that the Debtor or Reorganized Debtor, as applicable, may have against the holder of any Claim.

## XII.    TAX ISSUES

### 12.1    Tax Consequences of the Plan.

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, EACH CREDITOR AND INTEREST HOLDER**

26

**IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF TAX ISSUES HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY CREDITOR OR INTEREST HOLDER FOR THE PURPOSE OF AVOIDING ANY TAX PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS DESCRIBED HEREIN; AND (C) EACH CREDITOR AND INTEREST HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following is a general summary of certain material federal income tax consequences of the Plan and the distributions provided under the Plan. This summary does not discuss all aspects of federal taxation that may be relevant to a particular creditor in light of its individual investment circumstances or to certain creditors or shareholders subject to special treatment under the federal income tax laws (for example, tax-exempt organizations, financial institutions, broker-dealers, life insurance companies, foreign corporations or individuals who are not citizens or residents of the United States). This summary does not discuss any aspects of state, local or foreign taxation. The impact on foreign holders of Claims and Equity Interests is not discussed.

This summary is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. The Debtor has not requested a ruling from the Internal Revenue Service (the "IRS") with respect to these matters and no opinion of counsel has been sought or obtained by the Debtor with respect thereto. There can be no assurance that the IRS or any state or local taxing authorities will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained. **THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR OR INTEREST HOLDER, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.**

### A. Federal Income Tax Consequences to the Debtor.

Generally, a debtor will realize cancellation of debt ("COD") income to the extent, if at all, the debtor pays a creditor pursuant to the plan an amount of consideration in respect of a claim against the debtor that is worth less than the amount of such claim. For this purpose, the amount of consideration paid to a creditor generally will equal the amount of cash or the fair market value of property paid to such creditor. If a debtor is in a bankruptcy case at the time the COD income is realized (if any is realized), the debtor will not be required to include COD income or gross income, but rather will be required to reduce tax attributes by the amount of COD income so excluded.

**B.      Tax Consequences to Creditors.**

In General.  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether such Claim constitutes a debt or a security for federal income tax purposes, (b) whether the holder of the Claim receives consideration in more than one (1) tax year, (c) whether the holder of the Claim is a resident of the United States, (d) whether all consideration received by the holder of the Claim is deemed to be received by the holder of the Claim as part of an integrated transaction, (e) whether the holder of the Claim reports income using the accrual or cash method of accounting, (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim, and (g) whether the Claim was acquired at a discount and whether the market discount rules are applicable to the holder.

Gain or Loss on Exchange.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his or her Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income).  Any gain recognized generally will be a capital gain if the Claim was a capital asset in the hands of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

**C.      Backup Withholding.**

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may be subject to backup withholding at the rate of 31 percent with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the holder's federal income tax liability.  Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO**

**CONSULT WITH HIS OWN TAX ADVISOR REGARDING SUCH TAX CONSEQUENCES.**

## XIII.   PLAN FEASIBILITY

The Debtor expects to have more than sufficient Assets to pay Administrative Expense Claims, Secured Claims, Priority and Priority Tax Claims, and to provide a dividend to holders of Allowed General Unsecured Claims.

After the competitive auction, the Debtor generated proceeds sufficient to satisfy the DIP Loan, totaling approximately $660,600.   The DIP Loan paid for substantially all of the Administrative Expense Claims incurred in the first three months of the Bankruptcy Case.  In addition to satisfaction of the DIP Loan, the Debtor realized $3,625,000 in Cash.

As the Debtor has sufficient funding to comply with its obligations under the Plan, the Plan is feasible.

## XIV.   BEST INTERESTS OF CREDITORS

The Debtor submits that the Plan is in the best interest of creditors and should be approved because creditors will receive their distribution more quickly and will receive a greater distribution.

The Debtor believes that the distribution to creditors would be equal to or greater under the Plan than which would be received in a Chapter 7 case.  The conversion of the case to Chapter 7 and appointment of a Chapter 7 trustee, who could be an individual with no familiarity with the Bankruptcy Case, would create an added layer of administrative expense.  The Estate would bear the costs of the learning curve that would be incurred by the Chapter 7 trustee and its professionals, as well as the costs incurred by the Chapter 7 trustee in reviewing and objecting to newly filed Claims.  Because the Debtor's Professionals are well-versed with the facts of the Bankruptcy Case, their assistance in resolving Disputed Claims and pursuing recovery on unliquidated Assets is likely to yield a better result than that which would likely be achieved by a newly appointed Chapter 7 fiduciary, thereby reducing Claims and increasing available Assets for distribution.

As set forth in Section II above, the Debtor believes that the distribution to creditors will occur more quickly under the Plan because a conversion of the Bankruptcy Case to Chapter 7 would result in substantial delay.  The conversion of the Bankruptcy Case would result in the appointment of a Chapter 7 trustee who would be responsible for the administration of the case. The Bankruptcy Court would set a date for another Section 341 meeting of creditors.  The Bankruptcy Court would also establish a new bar date for filing of Claims, which would likely be 90 days after the Section 341 meeting.  The newly appointed Estate representative would need to review all Claims filed, including new Claims, which might necessitate the filing of additional objections to claims and adjudication by the Bankruptcy Court.  This process could delay the resolution of disputed Claims and distribution of funds by several months, or longer.  By contrast, the Debtor expects to achieve confirmation of its liquidating Plan in approximately three (3) months and distributions can commence as soon as reasonably practicable after the

Effective Date.  The bar date for filing Claims expired on March 18, 2024, which will allow for a more expeditious review and determination of Allowed Claims.

For the reasons set forth above, creditors will receive or retain under the Plan at least the amount or value such creditors would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code, and such distribution will likely occur on a more expedited basis. Consequently, the best interests of creditors requirement set forth in Section 1129(a)(7) of the Bankruptcy Code has been satisfied.

Based upon the prospects for a superior recovery and earlier payment to creditors, the Debtor recommends that the wind-down and liquidation of the Debtor's financial affairs be completed pursuant to the terms of the Plan.

Respectfully submitted
INTERGALACTIC
THERAPEUTICS, INC.
By its counsel,

*/s/ Andrew G. Lizotte*
Harold B. Murphy (BBO #362610)
Andrew G. Lizotte (BBO #559609)
Leah A. O'Farrell (BBO #708424)
Murphy & King, P.C.
28 State Street, Suite 3101
Boston, MA 02109
(617) 423-0400
alizotte@murphyking.com

Dated: April 11, 2024

**IN RE INTERGALACTIC THERAPUETICS, INC. f/k/a/ IGTX, LLC,**

**BANKRUPTCY CASE NO. 23-41067-EDK**

**EXHIBIT A TO**

**[PROPOSED]**

**DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF LIQUIDATION OF INTERGALACTIC THERAPEUTICS, INC. f/k/a IGTX, LLC,**

The *Plan of Liquidation of Intergalactic Therapeutics, Inc. f/k/a/ IGTX, LLC* has been filed separately.